UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 SEP 24  P 5 54

U.S. DISTRICT COURT

DIRK EPPERSON and BETTY      :
SCHNEIDER,                   :
                             :
        Plaintiffs,          :
                             :
v.                           :    No. 3:01CV1798(DJS)
                             :
IRVIN RICHTER, HILL          :
INTERNATIONAL, INC.; HILL ARTS :
& ENTERTAINMENT SYSTEMS, INC., :
n/k/a HAESI SOFTWARE, INC.;  :
                             :
        Defendants.          :

## MEMORANDUM OF DECISION

Plaintiffs Dirk Epperson ("Epperson") and Betty Schneider

("Schneider") have brought the above-captioned action against

Irvin Richter ("Richter"); Hill International, Inc. ("Hill"); and

Hill Arts & Entertainment Systems, Inc. ("Hill Arts"), n/k/a

HAESI Software, Inc. ("HAESI") seeking to disregard HAESI's

corporate form and hold Richter and Hill liable for a default

judgment entered against HAESI on April 23, 1997.  Now pending

are plaintiffs' (dkt. # 59) and defendants'[1] (dkt. # 52) cross-

motions for summary judgment.  For the reasons set forth herein,

the cross-motions for summary judgment are **DENIED**.

---

[1] Richter and Hill have filed a motion for summary judgment,
which HAESI has not joined.  For the sake of simplicity, however,
and because all three defendants have a unity of interest in the
issues raised in the pending motions regardless of whether HAESI
chooses to litigate them, the court will refer to the three
defendants as "defendants" throughout this memorandum.

## I. THE PARTIES

Before engaging in the following prolonged recital of the procedural background and facts necessary decide the pending motions, a brief summary of the parties and claims is provided. Epperson and Schneider, initially as shareholders of Performing Arts Technology, Inc. ("PAT"), entered into a contract to develop computer software for Artsoft, Inc. ("Artsoft") in 1988.   Before the contract was completed, PAT dissolved and Epperson and Schneider assumed the obligations under the contract.

Irvin Richter was, at the time of the events giving rise to this lawsuit, the Chairman and CEO of Hill International, Inc. ("Hill").   Hill is an international construction consulting and management firm located in New Jersey.   Richter owned 66.7% of Hill's stock, and Richter's sons owned the remainder of the stock in Hill.

In 1987, Richter and Hill acquired a majority interest in Artsoft, which became known as Hill Arts & Entertainment Systems, Inc. ("Hill A&E") in 1990.   Richter became the sole shareholder of Hill A&E on May 27, 1992.   Hill loaned Hill A&E about $12 million, and became a secured creditor of Hill A&E.   On May 31, 1996, Hill A&E sold substantially all its assets to Entertainment Express, Inc. ("EE").   Also, on May 31, 1996, Hill A&E changed its name to HAESI Software, Inc. ("HAESI").   Richter, individually and through another entity he owned and controlled,

-2-

held a substantial amount of EE stock during the time of the sale.  Hill, as Hill A&E's secured creditor, took possession of the proceeds of the asset sale to EE, which later became known as Advantix, Inc. and then Tickets.com.

On April 23, 1997, following HAESI's sale of assets to EE, Epperson and Schneider obtained a judgment against Hill A&E and HAESI based upon a breach of the software development contract. Epperson and Schneider have been unable to procure satisfaction of this judgment from HAESI, and now seek to pierce HAESI's corporate veil and hold Richter and Hill liable for the amount of the judgment.

## II. BACKGROUND

The above-captioned lawsuit is one of three lawsuits, two of which remain pending on the undersigned's docket (Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS) (D. Conn.) and Epperson v. Richter, 3:01CV1798(DJS) (D. Conn.)) relating to monies due pursuant to a contract entered into in 1988 between plaintiffs and Artsoft, defendant HAESI's predecessor in interest.  This court entered a default judgment against Hill A&E and HAESI in the amount of $422,446.00, plus post-judgment interest, in Dirk Epperson and Betty Schneider v. Hill Arts & Entertainment Systems, Inc., No. 3:95CV2131(DJS) (D. Conn.) on April 23, 1997.  The two active cases pending on the undersigned's docket are efforts by plaintiffs to collect this

-3-

default judgment from other persons and entities. Several motions are now pending in these two remaining cases. A summary of the litigation between these parties to date follows.

On October 4, 1995, Dirk Epperson and Betty Schneider (collectively "plaintiffs") filed a lawsuit ("the First Action") against Hill A&E seeking damages for breach of a software development contract. Plaintiffs were the sole shareholders of PAT, which was a California corporation in the business of developing and marketing ticketing software for the performing arts industry. On August 2, 1988, PAT entered into a contract with Artsoft, which was a Delaware corporation with its principal place of business in Connecticut engaged in the same business. The contract provided that PAT would develop software products for Artsoft to either use for its own purposes or sell to others. Further, Artsoft was to pay royalties, in an amount not to exceed $250,000.00, to PAT on products developed pursuant to the contract and sold during a three-year period following the date of the first delivery of the software. In 1990, Hill A&E became Artsoft's successor in interest. Plaintiffs alleged that, despite the fact that PAT had performed its obligations under the contract, and that the maximum amount of royalties of $250,000.00 was due and owing, Hill A&E had not tendered full payment. After demands for payment, the first of which was dated December 20, 1991, plaintiffs filed suit in 1995.

