# **EXHIBIT B**

```
                                                                    1
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY

  _____ CIVIL ACTION NO.
                 99MC107 (JBS)

  Dirk Epperson and
  Betty Schneider,

       Plaintiffs,        Oral Deposition of

  vs.                     Dirk Epperson

  Irvin Richter, Hill
  International, Inc.
  Hill Arts & Entertainment
  Systems, Inc., n/k/a HAESI
  Software, Inc.,

       Defendants.
  _____

              * * * * *
       Friday, February 23, 2001
              * * * * *

       Transcript in the above matter taken
  at the offices of Hill International, Inc., One
  Levitt Parkway, Willingboro, New Jersey,
  commencing at 9:30 a.m.

  A P P E A R A N C E S:

       ROBERT SULLIVAN, ESQUIRE
       BY:  ROBERT J. SULLIVAN, JR., ESQUIRE
       190 MAIN STREET
       WESTPORT, CONNECTICUT 06880
       (203) 227-1404
       Attorneys for the Plaintiffs




       Certified Shorthand Reporting Services
                arranged through
            Mastroianni & Formaroli, Inc.
              709 White Horse Pike
            Audubon, New Jersey 08106
                (856) 546-1100
```

**Page 26**

Q. Did you have any discussion with him as to the manner in which Mr. Richter would be putting funds into the company?
A. Not that I recall.
Q. Were there any discussions as to whether or not Mr. Richter's funds would be securitized in any way?
A. Not that I recall.
    THE WITNESS: Possibly off the record, but I --
    MR. SULLIVAN: Let's go off the record then.
    THE WITNESS: Okay.
    (Off-the-record discussion.)
BY MR. GREENBERG:
Q. Okay. Mr. Epperson, it was described by your wife when you incorporated Performing Arts Technology initially, which she said was in 1983 --
A. Yes.
Q. -- who were the stockholders at that point?
A. Myself and Betty, Ms. Schneider.
Q. Okay. And were you fifty-fifty stockholders at that point?

**Page 27**

A. Correct.
Q. Okay. And she indicated she was the president and you were the vice president?
A. Correct.
Q. Okay. Do you remember who acted as secretary and the treasurer?
A. I don't. I believe I was secretary, but I'm not positive.
Q. Okay. When Performing Arts Technology entered into an agreement with Art Soft your wife had indicated that you were, in fact, represented by counsel; is that correct?
A. Correct.
Q. Okay. And do you concur with her testimony that there was no discussion at the time with regard to finding a basis to secure the payments to you by way of any financing statements or liens of any nature?
(Objection) MR. SULLIVAN: Okay. I'm going to object to that. Mischaracterizes his testimony.
    You can answer.
    MR. GREENBERG: Well, I'll ask him directly then --
    THE WITNESS: Yeah.

**Page 28**

    MR. GREENBERG: -- just to avoid the issue.
BY MR. GREENBERG:
Q. Do you recall any conversations or discussions at the time of the exchanges of drafts leading up to the signing of that agreement, any discussion with regard to finding a way to secure the payments to you in any way?
A. I actually do vaguely remember a conversation I had personally, which is why Ms. Schneider was maybe not aware, a personal conversation with Robert Daunt who was our counsel advising us for that contract, asking if we thought --
    MR. SULLIVAN: Well, one thing I will say at the moment is that conversations between attorneys and clients are privileged. I don't want to waive the privilege necessarily, but I also don't want to hold back information.
    Can you maybe give us a second and I'll talk --
    MR. GREENBERG: Well, it's the client's privilege, he can waive it or --
    MR. SULLIVAN: It's usually waived

**Page 29**

after consultation with counsel.
    MR. GREENBERG: Yeah.
    MR. SULLIVAN: Okay. As to this question alone I'm going to allow him to waive the attorney/client privilege.
    MR. GREENBERG: Okay.
    THE WITNESS: In the discussions with Mr. Daunt we decided that there was no need for direct lien against Art Soft or Hill for two reasons, one is we had been represented that Hill had a large amount of money and that cash was not an issue, but more importantly that the software, which is what we entered the agreement to write, would revert to us in the event of default by Art Soft and -- so that was what we believed at the time to be a substantial remedy.
BY MR. GREENBERG:
Q. Okay. When you referred to Hill in your answer there, referring to Hill Arts and Entertainment as opposed to Hill International?
A. No. Sorry. When I referred to Hill, I was referring to Hill alone, I meant Hill International.
    MR. SULLIVAN: Wait a minute. How

EPPERSON vs. RICHTER - February 20, 2007 - D... Epp......