-4-

Shortly after plaintiffs filed the First Action, Hill A&E underwent significant changes that altered the course of this litigation.  On May 31, 1996, Hill A&E changed its name to HAESI, sold substantially all of its assets to EE, and received a convertible note from EE as payment.  According to the Secretary of HAESI at that time, David Richter, HAESI pledged the convertible note and any other remaining assets to Hill, which was a secured creditor with an interest far in excess of the value of HAESI's assets.  Following this corporate activity, HAESI's counsel withdrew from the case, and HAESI took the position that it would not hire replacement counsel, as required for a corporation by the Local Rules for the District of Connecticut.

As a result, HAESI did not meet its obligations as a corporate litigant in this court.  On February 3, 1997 plaintiffs moved for the entry of default against Hill A&E and HAESI for failure to obtain replacement counsel, failure to respond to discovery requests per order of this court, and failure to appear at a hearing on plaintiffs' application for a prejudgment remedy. The court granted this motion by endorsement on February 11, 1997.  The court also granted plaintiffs' motion for judgment on April 3, 1997, and, on April 23, 1997 entered a default judgment against Hill A&E n/k/a/ HAESI in favor of plaintiffs in the amount of $422,446.00, with post-judgment interest to accrue at

-5-

the statutory rate.

In light of HAESI's apparently compromised financial status, plaintiffs looked to alternate sources to satisfy the default judgment. On March 12, 1997, plaintiffs amended their original complaint in the First Action to add Advantix, which became the successor in interest to EE, along with Hill and Richter as defendants. Plaintiffs asserted two new causes of action: the first alleged that Hill and Richter were liable for the amount of the default judgment because they were the alter-ego of HAESI; and the second alleged that HAESI fraudulently conveyed assets to Advantix.[2] On March 23, 1998, this court dismissed plaintiffs' amended complaint against the new defendants for lack of subject matter jurisdiction. Specifically, the court concluded that both the plaintiffs and Advantix were citizens of California at the time the amended complaint was filed, and, therefore, the action lacked complete diversity of citizenship. Further, the Court concluded that the plaintiffs failed to meet their burden of establishing that Advantix should not be considered a citizen of California because it was the alter-ego of Richter.

On April 27, 1999, the plaintiff filed the action bearing the docket number 3:99CV778(DJS)("the Second Action") asserting two counts: first, alleging that, on May 31, 1996, Hill A&E

---

[2] The amended complaint re-asserted the original two counts against HAESI. The April 23, 1997 default judgment was entered upon these counts.

fraudulently conveyed its assets to EE; and, second, that Hill A&E fraudulently granted liens in its property to Richter and Hill. In the Second Action, plaintiffs seek an order voiding Hill A&E's transfer to EE, thereby allowing them to execute their judgment against HAESI f/k/a Hill A&E. Plaintiffs argued that the court had subject matter jurisdiction over this claim pursuant to the court's inherent authority to preserve the integrity of its own judgments, complete diversity notwithstanding. By decision dated March 23, 1998, the court, relying upon Peacock v. Thomas, 516 U.S. 349 (1996), held that there was no independent jurisdictional basis to hold defendants against whom judgment had not been entered liable for the default judgment against HAESI f/k/a Hill A&E, and dismissed the case. On March 7, 2001, the Court of Appeals for the Second Circuit reversed the court's dismissal and remanded the Second Action to the undersigned's docket. The Court of Appeals held that, as distinguished from alter ego cases specifically addressed in Peacock, "fraudulent conveyance actions operate as simple collection mechanisms; they do not present a substantive theory seeking to establish liability on the part of a new party not otherwise liable," and, therefore, no independent basis for subject matter jurisdiction over plaintiffs' claims against the new defendants was necessary. Epperson v. Entertainment Express, Inc., 242 F.3d 100, 108 (2d Cir. 2001).

On June 30, 1999, plaintiffs filed a lawsuit ("the Third Action") in the United States District Court for the District of New Jersey against Richter, Hill, and Hill A&E n/k/a HAESI. The complaint in the Third Action alleged that Richter and Hill were liable for the default judgment against Hill A&E and HAESI on the theory that HAESI is the alter ego of Richter, Hill, or both Richter and Hill. Because plaintiffs did not name Advantix as a defendant, diversity was complete, thus avoiding the jurisdictional questions encountered in the Second Action caused by relying upon the court's supplemental enforcement jurisdiction. Defendants moved to dismiss the Third Action or, in the alternative, to stay the Third Action pending resolution of the Second Action. Defendants argued that an important issue asserted by plaintiffs as evidence that HAESI's corporate veil should be pierced to get to Hill and Richter in the Third Action was whether the interests granted by HAESI to Advantix, Richter, and Hill were fraudulent, and that this question would have to be adjudicated in the Second Action. Because the Second Action was the first filed, defendants requested a dismissal or the entry of a stay of the Third Action.

On July 17, 2001, the Honorable Stanley S. Brotman, United States District Judge, heard argument on defendants' motion to dismiss, and suggested that transferring the Third Action to the District of Connecticut may be appropriate. The next day,

defendants consented to a transfer of the Third Action to the
District of Connecticut, which Judge Brotman ordered on September
17, 2001 pursuant to 28 U.S.C. § 1404(a).

Now that the Second and Third Actions have been pending on
the undersigned's docket, several dispositive motions have been
filed.   In the Second Action, Richter's motion to dismiss (dkt. #
35, filed on September 6, 2001), defendants' motion for summary
judgment (dkt. # 37, filed on October 5, 2001), and plaintiffs'
cross-motion for summary judgment (dkt. # 68, filed on January 7,
2002) are pending.   In the Third Action, defendants' motion for
summary judgment (dkt. # 52, filed on May 3, 2002) and
plaintiffs' cross-motion for summary judgment (dkt. # 59, filed
on May 14, 2002) are pending.