Case 3:01-cv-01798-AWT    Document 137-3    Filed 03/23/2007    Page 4 of 4

**Page 42**

1  documents we have filed, and I'm -- I'm not
2  positive that it's in all of the New Jersey
3  filing, and that is the Entertainment Express
4  business plan.
5  Q. Okay. And did you have any involvement in
6  the operations of Hill Arts and Entertainment
7  or HAESI between the time you left in January
8  1993 and May of 1996?
9  A. Any involvement in the operations?
10 Q. Of the company.
11 A. Please clarify. Did I make decisions
12 based --
13 Q. Were you present at their place of
14 business? Were you employed in any capacity?
15 Were you doing any work for them at that time?
16     MR. SULLIVAN: Are you asking him
17 what he did when he was at HAESI?
18     MR. GREENBERG: No, after he left.
19     MR. SULLIVAN: I'm sorry.
20     MR. GREENBERG: After he left.
21     THE WITNESS: Well, let me state two
22 things that happened and -- which may or may
23 not fall into your question. One is that Betty
24 and I certainly met with Mr. Schwartz and Mr.
25 Cassano on a number of occasions regarding the

**Page 43**

1  overdue payments, the other is that I was -- my
2  employment after Hill Arts and Entertainment
3  was at Cybase, large software company. Hill
4  Arts and Entertainment was about to spring into
5  Entertainment Express at that point and so came
6  to Cybase looking for investments in
7  Entertainment Express as a new venture based
8  entity and I was involved -- because of my
9  position at Cybase I was involved in the
10 technology evaluation of Hill Arts and
11 Entertainment software, the fact that I wrote
12 most of it helped, and I recused myself from
13 any of the business dealings because I did let
14 Cybase know that I had a financial dispute with
15 them and I didn't want to get involved.
16 BY MR. GREENBERG:
17 Q. Okay. Other than that incident with
18 Cybase and attempts to collect the money that
19 were due to you you had nothing to do with the
20 day-to-day operations --
21 A. Correct.
22 Q. -- is that correct?
23 A. Correct.
24 Q. Okay. Had you seen any financial
25 statements of the company during that period of

**Page 44**

1  time?
2  A. No.
3  Q. Okay. Are you aware of any of the
4  financial transactions of the company during
5  that period of time?
6  A. Not except -- except as we have found out
7  after the fact.
8  Q. Okay. Other than what you've already told
9  us about the fact that you felt uncomfortable
10 because Hill International was involved, I'm
11 talking now at the time of the contract with
12 Art Soft and your company, did you do any
13 investigation of Art Soft's financial status?
14 A. Me personally?
15 Q. You, your counsel, anybody that you
16 instructed.
17 A. Well, we got sales figures, I believe, and
18 projections from Mr. Schwartz, and this went
19 through our consultant who was helping us to
20 decide where to get additional funding.
21 Q. Did you see a financial statement of Art
22 Soft?
23 A. I don't recall.
24 Q. Do you remember asking for one?
25 A. I don't remember. I do believe that our

**Page 45**

1  consultant asked for one.
2  Q. And who was the consultant?
3  A. His name was John Chapman.
4  Q. Does he work for a company?
5  A. No, he's free-lance, independent.
6  Q. Is he an accountant?
7  A. He is an entrepreneur, I guess, would be a
8  good word.
9  Q. And where does he live?
10 A. Danville, California.
11 Q. Do you have his full address?
12 A. Not available here. We do somewhere.
13 Q. You can --
14 A. Yes.
15 (Request) MR. GREENBERG: I ask that be
16 supplied to us.
17     MR. SULLIVAN: Sure.
18 BY MR. GREENBERG:
19 Q. Okay. So you don't even know whether or
20 not Mr. Chapman asked for a financial
21 statement?
22 A. I'm not positive, no.
23 Q. Okay. Did you or your wife, to your
24 knowledge, do any other due diligence to
25 determine the financial viability of Art Soft?