### III. PENDING MOTIONS

As previously indicated, plaintiffs' (dkt. # 59) and
defendants' (dkt. # 52) cross-motions for summary judgment   are
pending in this Third Action.

### A. FACTS

Rule 9(c) of the Local Rules of Civil Procedure for the
District of Connecticut (now Rule 56) sets forth a procedure to
aid the court in identifying factual disputes in motions for
summary judgment.   What follows are the undisputed facts set

forth in the parties' submissions,[3] as well as those facts to
which the non-moving party with respect to each motion has not
offered any evidence in opposition.[4]

    This lawsuit has its genesis in a business deal between two
competing companies in 1988. The first company was Artsoft, Inc.
("Artsoft"). Artsoft was founded by Lawrence Schwartz in 1984
and incorporated in the State of Connecticut. Artsoft maintained
its principal place of business in Guilford, Connecticut and
developed, installed, and serviced ticketing software used at
entertainment and sports venues. On August 7, 1987, Irvin
Richter (36 shares), Hill International, Inc.[5] ("Hill") (48
shares), and William J. Doyle (13 shares), who was the President
of Hill, became the owners of Artsoft. On February 27, 1990, a
Delaware corporation also named Artsoft purchased all of the
shares of the Connecticut Artsoft and became the successor in
interest to the Connecticut Artsoft. Richter (390 shares), Hill
(480 shares), and Doyle (130 shares) owned the Delaware Artsoft,

---

[3] The court does not reject any affidavits filed in support
of the pending motions, and notes the parties arguments in
support thereof in assigning weight to the statements set forth
in the challenged affidavits.

[4] The court takes judicial notice of the record in the Third
Action.

[5] In 2001, Richter owned 66.7% of Hill's shares of stock.
At all pertinent times, Richter exercised control over Hill's
affairs. (See Epperson v. Entertainment Express, Inc., No.
3:99CV778(DJS), Dkt. # 71, § A., ¶ 6).

which was incorporated on June 30, 1987.  Upon purchasing the Connecticut Artsoft, the Delaware Artsoft changed its name to Hill Arts & Entertainment Systems, Inc. ("Hill A&E").  On May 27, 1992, Richter became the sole owner of Hill A&E.[6]

The second party to the aforementioned business deal was Performing Arts Technology, Inc. ("PAT").  Plaintiffs were the sole shareholders of PAT, which was a California corporation in the business of developing and marketing ticketing software for the performing arts industry.

On August 2, 1988, PAT entered into a contract with Artsoft, which provided that PAT would develop software products that Artsoft would then either use for its own purposes or sell to others.  Specifically, under the contract, PAT would "port" specified Artsoft software to function in a new operating environment and "design and develop a new generation of software to replace or supplement some of Artsoft's Existing Software." (Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS), Dkt. # 67, Ex. B, Ex. A at 1).  With respect to the second undertaking set forth in the contract, the parties stated the following: "PAT and Artsoft will work together to design and develop this new and advanced version of Artsoft's Existing Software under the direction and control of Artsoft." (Id., Ex.

_____

[6] Richter purchased Hill's shares of Hill A&E on July 1, 1991.

-11-

B, Ex. A, ¶ 3.1 at 4). The contract provided that Artsoft would own all intellectual property rights to any new program developed pursuant to the contract, and that the development of the new program was for the sole benefit of Artsoft. Compensation to PAT for services rendered with respect to the development of new software was in the form of a monthly fee and royalties, in an amount not to exceed $250,000.00, to PAT from the sale of new software products sold during a three-year time period following the date of the first delivery of the new software. The contract provided that, in the event Artsoft defaulted on the royalty payments, Artsoft would forfeit the "right to use or market any New Program containing any PAT work product."[7] (Id., Ex. B, Ex. A, ¶ 14.6 at 14).

Artsoft and PAT also entered into additional business arrangements. Pursuant to the terms of the August 2, 1988 contract, Epperson became Artsoft's Vice President of Development by separate contract dated April 1, 1989. Epperson remained an employee of Artsoft and Hill A&E in this capacity until 1993.[8] Further, PAT and Artsoft entered into a Stock/Asset Purchase Agreement, dated August 7, 1988, whereby PAT granted Artsoft the

---

[7] Plaintiffs did not invoke this remedy when they filed suit in this court on October 4, 1995. At all relevant times in the First Action, plaintiffs sought only unpaid sums due and owing.

[8] Epperson testified that he left Hill A&E because Hill A&E was scaling back its software development, which was Epperson's primary area of expertise.

option to purchase all of PAT's stock or all of PAT's assets related to specified lines of business upon payment of the maximum royalty fee under the August 2, 1988 contract.  In April of 1990, PAT employees became Artsoft employees, and Artsoft assumed PAT's customers, support contracts, and assets.

With respect to the development of a marketable product, the business arrangement between Artsoft and PAT was successful.  The new program referred to in the August 2, 1988 contract was in fact developed and named Artsoft/SQL and Sportsoft/SQL.  Epperson claims that Artsoft and later HAESI successfully marketed this software for years, and that the rights to the software were transferred to EE on May 31, 1996.

Once the software had been developed, however, payment under the contract was not tendered when due.  Plaintiffs alleged that, despite the fact that PAT had performed its obligations under the contract, and that the maximum amount of royalties of $250,000.00 was due and owing, Hill A&E had not tendered full payment.[9] According to plaintiffs, Hill A&E had paid $76,250.00. Plaintiffs then sued Hill A&E on October 4, 1995 in this court for the unpaid balance, late fees, costs, and attorneys' fees,

---

[9] On June 19, 1989, PAT and Artsoft entered into an Amendment to Custom Software Development Agreement.  This amendment altered the fee schedule with respect to the development of the new software by eliminating the monthly fee and providing for a cash advance of $40,000.00 towards the payment of the maximum royalty fee.

-13-

and this court entered a default judgment against Hill A&E in the amount of $422,446.00 on April 23, 1997.

Even though plaintiffs had obtained a default judgment against Hill A&E and HAESI, they were unable to recover the amount of the judgment because, through a series of corporate transactions, HAESI did not have the assets to satisfy plaintiffs' judgment. Three entities owned or controlled by Richter were involved in the transactions that left HAESI f/k/a Hill A&E unable to satisfy plaintiffs' default judgment: HAESI; Hill; and Entertainment Express, Inc. ("EE").

The first entity was HAESI. As stated previously, as of May 27, 1992, Richter was the sole shareholder of Hill A&E. As of May 31, 1996, Richter was also the sole director of Hill A&E. Lawrence Schwartz was the President of Hill A&E, James Cassano was the Vice Chairman, David Richter was the Secretary, and Stanley Gloss was the Controller.

The second entity was Hill. Hill is a professional services firm in the business of providing construction consulting and construction management services to governmental entities, institutions, and the private sector. As of 2001, Richter owned 66.7% of Hill, and, at all times pertinent to this lawsuit, Richter controlled Hill. Richter was also the Chairman, CEO, and Director of Hill. James Cassano was the Senior Vice President of Hill.

-14-

The third entity was EE.  Prior to May 28, 1996, Richter owned 4.5 million shares of EE stock, and Schwartz and James Cassano each owned 1 million shares of EE stock.  As of May 28, 1996, EE repurchased all of its outstanding stock and sold 80% of its stock to R4 holdings, of which Richter owns an interest not specified in the record, and 10% each to both Cassano and Schwartz.  On May 31, 1996, EE's corporate leadership was as follows: Richter, Director; Cassano, Chairman, CEO, and Director; Lawrence Schwartz, President and Director; and David Richter, Vice President, General Counsel, and Secretary.

The first transaction affecting HAESI's ability to satisfy plaintiffs' default judgment was a loan from Richter to Hill A&E.  On November 26, 1991, Hill A&E made a Promissory Note payable to Richter with the principal amount of $1,100,000.00.  The note was payable on demand, with an interest rate at the prime rate as set by Commerce Bank, N.A. plus 1.5%.  Also on November 26, 1991, Hill A&E executed a security agreement in all Hill A&E's personal property as collateral for the promissory note.   UCC-1 financing statements with respect to Richter's security interest were filed in Connecticut on December 5, 1991, in New Jersey on December 10, 1991, and in California on October 24, 1994.  The security agreement and the UCC-1 statements cited the following property as subject to the security interest granted to Richter:

> all "Accounts," "Contracts," "Contract Rights,"
> "Chattel Paper," "Instruments," "Documents," "General

> Intangibles," "Inventory," "Equipment," and "Fixtures,"
> as each term is defined in the Uniform Commercial Code
> as enacted in the State of New Jersey, all deposits and
> bank accounts, all other personal property, tangible or
> intangible, all books and records relating to the
> foregoing, and all proceeds and products thereof and
> substitutions, additions, and accessions thereto, now
> existing or hereafter acquired, wherever located.

(Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS),

Richter Dec., Dkt. # 71, Ex. 4 at 1).  Richter states that, as of

April 30, 1996, the balance due on the note was $682,344.40.

The second transaction affecting HAESI's ability to satisfy

plaintiffs' default judgment was a loan from Hill to Hill A&E.

On April 1, 1994, Hill A&E and Hill entered into a Loan and

Security Agreement.  In this agreement, the parties stated the

following: "[Hill A&E] has borrowed from [Hill] for several years

on a line of credit.  [Hill A&E] and [Hill] wish to renew this

Line of Credit Loan in the amount of $12,000,000 for another five

year period."  (Id., Ex. 7 at 1).  The agreement further states

that

> [Hill] shall establish for [Hill A&E] a $12,000,000
> line of credit ("Line of Credit Loan") pursuant to
> which advances have been made and, in [Hill's]
> discretion, additional advances for the payment of
> obligations of [Hill A&E] may be made by [Hill] and for
> payment of interest on this Line of Credit Loan may be
> made from time to time up to a maximum aggregate
> outstanding principal balance of Twelve Million
> ($12,000,000.00) Dollars.  The Line of Credit Loan
> shall accrue at the rate of Seven (7%) per anum.

(Id., Ex. 7 at 2).  The agreement further provided that Hill

would take a security interest in "collateral," which is defined

-16-

as "all Accounts Receivable, Equipment, Inventory, Contract Rights and General Intangibles of Borrowers and Guaranty, all of the foregoing whether now owned or hereafter acquired" (id., Ex. 7 at 2), "now owned or hereafter acquired by [Hill A&E and all cash and non-cash proceeds thereof and proceeds of proceeds," (id., Ex. 7 at 3). Hill A&E made a Replacement Line of Credit Note payable to Hill on April 1, 1994. UCC-1 statements with respect to Hill's security interest were filed in Connecticut on June 7, 1994, New Jersey on June 8, 1994, and California on October 18, 1994. Both statements set forth the following property as subject to the security interest:

> All "Accounts", "Contracts", "Contract Rights",
> "Chattel Paper", "Instruments", "Documents", "General
> Intangibles", "Inventory", "Equipment", and "Fixtures"
> as each term is defined in the Uniform Commercial Code
> as enacted in the State of New Jersey, all deposits and
> bank accounts, all other personal property, tangible or
> intangible, all books and records relating to the
> foregoing and all proceeds and products thereof and
> substitutions, additions and accessions thereto, now
> existing or hereafter acquired, wherever located.

(Id., Ex. 9 & 10).

Subsequent to Hill A&E and Hill's agreement, Richter recorded a subordination of his security interest to that of Hill. On September 8, 1994, Richter filed a UCC-3 Statement of Subordination in New Jersey, which certified that he had subordinated his security interest in Hill A&E's property to Hill's security interest. Richter's October 24, 1994 UCC-1 statement, which was filed in California, also indicated that

-17-

Hill's interest was superior to Richter's. On October 31, 1994, Richter filed a UCC-3 statement of subordination in Connecticut reflecting the same.

Hill A&E accounted for the loan from Hill in two different ways on Hill A&E's balance sheets. According to defendants, Hill A&E listed funds received from Hill as loans on Hill A&E's 1989, 1990, and 1991 balance sheets. According to defendants, however,

> [i]n 1992, because Hill A&E was seeking investors, and new investors will not agree to have their investments [] subordinated to secured debt, Richter considered requesting Hill to convert its debt to preferred stock. Hill A&E's balance sheets were changed to reflect what the balance sheets would have looked like had new investors been found. No new investors were found, and Hill did not convert its debt to preferred stock. In 1995, Arthur Anderson audited Hill A&E's financial statements and required that the Hill loans be listed on Hill A&E's balance sheets as a Note. Hill A&E issued new balance sheets for 1993, 1994, and 1995 listing the Hill loans as long term debt and Notes.

(Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS), Dkt. # 71, Resp. to ¶ 110 at 22-23). During 1993 through 1995, Stanley Gloss classified the funds in question from Hill as "Debt to Parent Incurred" on Hill A&E's Cash Flow statements. (See Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS), Dkt. # 75, ¶ 11 at 3). Whatever the reason therefor, it is undisputed that Hill A&E's 1993 through 1995 balance sheets classified funds received from Hill as capitalization rather than a loan prior to being audited by Arthur Andersen in 1995.

The parties' submissions to the court in the Second and

-18-

Third Actions chronicle the troubled financial condition of Hill A&E from roughly 1990 through 1996. The record indicates that Schwartz, the founder of Artsoft and President of Hill A&E, was in frequent correspondence with Richter, the sole director and shareholder of Artsoft, regarding Hill A&E's financial condition. Specifically, the parties have submitted a substantial amount of correspondence between Schwartz, Richter, and other officers of Hill A&E and Hill detailing, among other things, Hill A&E's cash flow problems, disagreements regarding the authorization of Hill A&E's expenditures, Hill A&E's requests for additional capital, disagreements regarding Schwartz's authority to enter into contracts on behalf of Hill A&E, resolving inter-company reimbursement issues between Hill A&E and Hill, keeping Hill A&E's creditors at bay, including some instances where the particular obligation at issue was guaranteed by Hill, and layoffs caused by Hill A&E's financial condition. The record also reveals that, towards the end of this time period, Hill A&E, Hill, and Richter were exploring new options regarding the future of Hill A&E.

The third transaction affecting HAESI's ability to satisfy plaintiffs' default judgment was Hill A&E's sale of its assets to EE. On May 31, 1996, Hill A&E sold substantially all of its

-19-

assets[10] to EE, and changed its name to "HAESI". Payment was in
the form of a convertible note to HAESI from EE in the amount of
$3,000,000.00, with interest to accrue at a rate of 8% per year.
The principal was due on May 31, 2001. Interest on the
convertible note was to be paid annually on May 31 of each year,
the first payment of which was to be paid in stock, and each
payment thereafter in either stock or cash, at EE's discretion.
The convertible note gave the holder the right to convert any
amount of the principal balance thereof into EE common stock.

As HAESI's secured creditors, Hill and Richter took liens on
the convertible note as proceeds from the asset sale. As of the
date of the sale, Hill A&E owed Hill $8,402,909.18 in principal
and $3,782,000.00 in interest pursuant to the April 1, 1994 Loan
Security Agreement. Hill A&E also owed Richter $682,344.00 at
this time, which was also secured. As a condition of the asset
sale to EE, both Hill and Richter released their security
interests on the assets transferred to EE, and substituted the
convertible note, and any payments made thereunder, as collateral
for their loans to HAESI. Hill and Richter subsequently filed
UCC-1 statements in New Jersey listing the following collateral

---

[10] A fairness evaluation, dated May 31, 1996 and conducted by
Howard, Lawson & Co. at the request and for the benefit of Hill,
valued Hill A&E's assets at $2.3 million as of April 30, 1996.
(See Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS),
Sullivan Aff., Dkt. # 63, Ex. R at 1). As of April 30, 1996,
according to the fairness opinion, Hill A&E's liabilities totaled
$13.2 million. (See id.).

-20-

as subject to their respective security interests:

> Debtor's interest in the $3,000,000 Convertible
> Promissory Note ("Note") from entertainment Express,
> Inc. to Debtor dated May 31, 1996; all shares of stock
> hereafter acquired by Debtor as interest or upon
> conversion of the Note; all interest, dividends and
> distributions payable with respect to the foregoing
> (whether or not the same constitute general
> intangibles); and all proceeds of the foregoing.

(Epperson v. Entertainment Express, Inc., No. 3:99CV778(DJS),

Richter Dec., Dkt. # 41, Exs. 20 & 21).  Hill, which is located

in New Jersey, took possession of the convertible note following

the asset sale, and payments under the convertible note were made

to Hill.  Hill then foreclosed on the note on November 11, 1996.

According to defendants, the purpose of selling HAESI's

assets was to create a new entity with unencumbered assets so

that an infusion of venture capital could be obtained and EE

could enter into a ticket transaction business rather than

strictly a software development and licensing business.  In April

of 1996, EE,[11] Hill A&E, and Ventana Global, Ltd. entered into an

agreement whereby EE would acquire Hill A&E's assets, including

the software developed pursuant to the August 2, 1988 contract

between PAT and Artsoft.  Further, pursuant to this agreement,

Ventana would obtain venture capital for EE and assist in a

reorganization of EE's corporate finance structure in order to

facilitate an initial public offering.  Thus, Richter and Hill

---

[11] EE was incorporated under the laws of the State of
Delaware on January 29, 1995.

effectively converted their interest in Hill A&E from secured debt to equity in a new entity.

## B. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d

-22-

Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

### C. DISCUSSION

#### 1. CHOICE OF LAW

Prior to exploring the parties' arguments regarding the merits of their pending motions, the court must first determine the law to be applied.  Plaintiffs seek to disregard HAESI's corporate entity and hold Hill, Richter, or both Hill and Richter liable for the April 23, 1997 default judgment entered against HAESI.  HAESI is incorporated under the law of Delaware, and its principal place of business is located in Connecticut.  The parties have briefed the law of both states with respect to the issues raised in the pending motions, and, most significantly, have both stated that the court's decision with respect to the pending motions should be the same no matter which state's law is applied.  The court also finds that there is little difference in the general standards applied by courts in each state, and the parties have not argued that application of either Connecticut or Delaware law would have an impact upon the court's analysis of the issues raised in the pending motions.  Because the application of either Connecticut or Delaware law will not impact the court's decision with respect to the pending motions, the law of the forum state, which is Connecticut, applies to plaintiffs'

claims.[12]   See   Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938);

cf. Van Dusen v. Barrack, 376 U.S. 612, 639 & n.40 (1964)

(holding that when a case is transferred to a different venue

pursuant to 28 U.S.C. § 1404(a), the transferee court applies the

choice of law principles of the transferor forum if failure to do

so would "significantly affect the outcome of the case").

### 2. PIERCING THE CORPORATE VEIL

According to Connecticut law,

> Courts will disregard the fiction of separate legal
> entity when a corporation "is a mere instrumentality or
> agent of another corporation or individual owning all
> or most of its stock." Hoffman Wall Paper Co. v. City
> of Hartford, 114 Conn. 531, 535 [(1932)]. . . . .
> "Under such circumstances, the general rule which
> recognizes the individuality of corporate entities and
> the independent character of each in respect to their
> corporate transactions and the obligations incurred by
> each in the course of such transactions will be
> disregarded, where, as here, the interests of justice
> and righteous dealing so demand." Connecticut Co. v.
> New York, N.H. & H.R. Co., 94 Conn. 13, 26 [(1919)]. .
> . .

Zaist v. Olson, 154 Conn. 563, 573-74 (1967).  The Connecticut

Supreme Court has recognized two theories for disregarding the

corporate entity.  The first is the "instrumentality" theory:

> The instrumentality rule requires, in any case but an
> express agency, proof of three elements: (1) Control,
> not mere majority or complete stock  control, but

---

[12] Defendants cite authority holding that the state of
incorporation should govern the question of whether the corporate
form should be disregarded.  See, e.g., Restatement (Second) of
Conflict of Laws § 309 (1971).  Reference to this authority,
however, is necessary only when there is a conflict between the
laws of two interested states.

> complete domination, not only of finances but of policy
> and business practice in respect to the transaction
> attacked so that the corporate entity as to this
> transaction had at the time no separate mind, will or
> existence of its own; and (2) Such control must have
> been used by the defendant to commit fraud or wrong, to
> perpetrate the violation of a statutory or other
> positive legal duty, or a dishonest or unjust act in
> contravention of plaintiff's legal rights; and (3) The
> aforesaid control and breach of duty must proximately
> cause the injury or unjust loss complained of.

Zaist v. Olson, 154 Conn. 563, 575 (1967). "The instrumentality

rule imposes individual liability for corporate actions upon a

shareholder, director, or officer of a corporate entity that is,

in economic reality, the instrumentality of the individual."

Campisano v. Nardi, 212 Conn. 282, 291 (1989). Generally

speaking, liability under the instrumentality approach is imposed

where the corporate form is used to perpetrate some kind of

wrongful act for the benefit of one who controls the corporation.

See Zaist, 154 Conn. at 578 ("On the basis of the referee's

report, the court could properly conclude that Olson so

completely controlled East Haven that that corporation had 'no

separate mind, will or existence of its own'; . . . that the

control was used to perpetrate an unjust act in contravention of

the plaintiffs' rights; and that it caused the unjust loss

complained of.").

Second, "[t]he identity rule primarily applies to prevent

injustice in the situation where two corporate entities are, in

reality, controlled as one enterprise because of the existence of

-25-

common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc., 187 Conn. 544, 560 (1982). The Connecticut Supreme Court has defined the identity rule as follows:

> If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

Angelo Tomasso, Inc., 187 Conn. at 554 (quoting Zaist, 154 Conn. at 576). The identity theory has also been applied to hold an individual liable for the obligations of a corporation.[13] See Saphir v. Neustadt, 177 Conn. 191, 211 (1979); Zaist, 154 Conn. at 578; Toshiba America Medical Systems, Inc. v. Mobile Medical Systems, Inc., 53 Conn. App. 484, 492 (1999); Davenport v. Quinn, 53 Conn. App. 282, 303 (1999); see Kregos v. Latest Line, Inc., 929 F. Supp. 600, 604 (D. Conn.) ("The identity rule is usually applied in situations where two corporate entities are controlled as one enterprise because of the existence of common shareholders, directors and officers and the lack of observance of corporate formalities. . . . This rule, however, has also been

---

[13] The court finds that both Richter, as an individual, and Hill, as a corporation, could be held liable for the April 23, 1997 default judgment entered against HASEI under either Delaware or Connecticut law.

-26-

applied to find individual stockholders liable."), <u>vacated in
part</u>, 951 F. Supp. 24 (D. Conn. 1996). Generally speaking, the
identity rule imposes liability when two corporations or a
corporation and an individual should properly be considered one
in the same.  See <u>Zaist</u>, 154 Conn. at 578 ("The court could, with
equal propriety, reach the conclusion that the identity of Olson
and Olson, Inc. was such that a judgment against Olson, Inc. [and
Olson] was warranted.").

    The question before the court is whether there is any issue
of material fact regarding whether Richter and Hill dominated
HAESI and used HAESI for an improper purpose that caused injury
to plaintiffs, or whether the relationship between Richter, Hill,
and HAESI was such that they should properly be considered one
entity.  See <u>Angelo Tomasso, Inc.</u>, 187 Conn. at 561 ("The issue
of whether the corporate veil is pierced presents a question of
fact.").  Both parties argue that the opposing party cannot, as a
matter of law, present sufficient evidence to sustain a finding
in their favor on either theory.

    Defendants argue that the court may not, as a matter of law,
apply the instrumentality theory and hold Richter or Hill liable
for HAESI's obligation because defendants' conduct does not
amount to fraud or illegality.  The Connecticut Supreme Court has
stated the following regarding this issue:

    The second element of the instrumentality test
    addresses the kind of misconduct that will impose

-27-

> personal liability on an individual who has exercised
> complete domination over a corporation in total
> disregard of its existence as a separate entity.  We
> have found such misconduct, even absent fraud or
> illegality, when the individual in control has used a
> corporate instrumentality to avoid personal liability
> that he had previously assumed.

Campisano v. Nardi, 212 Conn. 282, 292 (1989).  "The

instrumentality rule merely requires the trial court to find that

the defendants committed an unjust act in contravention of the

plaintiff's legal rights."  Toshiba America Medical Systems, Inc.

v. Mobile Medical Systems, Inc., 53 Conn. App. 484, 491 (1999).

Assuming, for the moment, that plaintiffs can prove that

Richter and Hill dominated HAESI, defendants maintain that there

is no wrongful act for which HAESI was used as an instrument to

perpetrate, thereby precluding application of the instrumentality

rule.  Defendants characterize the alleged wrongful act as

HAESI's breach of the August 2, 1988 software development

contract, and then argue that the breach of a contract between

two business entities cannot be considered a wrongful act for the

purpose of applying the instrumentality rule to pierce the

corporate veil.   In Campisano v. Nardi, 212 Conn. 282 (1989),

the Connecticut Supreme Court stated the principle relied upon by

defendants as follows:

> In the absence of a claim that the corporation was
> formed for an improper purpose, or that the plaintiffs
> were improperly induced to enter into a contract with
> the corporation, the mere breach of a corporate
> contract cannot of itself establish the basis for
> application of the instrumentality rule.

-28-

Id. at 294 (footnote omitted).  Defendants argue that, because
plaintiffs cannot prove that HAESI was incorporated for the
purpose of entering into a contract with plaintiffs, with the
intention of breaching this contract, or that HAESI induced
plaintiffs to enter into the contract with the intention of
breaching it, HAESI's breach of the software development contract
cannot be the basis for applying the instrumentality rule.

    Plaintiffs have offered sufficient evidence for trier of
fact to find that defendants' alleged conduct is sufficiently
wrongful to potentially justify disregarding the corporate form.
Defendants' description of HAESI's obligation to plaintiffs is
narrowly drawn; the evidence in the record could support a more
broad characterization of HAESI's obligation.  Here, the evidence
could support the conclusion that HAESI's failure to pay the
balance owed on the August 2, 1988 contract culminated in the
entry of the April 23, 1997 default judgment.  Thus, the
obligation could be characterized as the failure to satisfy a
judgment in addition to the failure to pay the balance of a sum
due under a contract.  As opposed to the mere breach of a
contract, the use of the corporate form to avoid paying an
obligation incurred by contract that is reduced to a judgment
could be sufficient to satisfy the instrumentality rule.  See
Davenport v. Quinn, 53 Conn. App. 282, 301 (1999) (considering
the diversion of assets from corporate entity in order to avoid

-29-

payment of judgment in favor of plaintiff a wrongful act with
respect to the transaction in satisfaction of the instrumentality
test); Toshiba America Medical Systems, Inc., 53 Conn. App. at
491-92 (rejecting argument that the evidence demonstrated no
wrongful act as required by the instrumentality rule because the
evidence supported the conclusion that defendant diverted funds
from the corporation to avoid paying the balance due under
contracts with the plaintiff); cf. Campisano v. Nardi, 212 Conn.
282, 293 (1989) ("Implicit in the plaintiffs' claim of error is
the proposition that the instrumentality rule is triggered
whenever individual control of a corporation is coupled with a
breach of contract by the corporation. We know of no authority
for so far-reaching a proposition.  The plaintiffs do not claim
that the defendant used his control over the corporation in order
to commit or to avoid liability for any personal wrongful act.");
Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 269 (D.
Del. 1989) ("The law requires that fraud or injustice be found in
the defendants' use of the corporate form.").

        Also, defendants argue that plaintiffs have not demonstrated
a sufficient nexus between Hill's and Richter's alleged control
and the transactions involving plaintiffs themselves.  Defendants
cite Angelo Tommasso, Inc. v. Armor Construction & Paving, Inc.,
187 Conn. 544 (1982) in support of this argument.  In Angelo
Tommasso, Inc., the plaintiffs sued the defendant corporation,

and its two officers as individual guarantors, on a sum due on a line of credit. See id. at 547. The individuals then filed a third-party claim against Pierre Lemieux seeking to hold him liable for the defendant corporation's debt. See id. The Connecticut Supreme Court applied the instrumentality theory and held that, although the third-party plaintiffs provided evidence that Lemieux dominated the defendant corporation's affairs, the third-party plaintiffs did not demonstrate a nexus between Lemieux's control and the execution of the personal guarantees. See id. at 558-59. The Court further stated that "[t]he fact that the corporate veil could be disregarded for some purposes does not mean that it must be disregarded for all purposes." Id. at 559; cf. 1 Fletcher Cyc. Corp. § 43 at 711-15 (Perm. Ed. 1999) ("There is a presumption of separateness the plaintiff must overcome to establish liability by showing that the parent is employing the subsidiary to perpetrate a fraud and that this was the proximate cause of the plaintiff's injury. Merely showing control, in the absence of an intent to defraud or escape liability is insufficient to overcome that presumption. Although wrongdoing by the parent need not amount to plain fraud or illegality, the injured party must show some connection between its injury and the parent's improper manner of doing business-without that connection, even when the parent exercises domination and control over the subsidiary, corporate

-31-

separateness will not be recognized.").

Given the circumstances of HAESI's failure to pay the contractual balance, and the fact that the contractual obligation was reduced to a judgment, the court cannot find that, as a matter of law, plaintiffs could not prove the required nexus between Richter and Hill's alleged domination of HAESI and HAESI's obligation to plaintiffs.  Plaintiffs offer evidence that, at the time they entered into the August 2, 1988 agreement, they understood Richter to be in control over HAESI and Hill, and that they would ultimately answer to Richter.  When framed in this light, plaintiffs' evidence that Richter and Hill controlled HAESI could be sufficiently connected to the original contract negotiations.  Further, plaintiffs cite numerous allegedly dilatory litigation tactics on the part of defendants in the First Action, which could support the claim that defendants were trying to stall or delay satisfaction of HAESI's obligation to plaintiffs.

The central theme of both plaintiffs' and defendants' motions is the degree of control Richter and Hill exerted over HASEI's affairs.  Both parties argue that the record will not sustain the opposing party's position.  Issues of material fact, however, preclude the entry of judgment in favor of either plaintiffs or defendants on either the instrumentality or identity theories.  Without poring over each factual dispute, the

-32-

existence of which is adequately set forth in the parties' Local
Rule 9(c)2 submissions, there are two fundamental issues that can
only fairly be resolved at trial: (1) whether or to what degree
HAESI was undercapitalized in relation to its financial
obligations, including the obligation to plaintiffs; and (2) to
what degree did Richter and Hill exercised control over HAESI's
affairs, including the original transaction giving rise to the
breach of contract suit and the default judgment. See, e.g.,
Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967) ("The defrauded
creditor or 'victim' of a business transaction with an
undercapitalized corporation, for instance, often has a strong
case for piercing the veil of a 'sham' corporation. . . . The
controversy in such cases invariably involves some degree of
reliance by the plaintiff, contributing to the fraud, or undue
advantage or trick accenting the injustice.") (applying admiralty
law); Angelo Tomasso, Inc., 187 Conn. at 556-57 ("the key factor
in any decision to disregard the separate corporate entity is the
element of control or influence exercised by the individual
sought to be held liable over corporate affairs.")

In Zaist, the seminal case with respect to piercing the
corporate veil in Connecticut, the Connecticut Supreme Court
stated that

> [t]he only reasonable meaning to attach to the
> transaction spread upon this record is that East Haven
> [the corporation alleged to be Olson's alter ego]
> undertook no obligation of its own to the plaintiffs,

-33-

> was financially unable to cope with the actual
> transaction, and reaped no benefit from it.  The
> undertaking throughout was Olson's, planned and carried
> out through his various other corporate creatures for
> his own and Olson, Inc.'s enrichment, a part of which,
> if the plaintiffs were denied a recovery, would consist
> of the amount which East Haven, as the plaintiff's
> ostensible debtor, is unable to pay because Olson and
> Olson, Inc. have not provided the final necessary
> funds.

Zaist, 154 Conn. at 577-78.  Here, plaintiffs developed a new

software program pursuant to an August 2, 1988 contract with

HAESI's predecessor in interest.  Richter, as the financial

driving force behind the thicket of corporate activity recounted

in the record, allegedly participated in the procurement of the

contract and reaped the benefit of plaintiffs' labor.  Plaintiffs

have presented enough evidence for the trier of fact to conclude,

although not necessarily to conclude, that Richter dominated

HAESI's affairs and was able to manipulate corporate transactions

to avoid compensating plaintiffs for the benefit they conferred

upon him even when they obtained a judgment therefor.  As such,

neither party is entitled to judgment as a matter of law on the

record before the court.

## IV. CONCLUSION

For the reasons set forth herein, plaintiffs' (dkt. # 59) and defendants' (dkt. # 52) cross-motions for summary judgment are **DENIED**.  Because plaintiffs seek equitable relief, this case will be tried to the court.  The parties shall submit affidavits of direct testimony and proposed findings of fact and conclusions of law on or before **December 3, 2004**.

So ordered this 24th day of September, 2004.

s/DJS

DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE

-35-