UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------- :
DIRK EPPERSON and BETTY SCHNEIDER :
                     Plaintiffs :   No.3:01CV1798 (AWT)
            v. :
                   :
IRVIN RICHTER, HILL INTERNATIONAL, INC., :
HILL ARTS & ENTERTAINMENT :
SYSTEMS, INC. n/k/a HAESI SOFTWARE, :   March 23, 2007
INC. :
             Defendants :
---------------------------------------------------------- :

**JOINT TRIAL MEMORANDUM**

1.     **Trial Counsel.**

        Robert J. Sullivan, Jr.
        Law Offices of Robert Sullivan
        190 Main Street
        Westport, CT 06880
        Tel. No. (203)227-1404
        Counsel for Plaintiffs

        Carolyn W. Kone
        Brenner, Saltzman & Wallman, LLP
        271 Whitney Avenue
        P.O. Box 1746
        New Haven, CT 06507-1746
        Tel. No. ( 203)772-2600
        Counsel for Defendants Irvin Richter and Hill International, Inc.

        David R. Schaefer
        Brenner, Saltzman & Wallman, LLP
        271 Whitney Avenue
        P.O. Box 1746
        New Haven, CT 06507-1746
        Tel. No. ( 203)772-2600
        Counsel for Defendants Irvin Richter and Hill International, Inc.

2.    **Jurisdiction.**

This action was commenced in the United States District Court for the District of New Jersey as a diversity action in accordance with 28 USC 1332. It was transferred to the United States District Court for the District of Connecticut on Consent per order of Hon. Stanley S. Brotman in accordance with 28 USC 1404(a).

3.    **Jury/Non-jury.**

This is a non-jury case.

4.    **Nature of Case.**

Plaintiffs seek to pierce the corporate veil of HAESI SOFTWARE, Inc. to hold liable defendants Irvin S. Richter and Hill International, Inc. for that certain judgment entered in Docket No. 3:95CV2131(DJS) on April 23, 1997.

5.    **Stipulations of Fact and Law.**

Counsel for Plaintiffs and Defendants have been unable to stipulate, despite significant effort. They are willing, however, to continue to attempt to achieve stipulations in advance of the trial of this matter.

6.    **Plaintiff=s Contentions.**

Plaintiff Dirk Epperson (EPPERSON) developed software for Hill Arts & Entertainment Systems, Inc. (HAESI) based upon promises that its controlling shareholder Irvin Richter (RICHTER) and/or RICHTER'S other corporation, Hill International, Inc. (HILL) were funding the project and would bear ultimate responsibility for payment. When agreed payments were not made, EPPERSON sued and obtained judgment against HAESI in this court Docket No.

2

3:95CV2131(DJS). During the course of suit, RICHTER arranged for the transfer of HAESI's assets to a new entity controlled by RICHTER, and let HAESI go defunct. Plaintiff will present evidence that HAESI was controlled by RICHTER, that HAESI was grossly undercapitalized, that the corporate privilege was abused, inter alia by litigation delay and avoidance tactics and refusing to respond to valid court orders and judgments, and that the corporate veil should, therefore, be pierced.

7.    **Defendant=s Contentions.**

## # 7 - DEFENDANTS IRVIN RICHTER AND HILL INTERNATIONAL, INC.'S FACTUAL CONTENTIONS

Defendants Irvin Richter ("Mr. Richter") and Hill International, Inc. ("Hill") contend that they are not the alter egos of Hill Arts and Entertainment, Inc. ("Hill A&E"). Defendants Hill and Hill A&E had separate corporate existences - they had separate officers, directors, shareholders, and employees, they were engaged in separate industries ( Hill is involved in the construction consulting business, while Hill A&E was involved in the development and sale of ticketing software for entertainment and sports venues), and they had separate places in businesses in different states. Further, Hill A&E observed corporate formalities – it maintained a minute book, filed its own tax returns, prepared financial reports, maintained its own bank accounts, adopted by laws, had its own assets, passed resolutions, generated funds for its own work, and undertook its own contractual obligations. Its day-to-day operations were carried out by its President, Laurence Schwartz (who had founded Hill A&E's predecessor, ArtSoft, Inc.). Mr. Schwartz was not an officer, shareholder or director of Hill. Hill A&E's funds were not commingled with those of Mr. Richter's or Hill's. Additionally, Hill A&E's funds were

3

not used to pay for the expenses of Mr. Richter or Hill. Moreover, Hill A&E and Hill were not held out to the public as one entity.

Further, neither Mr. Richter nor Hill were involved in the contractual negotiations with Plaintiffs' corporation, Performing Arts Technology, Inc. ("PAT"). Neither made any promises to Plaintiffs that either would be liable for Hill A&E's obligations under the agreement with PAT (the "Agreement"). PAT was represented by counsel and a financial advisor for such negotiations, and PAT's contract with Hill A&E specifically stated that PAT was contracting only with Hill A&E and not with Hill A&E's corporate parents or affiliates. In addition, neither Mr. Richter nor Hill were involved in the performance of the Agreement or the decisions as to whether and when payments would be made under the Agreement with PAT, with the exception of a single payment made by Mr. Richter at Mr. Epperson's request and then added to Hill A&E's debt to Mr. Richter. All of these activities were carried out by Mr. Schwartz. The work performed under the Agreement was for the benefit of Hill A&E and not for the benefit of Hill or Mr. Richter . Moreover, to the extent that capitalization after corporate formation should be considered in an alter ego case, Hill A&E was not grossly undercapitalized for its undertaking with Plaintiffs' company.

Additionally, the corporate form was not used for a wrongful purpose. Hill loaned Hill A&E in excess of $12 million and took back a security interest in Hill A&E's assets. Mr. Richter loaned Hill A&E $1 million and held a second lien in such assets. These secured loan transactions occurred long before Plaintiffs commenced their litigation against Hill A&E or had their attorney send a demand letter. In fact, Hill A&E continued to pay Plaintiffs royalties after these secured transactions occurred. Mr. Richter and Hill lost millions of dollars as a result of

4

such loans The sale of Hill A&E's assets to Entertainment Express, Inc. did not harm Plaintiffs because these assets were liened far in excess of any equity in such assets and therefore were not available to satisfy Plaintiffs' debt. There were no litigation delays in the case brought by Plaintiffs against Hill A&E. Rather, there were customary requests for extensions of time, which did not prejudice Plaintiffs in their ability to collect a judgment rendered in the litigation, particularly, because, as stated above, Hill A&E's assets were subject to liens that exceeded their value and therefore were not available to satisfy a judgment rendered in Plaintiffs' favor.

Finally, Plaintiffs waived and are estopped from bringing their alter ego claims. The Agreement with Hill A&E expressly stated that it was not with Hill A&E's parents or affiliates. Plaintiffs are educated and savvy business people in the software industry and thus were knowledgeable about the risks inherent in contracting with a software business. Further, Plaintiffs were represented by counsel and by a consultant in their negotiations with Hill A&E. Yet they did not request financial statements from Hill A&E prior to entering into the Agreement nor did they seek guaranties or security from either Mr. Richter or Hill.

Defendants also refer the Court to their Proposed Findings of Fact and Conclusions of Law for a more detailed statement of their factual contentions.

8.    **Legal Issues.**

## PLAINTIFFS' LEGAL ISSUES

Plaintiff contends that the corporate veil should be pierced. Plaintiff's Proposed Conclusions of Law contains a comprehensive analysis of the Law supporting this claim. The Law is taken, virtually verbatim, from the Ruling of Judge Dominic J. Squatrito on September 24, 2004.

## # 8 - DEFENDANTS IRVIN RICHTER AND HILL INTERNATIONAL, INC'S LEGAL ISSUES

1.    Whether New Jersey's choice of law principles apply to this case, because this case was transferred from the District of New Jersey to the District of Connecticut pursuant to 28 U.S.C. § 1404(a) and the failure to apply New Jersey's choice of law principles would significantly affect the outcome of the case?

2.    Whether under New Jersey's choice of law principles, a New Jersey District Court would apply the veil piercing laws of Delaware to this case, because Hill Arts and Entertainment, Inc. ("Hill A&E") was incorporated in Delaware?

3.    Whether under Delaware law, Hill A&E's corporate veil would be pierced and Hill International, Inc. ("Hill") and/or Irvin Richter ("Mr. Richter") would be held liable for the default judgment entered against Hill A&E and in favor of Plaintiffs, when there is no evidence that the corporate form was used to perpetrate a fraud or similar injustice?

4.    Whether there is no "similar injustice" under Delaware law in this case, because there is no evidence of bad faith or fraudulent intent in the formation of Hill A&E or the stripping of Hill A&E's assets in anticipation of a potentially adverse judgment, particularly because the secured interests in Hill A&E's assets were created years before Plaintiffs commenced litigation against Hill A&E and the asset sale to Entertainment Express did not result in the transfer of assets that would have been available to satisfy Plaintiffs' judgment because such assets were subject to liens far in excess of the value of Hill A&E's assets?

5.    Whether even if Connecticut law were applied to this case, Plaintiffs would not prevail in their veil piercing claims under either the instrumentality rule or the identity rule?

6.    Whether Plaintiffs cannot satisfy the first element of the instrumentality rule, because they cannot prove complete domination over the agreement between Plaintiffs' company, Performing Arts Technology, Inc. ("PAT") and Hill A&E (the "Agreement"), since Defendants were not involved in the formation or performance of the Agreement nor can they prove grossly inadequate capitalization of Hill A&E for the undertaking with PAT, when Hill A&E had assets in the amount of $387,000 and royalties due under the Agreement were to be paid only if sales from the software developed under the Agreement were adequate to fund such royalties?

7.    Whether Plaintiffs can satisfy the second element of the instrumentality test, when it cannot establish an intent by Defendants to defraud or escape liability as (i) neither Defendants had any personal liability to Plaintiffs, (ii) PAT was not improperly induced to enter into the Agreement, as the Agreement provided that PAT was contracting with Hill A&E and not with Hill A&E's parents or affiliates and neither Defendant made any representations to PAT in connection with entering into the Agreement and (iii) Defendants did not divert assets of Hill A&E to avoid paying Plaintiffs' claim, because the security interests granted to Defendants by Hill A&E were given over one and one half years prior to the filing of Plaintiffs' collection action to secure in excess of $12 million in loans?

8.    Whether Plaintiffs can satisfy the third element of the instrumentality test, when it cannot establish that Defendants' actions proximately caused their losses as the asset sale did not harm Plaintiffs as such assets were not available to satisfy Plaintiffs' judgment, since such assets were subject to valid liens that exceeded the value of Hill A&E's assets ?

9.    Whether Plaintiffs can pierce the corporate veil under the identity rule when there

was no single economic unit among Defendants and Hill A&E, and Hill A&E's operations were not conducted by Hill A&E for the benefit of Hill and Mr. Richter as there were separate corporate officers, directors, shareholders, and employees of Hill and of Hill A&E, Hill and Richter were engaged in a business separate from that of Hill A&E - construction consulting - while Hill A&E was in the business of developing ticketing software, Hill and Richter worked in Hill's offices in New Jersey while Hill A&E had separate offices, assets, equipment, bank accounts, sources of income, financial statements, tax returns and contractual obligations, Hill A&E observed corporate formalities, Hill A&E's funds were not commingled with those of Hill or Richter, Hill A&E's funds were not used to pay for the personal expenses of Hill or Mr. Richter, Laurence Schwartz, the President of Hill A&E, who founded Hill A&E and was not related to Mr. Richter or Hill, was in charge of the day to day operations of Hill A&E, and the work performed under the Agreement was for the benefit of Hill A&E and not for the benefit of Hill or Mr. Richter?

10.    Whether Plaintiffs are estopped or have waived their veil piercing claims against Hill or Mr. Richter, because the Agreement expressly provided that Plaintiffs were not contracting with Hill A&E's affiliates, i.e. Hill, and Plaintiffs, although they were represented by counsel and an advisor and were educated and sophisticated software developers who understood the risks inherent in a software start up company,  did not request any financial statements from Hill A&E or any guaranties or security from Hill or Mr. Richter?

Defendants also refer the Court to their Proposed Findings of Fact and Conclusions of Law for a more detailed statement of their legal claims.

9.    **Voir Dire Questions.**

This is a non-jury case.

10. **List of Witnesses.**

## PLAINTIFFS DIRK EPPERSON AND BETTY SCHNEIDER=S LIST OF WITNESSES

1.    Laurence F. Schwartz
      10 Potter Hill Drive
      Guilford, Connecticut

Mr. Schwartz is expected to testify, inter alia, as to his role and the roles of Irvin Richter and Hill International and others in the operations of Hill Arts & Entertainment (HAESI). He is expected to testify as to the financial condition of HAESI, including the financial statements generated and issued by HAESI. He is expected to testify as to the state of capitalization of the company during all the relevant periods. He is expected to testify as to the circumstances relating to the software development agreements pursuant to which the subject software was developed. He is expected to testify as to the promises of payment and the bases for said payments. He may be called upon to testify as to the basis for litigation positions taken following commencement of suit by Plaintiffs' suit for payment. He may also be called upon to testify as to the asset transfer to Entertainment Express, including but not limited to his involvement and interest therein. He may also be called upon to testify as to the valuation of assets of HAESI including in particular those that were transferred and he may be called upon to testify as to which assets were transferred.

2.    Dirk Epperson
      1008 Cragmont Avenue
      Berkeley, California  94708

Mr. Epperson is expected to testify, inter alia, as to the circumstances of his having

been asked to develop software for HAESI. He will testify as to how he came to enter into the agreement for the software development, the performance of the agreement, and his interactions with the defendants when the time for payment came. He will testify as to the assurances he received as to the intended capitalization of the project. He will testify as to the promises which were made which prompted him to await payment, his treatment by the defendants once he insisted upon payment, and the lack of any basis for the claims later made by the defendants that the monies were not due. Mr. Epperson may also be called upon to testify as to his involvement in the litigation and the impact upon the plaintiffs as to the manner in which the litigation was conducted.

3.      Betty Schneider
        1008 Cragmont Avenue
        Berkeley, California  94708

Although it is not likely that Plaintiff Schneider, wife of Plaintiff Dirk Epperson, will be called to testify, she listed here as a precautionary matter in the event she is called upon to supplement or the testimony of her husband.

4.      Rob Flynn, Esq.
        Tyler, Cooper & Alcorn LLP
        205 Church Street
        New Haven, Connecticut 06409

Mr. Flynn is expected to testify as to his role in representing HAESI once Plaintiffs filed suit, in particular, requests for time enlargements, negotiations for confidentiality agreements, the non-production of discovery properly requested, the transfer of assets during the course of his representation of the defendants and the basis for his withdrawal as counsel of record.

5.    Walter C. King
      Walter C. King and Associates
      991 Post Road East, #2
      Westport, CT 06880

Mr. King is a member of the American Institute of Certified Public Accountants, the

Connecticut Society of Certified Public Accountants, The Institute of Business Appraisers, Inc.,

the BSOP Association and the American Society of Appraisers-Business Valuation.  His

Curriculum Vitae is attached.  He is expected to testify as an expert witness inter alia, that

HAESI was grossly undercapitalized. The basis for his opinion is the financial statements and

other materials which have been identified as exhibits in this trial memorandum.  He is

expected to testify as to the actual capitalization of HAESI and other related companies,

based, again, upon the financial data contained in the exhibits.  He is expected to testify that

the transferees of the assets gained a significant advantage over the creditors, inter alia, due

to the skewed conversion ratio contained within the "Convertible Promissory Note".  He is

expected to testify as to the accounting methods used as to the asset transfer and the

valuation of the assets transferred.  He is expected to opine as to the customs and practices

pursuant to which companies such as the subject companies are typically operated.  He is

expected to opine, as needed, as to the proper accounting methods either used or to be used

in transactions such as those engaged in by the defendants, including, inter alia, the propriety

of reclassifying capital contributions into insider debt.  He is expected to testify as to the

propriety of generating financial statements with debt incorrectly referred to as capital "for

presentational purposes."  He is expected to testify as inconsistencies between the various

claims made by the defendants as debt and equity, in particular as to the "reclassification" of

the capital contributions into insider debt.

6.    Irvin Richter
      303 Lippincott Centre
      Marlton, New Jersey

Mr. Richter is expected to testify, inter alia, as to the capitalization of entities including HAESI, HILL, R4 Holdings, and Entertainment Express/Advantix. He is expected to testify as to his role in the operations at HAESI and said other companies. He is expected to testify as to the ownership structure of said entities. He is expected to testify as to the asset transfer and the circumstances pursuant to which it occurred. He is expected to testify as to the loans he claims that he and HILL have made to HAESI, including the classification or reclassification of capital contributions to debt. He is expected to testify as to the basis for positions taken during litigation initiated by the Plaintiffs. He is expected to testify as to his knowledge of and involvement in the agreements pursuant to which the software development was performed, and his knowledge of and involvement in the payment promises made during the time preceding and leading up to the filing of litigation by Plaintiffs.

7.    Stan Gloss
      525 River Valley Road
      Stratford, CT  06614

Mr. Gloss is expected to testify <u>inter</u> <u>alia</u> as to his preparation of the financial statements at HAESI, his involvement in the company, and his interaction with HILL, International. He may also be called upon as to his knowledge of the classification and/or reclassification of capital contributions to debt. He may also be called upon to testify as to his knowledge of the value of the assets of the company and the transfer of the assets from HAESI to Entertainment Express.

12

8.    David Richter
       303 Lippincott Centre
       Marlton, New Jersey

       Mr. Richter is expected to testify, inter alia, as to his knowledge, as an officer in HAESI

and other of the involved entities as to the corporate records of said entities, the asset transfer

in May, 1996, and his role in the various legal proceedings which are the subject of this

litigation.

9.    James S. Cassano
       17 Graham Way
       Devon, PA 19333-1434
       Mr. Cassano is expected to testify about capitalization, loans, classification and/or

reclassification of capital to debt, financial statements, memos and other correspondence

relating to HAESI, HILL, R4 Holdings, Entertainment Express, and Tickets.com.  He is also

expected to provide testimony relating to the asset transfer occurring in May, 1996, including

ownership and structure.

10.   Ronald Emma
       Hill International, Inc.
       303 Lippincott Centre
       Marlton, New Jersey 08053

       Mr. Emma is expected to testify about capitalization, classification and/or

reclassification of capital contributions to debt, financial statements, memos and other

correspondence relating to HAESI, HILL, R4 Holdings, Entertainment Express, and

Tickets.com.

11.   Dolores S. LoConte
       190 Main Street
       Westport, CT 06880

       Ms. LoConte may be called upon to confirm reports received at various times from

13

agencies such as Secretary of State for the State of Connecticut as to officers, directors and other corporate data relating to HAESI, HILL, R4 Holdings, Entertainment Express, Tickets.com and other related entities.

### DEFENDANTS IRVIN RICHTER and HILL INTERNATIONAL, INC.=S LIST OF WITNESSES

1.    Laurence F. Schwartz
      10 Potter Hill Drive
      Guilford, Connecticut

Mr. Schwartz is expected to testify about the founding of ArtSoft, Inc. later known as Hill Arts & Entertainment, Inc. (AHill A&E@) (hereinafter, except as stated otherwise, all references to Hill A&E shall include references to ArtSoft and to Hill A&E=s successor, HAESI), the capitalization of Hill A&E, the operations of Hill A&E, his responsibilities as President of Hill A&E, the officers and directors of Hill A&E, Hill A&E=s corporate records, corporate actions taken by Hill A&E, negotiations between Hill A&E and Performing Arts Technology, Inc. (APAT@) with respect to the 1988 agreement between ArtSoft and PAT for PAT to perform certain software development services for Hill A&E (the AAgreement@), the 1989 Amendment to the Agreement, and the Stock/Asset Option Grant Agreement, negotiations between Hill A&E and Dirk Epperson for Mr. Epperson=s Employment Agreement with Hill A&E, the drafting and execution of such agreements, the performance of such agreements, PAT=s employees becoming Hill A&E=s employees, agreements with respect to payments to be made under the Agreement, demands for payments under the Agreement, amounts owed under the Agreement, payments made under the Agreement, Hill A&E=s operations, the relationship between Hill A&E

and Irvin Richter (AMr. Richter@), the relationship between Hill A&E and Hill International, Inc. (AHill@), the development of the ArtSoft/SQL and SportSoft/SQL software by PAT and by Hill A&E, Glen Epperson=s role in the development of such software, Hill A&E=s financial condition, financial reports of Hill A&E, loans made to Hill A&E by Mr. Richter and Hill and security provided for such loans, the founding of Entertainment Express, Inc. (AEntertainment Express@), the defense of the litigation commenced by Plaintiffs against Hill A&E, conversations with Attorney Sullivan regarding Plaintiffs= demands for payment, the sale of Hill A&E=s assets to Entertainment Express and Ventana Global, Ltd.=s (AVentana@) role in such sale and the management of Entertainment Express.

2.      Irvin Richter
        303 Lippincott Centre
        Marlton, New Jersey

Mr. Richter is expected to testify about his purchase of his interest in Hill A&E, loans that he and Hill made to Hill A&E and security provided for such loans, payments made by Hill A&E under such loans, the relationship between Hill A&E and Hill, the relationship between Hill A&E and himself, actions that he took as the sole shareholder and director of Hill A&E, his role and Hill=s role in the making and performance of agreements and amendments to such agreements between Hill A&E and PAT and between Hill A&E and Mr. Epperson, Mr. Richter=s role and Hill=s role in the making of payments under the Agreement, his role and Hill=s role in the operations of Hill A&E, the financial condition of Hill A&E, the founding of Entertainment Express, the sale of Hill A&E=s assets to Entertainment Express, the role of Ventana in the asset sale and the management of Entertainment Express, the retention by Hill of Howard Lawson & Co. to provide a Fairness Opinion in connection with the sale of Hill A&E=s assets to

Entertainment Express, the substitution by Hill A&E of a convertible note from Entertainment Express for Hill A&E=s assets to secure loans that he and Hill had made to Hill A&E, the foreclosure on such collateral, and the defense of litigation brought by Plaintiffs against Hill A&E.

3.      Stanley Gloss
        525 River Valley Road
        Stratford, CT  06614

Mr. Gloss is expected to testify about who hired him as controller for Hill A&E, his responsibilities as controller, the preparation of Hill A&E=s financial reports and cash flow statements, the relationship between Hill A&E and Mr. Richter and Hill, loans made by Mr. Richter and Hill to Hill A&E, the audit of Hill A&E=s records performed by Arthur Andersen, the amount of royalties owed to PAT under the Agreement, and the defense of the litigation commenced by Plaintiffs against Hill A&E.

4.      Robert B. Flynn, Esq.
        Tyler, Cooper & Alcorn LLP
        205 Church Street
        New Haven, Connecticut 06409

Mr. Flynn is expected to testify about his firm=s representation of Hill A&E in the litigation brought by Plaintiffs against Hill A&E, the defense and conduct of such litigation, the reasons that he made requests for extensions of time in the litigation, the responses that Hill A&E provided to Plaintiffs= Interrogatories and Requests for Production, Hill A&E=s request for a confidentiality agreement in the case, and his firm=s motion to withdraw as counsel for Hill A&E.

16

5.    Steven N. Economou
      Managing Director
      Curtis Financial Group, LLC
      Two Penn Central Plaza
      Suite 1520
      Philadelphia, PA  19102

Mr. Economou is expected to testify as to the engagement of Howard Lawson & Co. to render a fairness opinion in connection with the sale of Hill A&E=s assets to Entertainment Express, and the Fairness Opinion dated May 31, 1996 (the AFairness Opinion@) rendered by Howard Lawson & Co. Defendants believe that Mr. Economou is a fact witness and not an expert witness under Rule 26(a)(2)(A). However, in an abundance of caution, Defendants state that the materials on which Mr. Economou intends to rely are listed in the Fairness Opinion, the basis for Mr. Economou=s opinion is also set forth in Fairness Opinion, and Mr. Economou=s area of expertise is in valuation of businesses, investment banking and venture capital. Mr. Economou=s resume is attached hereto as Schedule 1.

6.    Dan M. Afrasiabi
      Tickets.com, Inc.
      555 Anton Boulevard, 11th Floor
      Costa Mesa, California 92626

Mr. Afrasiabi is expected to testify about Ventana Global, Ltd=s (AVentana@) negotiations and agreement with Entertainment Express to become an investor in and raise money for Entertainment Express, Ventana=s role in Entertainment Express= acquisition of Hill A&E=s assets and the terms of the Convertible Note, and Ventana=s role in Entertainment Express= management.

7.    Ronald Emma
      Hill International, Inc.
      303 Lippincott Centre
      Marlton, New Jersey 08053

Mr. Emma is expected to testify about Hill≤s investment in Hill A&E, Hill A&E≤s line of

credit with Hill, advances made by Hill pursuant to the line of credit, and Hill≤s financial records

regarding such loans, including its audited financial statements.

8.    Philip H. Politziner
      Amper, Politziner, and Mattia P.A.
      2015 Lincoln Highway
      Edison, New Jersey 08818

Mr. Politziner is expected to testify about its audit of Hill≤s financial statements and the
manner in which Hill≤s loans to Hill A&E were reported on such financial statements.

9.    Dirk Epperson
      1008 Cragmont Avenue
      Berkeley, California  94708

Mr. Epperson is expected to testify about his background, his experience negotiating

contracts, PAT≤s negotiations with Hill A&E concerning the Agreement, the amendment to the

Agreement, and the Stock/Asset Option Grant Agreement, the negotiation of his employment

agreement with Hill A&E, the performance of the Agreement, the development of the

ArtSoft/SQL and SportSoft/SQL software by PAT and by Hill A&E, his employment with Hill

A&E, agreements between PAT and/or Plaintiffs and Hill A&E with respect to payments made

under the Agreement, demands for payment under the Agreement, payments made under the

Agreement, his brother≤s employment with Hill A&E, the employment of other PAT employees

by Hill A&E, the operations of Hill A&E, Mr. Schwartz≤s role as President of Hill A&E, and his

knowledge of Hill A&E≤s plans to sell its assets.

18

10.    Betty Schneider
       1008 Cragmont Avenue
       Berkeley, California  94708

Ms. Schneider is expected to testify about her background, her experience negotiating

contracts, PAT=s negotiations with Hill A&E concerning the Agreement, the amendment to the

Agreement, and the Stock/Asset Option Grant Agreement, the negotiation of Mr. Epperson=s

employment agreement with Hill A&E, the performance of the Agreement, the development of

the ArtSoft/SQL and SportSoft/SQL software by PAT and by Hill A&E, Mr. Epperson=s

employment with Hill A&E, agreements between PAT and/or Plaintiffs and Hill A&E with

respect to payments made under the Agreement, demands for payment under the Agreement,

and payments under the Agreement.

11.    David Richter
       303 Lippincott Centre
       Marlton, New Jersey

Mr. Richter is expected to testify about the sale of Hill A&E=s assets to Entertainment

Express in May 1996 and the wind down of Hill A&E after the asset sale. Mr. Richter will also

testify as to the defense by Hill A&E of the underlying litigation. Mr. Richter will also testify as to

the history and documentation of Hill A&E as the company=s corporate secretary at certain

relevant times hereto.

12.    James S. Cassano
       117 Graham Way
       Devon, PA 19333-1434

Mr. Cassano is expected to testify about Hill A&E=s operations and financial condition,

plans to sell Hill A&E=s assets, the founding of Entertainment Express, the sale of Hill A&E=s

assets to Entertainment Express, and Ventana=s role in the asset sale and the management of

Entertainment Express.

13.     Arnon E. Garonzik
        105 Box Hill Drive
        Cherry Hill, NJ 08003

     Mr. Garonzik is expected to testify about his positions at Hill and Hill A&E and any

negotiations between Hill A&E and PAT that he was involved in.

11.    **Exhibits.**

### Plaintiff=s List of Exhibits

1.    Letter from Jeanne E. Nolen, Asst. General Counsel of Hill International to Robert T. Daunt, Esq. dated Oct. 19, 1988

2.    Hill Memo to Irvin Richter from James S. Cassano dated 8/7/90

3.    Hill A&E Memo to IER from LFS dated 8/20/90

4.    Hill A&E Interoffice Memo to IER from Larry Schwartz dated 9/6/90

5.    Hill A&E Memorandum to Irv Richter from LFSchwartz dated 3/11/91

6.    Hill A&E Memorandum to Irv Richter from Larry Schwartz dated 3/22/91

7.    Hill A&E Memorandum to IER from LFS dated 8/11/91

8.    Hill A&E Interoffice Memorandum to IER from Larry Schwartz dated 10/23/91

9.    Office Electronic Mail to Irvin E. Richter from Laurence F. Schwartz dated 11/20/91

10.    Hill A&E Interoffice Memo to IER from LFS dated 1/15/92

11.    Memo to Irv Richter from Jim DiStefano dated 1/27/92

12.    Letter dated January 30, 1992 from Larry Schwartz to Dirk Epperson dated 1/30/92

13.    Performing Arts Technology Invoice to Hill A & E dated Dec 20, 1991

14.    Hill A&E Memorandum to IER from LFS dated 2/3/92

15.     Digital Equipment Co. letter to Donal R. Cruver dated 2/7/92

16.     Letter from Stoll Moss Theatres Ltd. to Irv E. Richter dated 2/17/92

17.     Letter from Irv E. Richter to Richard Johnson, Stoll Moss Theatres dated 2/19/92

18.     Hill A&E Memorandum to IER from LFS dated 2/24/92

19.     Hill A&E Memorandum to IER from LFS dated 3/2/92

20.     Hill A&E Memorandum to IER from Bill Tucker, Stan Gloss dated 3/4/92

21.     Hill A&E Fax to IER from Bill Tucker dated 3/6/92

22.     Office Electronic mail to Irvin E. Richter from Mary M. Wilkins dated 3/9/92

23.     Hill A&E Memorandum to IER from LFS dated 3/13/92

24.     Hill A&E Memorandum to IER from LFS dated 3/19/92

25.     Performing Arts Technology invoice to Hill Arts and Entertainment Systems dated April 1, 1992

26.     Hill A&E Memorandum to J.L.DiStefano from S.M.Gloss dated 4/17/92

27.     Letter from Dirk Epperson to Larry Schwartz dated June 4, 1992

28.     Hill A&E May, 1992 operating results

29.     Letter from Irvin E. Richter to Dirk Epperson dated June 26, 1992

30.     Invoice to Hill Arts and Entertainment Systems dated July 1, 1992

31.     Hill A&E Memorandum to L.F. Schwartz from S.M. Gloss dated 7/13/92

32.     Hill A&E Memo to I. E. Richter from S. M. Gloss re June, 1992 operating results dated 7/24/92

33.     Hill A&E Memo to I. E. Richter from S. M. Gloss re August, 1992 operating results dated 9/18/92

34.     Memo from Dirk Epperson to Larry Schwartz dated 9/27/92

35.    Invoice to Hill Arts and Entertainment Systems dated October 1, 1992

36.    Hill A&E Memorandum to I.E.Richter from S.M.Gloss dated 10/15/92

37.    Hill A&E Memorandum to I.E.Richter from S.M.Gloss dated 10/16/92

38.    Check No. 2758 of Hill Arts & Entertainment Systems to Performing Arts Technology dated October 22, 1992

39.    Memo to L. F. Schwartz from J. S. Cassano dated 11/5/92

40.    InterOffice Memo to Irv Richter from Larry Schwartz dated 11/24/92

41.    Letter from Leasetec Corp to James S. Cassano dated 12/2/92

42.    InterOffice Memo to Irv Richter from Larry Schwartz dated 12/10/92

43.    Performing Arts Technology Invoice to Stan Gloss Hill Arts and Entertainment Systems dated January 1, 1993

44.    InterOffice Memo to Irv Richter from Larry Schwartz dated 1/17/93

45.    InterOffice Memo to Ira Brind, Jim Cassano, Irv Richter from Larry Schwartz dated 1/29/93

46.    Hill A&E Memo to L.F.Schwartz from S.M.Gloss

47.    InterOffice Memo to Irv Richter from Larry Schwartz dated 2/15/93

48.    Hill A&E Memo to J.Cassano, J.DiStefano, R.Emma from S.Gloss dated 2/1693

49.    Note from Stan Gloss to Dirk Epperson dated Feb. 26, 1993

50.    Hill A&E Memo to I.E.Richter from S.M.Gloss dated 4/5/93

51.    Hill A&E Memo to I.E.Richter from S.M.Gloss dated 4/7/93

52.    Hill A&E Memo to I.E.Richter from S.M.Gloss dated 4/16/93

53.    Hill A&E consolidating worksheet, May 31, 1993 and related worksheets dated 5/31/93

54.    Office Electronic Mail to Marlene J. French from Irvin E. Richter dated 9/27/93

22

55.    Office Electronic Mail to Marlene J. french from Irvin E. Richter dated 9/27/93

56.    Memo from Stan Gloss to Ron Emma with Hill A&E financial statements dated 12/2/93

57.    Hill A&E Summary of Core U.S. Operations dated 12/9/93

58.    Memo from S. M. Gloss to J. S Cassano re Hill A&E December, 1993 financial reports dated 1/18/94

59.    Memo from SMG to Erin Leschak re Hill A&E balance sheets and A/P transactions dated 9/16/94

60.    Letter from Larry Schwartz to Dirk Epperson and Betty Schneider dated Sept. 21, 1994

61.    Letter from Dirk Epperson and Betty Schneider to Larry Schwartz dated Oct. 11, 1994

62.    Letter from Larry Schwartz to Dirk Epperson and Betty Schneider dated Nov. 28, 1994

63.    Entertainment Express Business Plan dated Jan. 25, 1995

64.    Hill A&E consolidating worksheet, May 31, 1995

65.    Letter from Robert Sullivan to Larry Schwartz dated 3/30/95

66.    COMPLAINT dated October 4, 1995 filed in the Connecticut District Court in Docket No. 3:95cv2131

67.    ANSWER TO COMPLAINT dated November 10, 1995 filed by Tyler, Cooper & Alcorn

68.    LETTER dated May 6, 1996 from Robert B. Flynn, Esq. to Robert Sullivan, Esq.

69.    CONFIDENTIALITY ORDER drafted May 15, 1996 by Hill Arts & Entertainment Systems, Inc. and letter from Robert B. Flynn, Esq. to Robert Sullivan, Esq. dated May 15, 1996

70.    UNANIMOUS WRITTEN CONSENT of Board of Directors of Entertainment Express dated May 28, 1996

71.    FAIRNESS OPINION from Howard, Lawson & Co. to Irvin Richter dated May 31, 1996

72.    WRITTEN CONSENTS OF SOLE DIRECTOR of Hill Arts & Entertainment Systems, Inc. and SECRETARY'S CERTIFICATE OF THE SELLER dated May 31, 1996

73.    CONVERTIBLE PROMISSORY NOTE from Entertainment Express, Inc. to Hill Arts and Entertainment Systems, Inc. in the principal sum of $3,000,000 dated May 31, 1996

74.    BILL OF SALE AND ASSUMPTION between Hill Arts & Entertainment, Inc. and Entertainment Express, Inc. dated May 31, 1996

75.    UNANIMOUS WRITTEN CONSENT OF DIRECTORS OF Entertainment Express dated May 31, 1996

76.    UNANIMOUS WRITTEN CONSENT OF STOCKHOLDERS of Entertainment Express, Inc. dated May 31, 1996

77.    LETTER dated June 6, 1996 from Robert Sullivan, Esq. to Robert B. Flynn, Esq.

78.    STATEMENT AND DESIGNATION BY FOREIGN CORPORATION of Entertainment Express, Inc. filed June 6, 1996

79.    MOTION TO COMPEL FURTHER RESPONSES TO INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS dated July 23, 1996

80.    MOTION OF TYLER COOPER & ALCORN TO WITHDRAW AS COUNSEL TO DEFENDANT HILL ARTS & ENTERTAINMENT SYSTEMS, INC. dated September 11, 1996

81.    LETTER from Robert B. Flynn, Esq. to The Honorable Joan G. Margolis dated October 4, 1996

82.    MEMORANDUM OF STATUS CONFERENCE dated October 8, 1996

83.    LETTER from David L. Richter, Secretary of HAESI Software, Inc. to The Honorable Joan G. Margolis dated October 8, 1996

84.    LETTER from David L. Richter, Secretary of HAESI Software, Inc. to The Honorable Joan G. Margolis dated November 6, 1996

85.    AMENDED COMPLAINT dated February 26, 1997 and ORDER GRANTING LEAVE TO FILE AMENDED COMPLAINT dated December 12, 1997

86.    DEFAULT JUDGMENT dated April 23, 1997 against Hill Arts & Entertainment Systems, Inc., n/k/a HAESI Software, Inc.

87.    DEFENDANTS ENTERTAINMENT EXPRESS, INC., HILL INTERNATIONAL., INC. and IRVIN RICHTER'S MOTION TO DISMISS dated June 30, 1997; AFFIDAVIT OF W.

THOMAS GIMPLE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS dated June 26, 1997; AFFIDAVIT OF IRVIN RICHTER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS dated June 30, 1997

88.    AFFIDAVIT of Dolores S. LoConte dated July 28, 1997

89.    LETTER from Robert Sullivan, Esq. to W. Glen Pierson, Esq. dated January 23, 1998 confirming delivery of the Fairness Opinion

90.    PLAINTIFFS' FIRST SET OF POST-JUDGMENT INTERROGATORIES TO DEFENDANT dated March 19, 1998

91.    COMPLAINT dated April 27, 1999

92.    MEMORANDUM OPINION AND ORDER of The Honorable Dominic J. Squatrito dated March 28, 1998; JUDGMENT dated March 24, 1998.

93.    PRESS RELEASE of Defendant Entertainment Express (at that time ADVANTIX)

94.    DECLARATION OF DAVID L. RICHTER dated November 29, 1999

95.    Plaintiffs' Motion for default for Failure to Comply with Discovery and Other Court Obligations (New Jersey)

96.    Letter from Robert Sullivan, Esq. to Judge Joel B. Rosen dated 3/27/01

97.    Letter from Robert Sullivan, Esq. to Judge Stanley S. Brotman dated April 2, 2001

98.    AFFIDAVIT of Irvin Richter dated 4/10/01

99.    Corporate records of HAESI

100.    California Complaint  Epperson v Tickets.com

101.    California: Dismissal of California Action  7/23/01

102.    New Jersey Complaint 6/30/99

103.    New Jersey: Plaintiffs' Discovery Demands

104.    New Jersey: Defendants Informal Discovery Responses

105.    New Jersey: Defendants Formal Discovery Responses

106.    New Jersey: Plaintiffs' Motions to Compel, Dismiss and related documents

107.    New Jersey Defendant's First Motion to Dismiss, Stay and related documents, including Responses

108.    New Jersey: Court Order Authorizing Refiling of Motion to Dismiss, Stay and Related documents including Responses

109.    New Jersey: Defendants' Second Motion to Dismiss, Stay and related documents, including Responses

110.    New Jersey: Transcript of Argument on motion to stay

111.    New Jersey: Memo setting forth call from Chambers of Judge Brotman confirming Defendants' consent to transfer of case to Connecticut

112.    New Jersey: Consent to transfer

113.    Epperson v Entertainment Express, Inc., 242 F.3d 100 (2d. Cir. 2001) 3/2/01

114.    New Jersey Summary Judgment motion and responses

115.    Defendants Motion to Dismiss Alter Ego case for lack of jurisdiction

116.    Summary Judgment Motions, Cross Motions and responsive or reply papers in Fraudulent Conveyance action

117.    Summary Judgment Motions, Cross Motions and responsive or reply papers in Alter Ego Action

118.    Ruling issued by Hon. Dominic Squatrito in Fraudulent Conveyance Action

119.    Ruling issued by Hon. Dominic Squatrito in Alter Ego Action

120.    Hill International, Inc. v. National Railroad Passenger Corporation, 957 F.Supp. 548 (1996).

121.    Fairness Opinion

122.    Article Discussing capital infusions

123.    Affidavit/Declarations of Irvin Richter

124.  Affidavit/Declarations of Ron Emma

125.  <u>California</u>: Motions to Dismiss

126.  Letter from Carolyn Kone to Second Circuit

127.  Plaintiffs will respectfully request that the Court take judicial notice of all of the filings in all of the relevant cases

128.  Demonstrative exhibits to include charts, diagrams, timelines and other demonstrative aids

### <u># 11 – DEFENDANTS IRVING RICHTER AND HILL INTERNATIONAL, INC.'S LIST OF EXHIBITS</u>

| Exhibit # | Document Name |
|-----------|---------------|
| 1 | ArtSoft, Inc. ("ArtSoft") Certificate of Incorporation (Connecticut), dated 04/19/84 |
| 2 | Hill Arts and Entertainment Systems, Inc. ("Hill A&E") Written Consent of the Sole Director, with attached Lafayette American Bank & Trust Company Certificate as to Corporate Resolutions, dated 12/01/95 |
| 3 | Hill A&E Informal Action by Sole Director, dated 09/01/91 |
| 4 | The Connecticut Bank and Trust Company, N.A. (CBT) Corporate Resolutions for the Account of Hill A&E, dated 01/15/91 |
| 5 | Hill A&E Informal Action by Sole Director, dated 02/27/90 |
| 6 | ArtSoft Unanimous Consent of the Board of Directors, dated 02/06/90 |
| 7 | ArtSoft Certificate of Incorporation (Delaware), dated 06/30/87 |
| 8 | Letter from Irvin E. Richter to ArtSoft, dated 07/29/87 |
| 9 | Letter from Hill International, Inc. ("Hill") to ArtSoft, dated 07/29/87 |
| 10 | Letter from William J. Doyle to ArtSoft, dated 07/29/87 |

27

| 11 | ArtSoft Informal Action by Sole Director, dated 07/29/87 |
| 12 | ArtSoft Informal Action of Shareholders, dated 04/15/88 |
| 13 | ArtSoft Informal Action by Sole Director, dated 04/15/88 |
| 14 | ArtSoft Informal Action by Incorporators & Bylaws, dated 06/30/87 |
| 15 | ArtSoft Informal Action by Sole Director, dated 01/07/89 |
| 16 | Letter from Arnon Garonzik to ArtSoft Board of Directors, dated 01/04/89 |
| 17 | ArtSoft Certificate of Ownership and Merger (DE), dated 04/13/90 |
| 18 | ArtSoft Certificate of Merger of at Least 90% Owned Subsidiary (Surviving Foreign Corporation) (DE), dated 02/26/90 |
| 19 | ArtSoft Consent of the Sole Director, dated 02/06/90 |
| 20 | Hill A&E Internal Revenue Service Notice of New Employer Identification Number Assigned, dated 03/23/90 |
| 21 | Stock receipt – transfer of 130 shares to Irvin E. Richter from William J. Doyle, dated 05/27/92 |
| 22 | Stock receipt – transfer of 480 shares to Irvin E. Richter from (blank), dated 07/01/91 |
| 23 | Cancelled Stock Certificate of 480 shares of Hill A&E, dated 07/01/91 |
| 24 | Barclays Bank of New York, N.A. Corporate Resolution, Telephone, Telegram, Fax, Telefax or any other Form of Electronic Transmission (for Hill A&E), dated 01/15/91 |
| 25 | Interoffice memorandum from LFS to RDM and SAW re: PAT, dated 03/28/89 |
| 26 | Plaintiff's Response to Defendant's First Set of Interrogatories (1995 Action), dated 04/17/96 |
| 27 | Minute Book, Certificate Book and Stock Ledger of HAESI Software, Inc. |
| 28 | Hill A&E Written Consent of the Sole Stockholder, dated 05/31/96 |
| 29 | Hill A&E Written Consent of the Sole Director, dated 06/01/96 |
| 30 | Hill A&E Written Consent of the Sole Director, dated 5/31/96 |

| 31 | Hill A&E Written Consent of the Sole Director, dated 03/29/96 |
| 32 | Dunn & Bradstreet, Inc. Report Re: Performing Arts Technology, Inc. ("PAT"), dated 08/08/86 |
| 33 | Memorandum from Larry to Arnon Re: Performing Arts Technology, Inc. (PAT), dated 12/26/87, with attached PAT-Positive aspects of acquisition |
| 34 | Stock/Asset Option Agreement (between Dirk A. Epperson and Betty Schneider), dated 08/07/89 |
| 35 | PAT: A Brief History; The Patron System & The Explorer System Module Overviews |
| 36 | PAT Timeline, dated 12/29/87 |
| 37 | Letter from Dirk Epperson to Larry Schwartz, dated 12/22/87 |
| 38 | Meeting w/John Chipman/Dirk Epperson – PAT (Notes) |
| 39 | Notes for Larry Schwartz, dated 01/13/88 |
| 40 | ArtSoft Agreement for the Protection of Proprietary Information, dated 12/18/87 |
| 41 | Letter of intent from Lawrence F. Schwartz to Mr. Dirk A. Epperson, dated 03/10/88 |
| 42 | Letter of intent from Lawrence F. Schwartz to Mr. Dirk A. Epperson, dated 03/23/88 |
| 43 | Interoffice memorandum from LFS to Everyone re: PAT Joint Venture, dated 05/05/88 |
| 44 | Letter of intent from Lawrence F. Schwartz to Mr. Dirk A. Epperson, dated 04/18/88 |
| 45 | Addendum to letter of intent, dated 04/28/88 |
| 46 | Press release: ArtSoft, Inc. Announces Joint Venture with Performing Arts Technology, dated 05/05/88 |
| 47 | Letter of intent from Lawrence F. Schwartz to Mr. Dirk A. Epperson, dated 05/13/88 |
| 48 | Custom Software Development Agreement (between PAT and ArtSoft), dated 08/02/88 |
| 49 | Employment Agreement (of Dirk A. Epperson), dated 04/01/89 |
| 50 | Letter from Larry Schwartz to Dirk Epperson Re: Custom Software Development Agreement, dated 07/10/88 |
| 51 | Interoffice memorandum from LFS to Dirk Epperson (DE) Re: PAT, dated 04/28/88 |
| 52 | Hill A& E Strategic Plan 1990 Budget (Revised) May 1990 |

| 53 | Hill A&E Balance Sheet Revised Calendar 1990 Budget ($000) |
|---|---|
| 54 | Interoffice memorandum from SMG to LFS Re: PAT, dated 04/14/89, with attached Maintenance Contracts @ 4/4/89 |
| 55 | Amendment to Custom Software Development Agreement (between ArtSoft and PAT), dated 06/19/89 |
| 56 | PAT Cash Receipts Journal (p.0001), dated 02/02/90 |
| 57 | Memorandum from James S. Cassano to Irvin E. Richter Re: Hill A&E, dated 02/05/92, with attached WKLYCASH.XLS, dated 02/03/92 |
| 58 | Memorandum from Jim DiStefano to Irv Richter Re: Hill A&E Cash Requirements, dated 01/27/92, with attached Hill A&E Q1 Projected Cash Flow (Schedule 1); Hill A&E Q1 Projected Net Cash Receipts from Sales (Schedule 2); Hill A&E Q1 Projected Monthly Cash Requirement (Schedule 3); Hill A&E Head Count at 1/23/92 (Schedule 4) |
| 59 | Memorandum from Larry Schwartz to IER Re: Milwaukee Brewers, dated 10/23/91 |
| 60 | Letter from Elaine Findley to Lawrence F. Schwartz, dated 11/18/92 |
| 61 | Interoffice memorandum from Larry Schwartz to IER Re: Intercompany Purchases, dated 09/06/90, with attached Gibbs & Hill Receivable |
| 62 | Interoffice memorandum from LFS to Irv, dated 06/11/90, with attached article from The Robb Report, dated July 1990 |
| 63 | Memorandum from Larry Schwartz to Irv Richter Re: Update and Cash Issues, dated 01/17/93 |
| 64 | Memorandum from Larry Schwartz to Irv Richter Re: Update on SQL Sales, dated 03/22/91 |
| 65 | Letter from Stanley Gloss to Catherine H. Emma, dated 09/08/95 |
| 66 | Hill A&E Technology & Ticketing Solutions |
| 67 | Interoffice memorandum from Larry Schwartz to Irv Richter Re: Cash Status, dated 02/15/93 |
| 68 | Hill A&E Years Ending 12/31 (000's) |
| 69 | Hill A&E article, dated 02/17/92 |
| 70 | Fax cover sheet from RBF to IER, dated 08/19/91, with attached case studies for Stoll Moss Theatres, Ltd. and Playhouse Square Center; interoffice memorandum from LFS to IER Re: |

| | |
|---|---|
| | Lashman, dated 04/23/91 |
| 71 | Certificate of Authority (of Jeanne E. Nolen), dated 08/03/90 |
| 72 | Revised Schedule for Gemini 1990 |
| 73 | *Hill Alert* – Hill Group Announces Hill A&E |
| 74 | Phoenix Baseball Business Meetings Review, dated 11/15/91 |
| 75 | Interoffice memorandum From Larry Schwartz to Ira Brind and Jim Cassano Re: Restructuring Phase II, dated 03/03/93, with attached Budget Planning-1993 Version 1.1 (Hill A&E U.S.), dated 03/03/93; Version 1.1 Administration, dated 03/03/93; Marketing; Client Services; EC Development; Sales; Client Services II; WC Development; Department Totals by Month; interoffice memorandum from Larry Schwartz to Ira Brind and Jim Cassano Re: Industry S/P Vendors, dated 03/03/93 |
| 76 | Hill A&E Personnel Change Notices effective 02/01/93 |
| 77 | Fax cover sheet from Stan Gloss to J.S. Cassano and I.E. Richter, dated 08/14/92, with attached memorandum from S.M. Gloss to L.F. Schwartz and James S. Cassano Re: Restructuring Status Report, dated 08/14/92; Hill A&E Proposed Consolidated Balance Sheet; Hill A&E Proposed Summary Income Statement; 1992 Forecast, dated 08/14/92 |
| 78 | Memorandum from Larry Schwartz to Dirty Dozen Re: Corporate Restructuring, dated 08/17/92, with attached memorandum from Larry Schwartz to Hill A& E Employees Re: Corporate Restructuring, dated 08/17/92; Hill A&E August 1992 |
| 79 | Interoffice memorandum from S.M. Gloss to L.F. Schwartz Re: Critical Cash Shortfall, 04/07/93, with attached demand of payment of past due taxes from the Town of Guilford, Office of the Tax Collector |
| 80 | Hill A&E Consolidated Income Statement 12/31/93 ($000) |
| 81 | Hill A&E Backlog Report for the Period 1/91-10/91, dated 10/23/91 |
| 82 | Fax cover sheet from L. Schwartz to Irv Richter, Jim Cassano and Jim DiStefano, dated 01/16/92, with attached interoffice memorandum from Larry Schwartz to IER Re: SQL Sales Projections (Per |

| | |
|---|---|
| | Ticket and Turnkey), dated 01/16/92; Hill A&E SQL System Sales Projections 1992 Turnkey System Sales Assumptions; Hill A&E 1992 SQL System Sales Projections Turnkey Sales, dated 01/15/92; Hill A&E SQL Systems Sales Projections 1992 Per Ticket Sales Assumptions; Hill A&E 1992 SQL System Sales Projections Per Ticket Sales, dated 01/15/92 |
| 83 | Hill A&E Market Segmentation, dated 07/21/92 |
| 84 | Memorandum from HLC, DAE, SMG, LRK, KLO, WMT, JSC, RBF, SSH, RDM, LFS and DRY to All Hill A&E Employees Re: Corporate Strategy, dated 07/24/92 |
| 85 | Hill A&E Business Development Plan Submitted by Robert B. Friend, dated 09/30/92 |
| 86 | Hill A&E U.S. (As of July, 1993); xPreliminary Analysis - Hill A&E |
| 87 | Interoffice memorandum from S.M. Gloss to J.S. Cassano/I.E. Richter Re: Hill A&E Operations Data, dated 07/22/93, with attached Hill A&E 1993 QZ Sales Report prepared by Robert B. Friend, dated 07/16/93; Hill A&E Third Quarter 1993 Forecast ($000); Hill A&E Second Quarter 1993 Results ($000); Hill A&E Second Quarter Patron Update ($000); Budget Planning-1993 (Hill A&E U.S.), dated 07/15/93, 7:44 AM; Variance Analysis-1993 (Hill A&E U.S.), dated 07/15/93, 7:44 AM; Budget Planning-1993 (Hill A&E U.S.), dated 07/15/93 (8:51 AM); Variance Analysis-1993 (Hill A&E U.S.), dated 07/15/93, 8:25 AM; Budget Planning-1993 (Hill A&E U.S.), dated 07/15/93, 7:52 AM; Variance Analysis-1993 (Hill A&E U.S.), dated 07/15/93, 9:00 AM; Budget Planning-1993 (Hill A&E U.S.), dated 07/15/93, 8:53 AM; Variance Analysis-1993 (Hill A&E U.S.), dated 07/15/93, 9:07 AM; Budget Planning-1993 (Hill A&E U.S.), dated 07/15/93, 7:48 AM; Budget Planning-1993 (Hill A&E U.S.), dated 07/15/93, 8:52 AM |
| 88 | Artistic Freedom from ArtSoft |
| 89 | E-mail from Irvin E. Richter to Marlene J. Frech Re: Hill A&E U.K. Overseas, dated 10/01/91 |
| 90 | Memorandum from SSH, UK Office, dated 06/01/92 |
| 91 | Hill A&E South Florida Consortium ArtSoft/SQL Proposal, dated 12/16/91 |
| 92 | Executive Summary, dated 02/05/92 |
| 93 | Hill A&E 1992 SQL System Sales Projections, dated 01/16/92 |

| 94 | Hill A&E Backlog Report for the Period 1/1/92-4/15/92, dated 04/16/92 |
| 95 | Hill A&E Service Agreement for Support of the Licensed Software (blank), dated 05/09/92 |
| 96 | Hill A&E Service Agreement for Support of the Licensed Software (blank), dated 03/29/92 |
| 97 | Hill A&E Software License Agreement (blank), dated 05/09/92 |
| 98 | Hill A&E Software License Agreement (blank), dated 03/29/92 |
| 99 | Hill A&E Software License Agreement (blank) |
| 100 | Software License Agreement between Hill A&E and Kentucky Center for the Arts Corporation, dated 11/12/91 |
| 101 | Software License Agreement (between Hill A&E and Playhouse Square Foundation), dated 07/10/91 |
| 102 | Letter from William Tucker to Atty. Todd B. Rothbard, dated 01/30/92, with attached memorandum from Julian Wood to Richard Johnston Re: Sybase Server Problems, dated 02/20/92; Stoll Moss Theatres Ltd. Decrease in Matured Sales; Stoll Moss Theatres Ltd. Decrease in Advance Sales |
| 103 | Letter from Richard Johnston to Larry Schwartz, Esq., dated 02/20/92 |
| 104 | Letter from Kenneth M. Kaufman to Laurence Schwartz, dated 05/18/92 |
| 105 | Letter of intent from Lawrence J. Wilker to Laurence F. Schwartz, dated 05/18/92 |
| 106 | Letter from Larry Schwartz to Ken Kinnear, dated 02/22/93 |
| 107 | Letter from Dirk Epperson to Larry Schwartz (with handwritten note), dated 06/04/92 |
| 108 | Letter from Larry Schwartz to Ken Kinnear and Umeeda Switlo, dated 10/09/92 |
| 109 | Letter from Laurie Wittoesch to Larry Schwartz Re: Software License Agreement Between Hill A&E and Kentucky Center for the Arts, dated 08/21/92 |
| 110 | Interoffice memorandum from S.M. Gloss to I.E. Richter Re: Hill A&E Information Requested, dated 04/06/93, with attached Settlement Agreement between Digital Equipment Corporation and Hill A&E, dated 01/18/93; Promissory Note (Hill A&E and Digital Equipment Corporation), dated 04/01/93; Release (Hill A&E and Digital Equipment |

| | |
|---|---|
| | Corporation), dated 01/18/93; Hill A&E Accounts Payable Ageing on 03/12/93, dated 03/12/93, 16:55; Accounts Payable Ageing on 03/12/93, dated 03/12/93, 16:56; Accounts Payable Ageing on 03/12/93, dated 03/12/93, 16:54; Accounts Payable Ageing on 03/12/93, dated 03/12/93, 16:57 |
| 111 | Press release: Hill A&E Announces Formation of New Houston Entertainment Ticketing Company, dated 10/01/92 |
| 112 | Telefax from Flemming Mork to Larry Schwartz, dated 11/24/92 |
| 113 | *Variety* Article: Hill A&E joins Ticketmaster ranks, dated 11/09/92 |
| 114 | Hill A&E *New York News*, Vol. 2, No. 2, dated Spring 1990 |
| 115 | Hill A&E Systems at BOMI By the Bay |
| 116 | *Computerworld* article: Entertaining the idea of SQL-based systems, dated 02/19/90 |
| 117 | *Innovations* Article: Computers Compete with Dinner, dated  March/April 1990 |
| 118 | Hill A&E Accounts Payable Ageing on 02/26/93 |
| 119 | Hill A&E Feb Cash Report Feb 21, 1991 (Friday) |
| 120 | Property Plant & Equipment |
| 121 | Hill A&E Statement of Cash Flow December 31, 1991 ($000) |
| 122 | Hill A&E Consolidated Balance Sheet December 31, 1991 ($000) |
| 123 | Hill A&E Summary of Operations December 31, 1991 ($000) |
| 124 | Hill A&E Accounts Receivable Analysis December 31, 1991 ($000) |
| 125 | Cash Forecast for Week Ending 2/14/92, dated 02/08/92 |
| 126 | Interoffice memorandum from S.M. Gloss to L.F. Schwartz Re: Cash for the Weeks Ending 1/17/92 and 1/24/92, dated 01/14/92, with attached Hill A&E Cash Forecast ($000); Budget Planning-1992 (Hill A&E), dated 01/14/92 |
| 127 | Interoffice memorandum from S.M. Gloss to L.F. Schwartz Re: Weekly Status Report, dated 01/14/92, with attached Financial Status Report ($000), dated 01/14/92; Hill A&E U.K. Financial Status Report (£000), dated 01/14/92; ageing report notes; Hill A&E Accounts Payable Ageing on |

| | |
|---|---|
| | 03/12/92, dated 01/13/92, 10:18; Hill A&E Accounts Payable Ageing on 03/12/92, dated 01/13/92, 10:30; Hill A&E Accounts Payable Ageing on 03/12/92, dated 01/13/92, 10:34; Hill A&E Accounts Payable Ageing on 03/12/92, dated 01/13/92, 10:38; Hill A&E Accounts Payable Ageing on 03/12/92, dated 01/13/92, 10:39 |
| 128 | Hill A&E Cash Projection August 31, 1992 |
| 129 | Financial Status Report ($000), dated 08/31/92 |
| 130 | Hill A&E Accounts Receivable Ageing 08/31/92 |
| 131 | 1994 Forecast (Consolidated Hill A&E), dated 05/18/94; 1994 Budget (U.K. Subsidiary), dated 05/17/94; Forecast Planning-1994 (Total Hill A&E U.S.), dated 05/18/94; Forecast Planning-1994 (General Cinema Project), dated 05/18/94; Forecast Planning-1994 (Hill A&E Core U.S.), dated 05/18/94; 1994 Cash Forecast (Consolidated Hill A&E), dated 05/18/94; 1994 Cash Budget (U.K. Subsidiary), dated 05/17/94; Forecast Planning-1994 (Total Hill A&E U.S.), dated 05/18/94; Forecast Planning-1994 (General Cinema Project), dated 05/18/94; Forecast Planning-1994 (Hill A&E Core U.S.), dated 05/18/94; 1995 Strategic Plan (Consolidated Hill A&E), dated 05/18/94; 1995 Budget (U.K. Subsidiary), dated 05/18/94; Budget Planning-1995 (Total Hill A&E U.S.), dated 05/18/94; Budget Planning-1995 (Corporate Client), dated 05/18/94; Budget Planning-1995 (Hill A&E Core U.S.), dated 05/18/94; 1995 Cash Strategic Plan (Consolidated Hill A&E), dated 05/18/94; 1995 Cash Budget (U.K. Subsidiary), dated 05/18/94; Budget Planning-1995 (Total Hill A&E U.S.), dated 05/18/94; Budget Planning-1995 (Corporate Client), dated 05/18/94; Budget Planning-1995 (Hill A&E Core U.S.), dated 05/18/94; 1996 Strategic Plan (Consolidated Hill A&E), dated 05/18/94; 1996 Strategic Plan (U.K. Subsidiary), dated 05/18/94; Strategic Planning-1996 (Total Hill A&E U.S.), dated 05/18/94; Strategic Planning-1996 (Corporate Client), dated 05/18/94; Strategic Planning-1996 (Hill A&E Core U.S.), dated 05/18/94 |
| 132 | Interoffice memorandum from S.M. Gloss to L.F. Schwartz Re: Cash Needs for the Week, dated 07/13/92 |

| 133 | Interoffice memorandum from Larry Schwartz to Irv Richter Re: 1992 Reforecast w/ Restructuring, dated 08/21/92, with attached 1992 Forecast (Consolidated Hill A&E), dated 08/21/92; 1992 Forecast (Hill A&E U.S.), dated 08/21/92; 1992 Forecast (Client Services), dated 08/21/92; 1992 Forecast (E.C. Development), dated 08/21/92; 1992 Forecast (W.C. Development), dated 08/21/92; 1992 Forecast (Sales), dated 08/21/92; 1992 Forecast (Marketing), dated 08/21/92; 1992 Forecast (Administration), dated 08/21/92; Budget Planning-1993 (The Powerstation), dated 08/21/92; 1992 Forecast (U.K. Subsidiary), dated 08/20/92; 1992 Forecast (U.K. Client Services), dated 08/20/92; 1992 Forecast (U.K. Sales & Marketing), dated 08/20/92; 1992 Forecast (U.K. General & Admin.), dated 08/20/92; March Cash Forecast; Hill A&E Forecast February through July 1992 ($000); Projected Cash Receipts from Sale/Cost of Goods Sold |
|---|---|
| 134 | Memorandum from LFS to IER Re: Cash Forecast for Week of February 24, dated 02/24/92, with attached Cash Forecast for week Ending 2/28/92, dated 02/24/92 |
| 135 | Hill A&E Operating Cash Forecast February – July, 1992 ($000) |
| 136 | Hill A&E Advances 1989 through 03/95, dated 12/12/00 |
| 137 | Six Week Cash Forecast |
| 138 | Hill A&E Accounts Receivable Analysis March 31, 1992 ($000) |
| 139 | Hill A&E Statement of Cash Flow March 31, 1992 ($000) |
| 140 | Hill A&E Summary of Operations March 31, 1992 ($000) |
| 141 | Interoffice memorandum from Stan Gloss to Ira Brind Re: Liability Status Report, dated 12/11/92, with attached Hill A&E December Cash Estimates |
| 142 | Hill A&E Cash Forecast February through July, 1992 ($000) |
| 143 | Hill A&E Statement of Cash Flow May 31, 1992 ($000) |
| 144 | Hill A&E Accounts Receivable Analysis May 31, 1992 ($000) (09/30/89 – 04/30/92) |

| | |
|---|---|
| 145 | Hill A&E Summary of Operations May 31, 1992 |
| 146 | 1992 Forecast (Consolidated Hill A&E), dated 07/06/92 |
| 147 | Hill A&E Accounts Receivable Analysis May 31, 1992 ($000) (11/30/89 - 06/30/92, 5/31/92) |
| 148 | Hill A&E Statement of Cash Flow August 31, 1992 ($000) |
| 149 | Hill A&E Accounts Receivable Analysis August 31, 1992 ($000) (01/31/90 - 08/31/92) |
| 150 | Hill A&E Statement of Cash Flow June 30, 1992 ($000) |
| 151 | Hill A&E Summary of Operations June 30, 1992 ($000) |
| 152 | Hill A&E Summary of Operations August 31, 1992 ($000) |
| 153 | Hill A&E Monthly Income Statement - Total Company January 31, 1996 |
| 154 | 1992 Forecast (Consolidated Hill A&E), dated 09/18/92 |
| 155 | 1993 Forecast (Hill A&E U.S.), dated 11/30/92 |
| 156 | Pro Forma Summary Budget (Consolidated Hill A&E), dated 03/09/92 |
| 157 | Budget Planning -1992 (Consolidated Hill A&E), dated 02/18/92 |
| 158 | Hill A&E Comparative Balance Sheet February 29, 1996 |
| 159 | Hill A&E Comparative Balance Sheet March 31, 1996 |
| 160 | Hill A&E May Cash Estimates |
| 161 | Hill A&E U.S. Operations Variance Analysis, dated 10/19/95 |
| 162 | Hill A&E U.S. Operations Variance Analysis, dated 01/18/96 |
| 163 | Hill A&E Comparative Balance Sheet January 31, 1996 |
| 164 | 1995 Results (Consolidated Hill A&E), dated 03/18/96 |
| 165 | Hill A&E Balance Sheet Years Ending December 31 ($000) |
| 166 | Hill A&E Budget Planning-1995, dated 02/16/96 |
| 167 | Hill A&E Comparative Balance Sheet December 31, 1995 |
| 168 | Memorandum from SMG to LFS Re: Month-end Financial Report-September, dated 10/24/95, with attached Cash Receipts |

| 169 | Hill A&E Consolidated Worksheet, Excludes Intercompany Accounts |
| 170 | Hill A&E Budget Planning – 1995, dated 06/09/95 |
| 171 | Hill A&E Comparative Balance Sheet July 31, 1995 |
| 172 | Memorandum from SMG to LFS Re: Month-end Financial Report-August, dated 09/14/95, with attached Employee Advance Accounts 8/31/95; Cash Receipts; Hill A&E U.S. Operations Variance Analysis, dated 09/14/95 |
| 173 | Memorandum from SMG to IER Re: November Results, dated 12/15/94, with attached Hill A&E U.S. Operations Variance Analysis, dated 12/06/94; Hill A&E U.S. Operations Variance Analysis (Cash Basis), dated 12/06/94; Budget Planning-1994 (Total Hill A&E U.S.), dated 12/07/94 |
| 174 | Memorandum from SMG to IER Re: October Domestic Results, dated 11/08/94, with attached Hill A&E U.S. Operations Variance Analysis, dated 11/08/94; Hill A&E U.S. Operations Variance Analysis (Cash Basis), dated 11/08/94 |
| 175 | Memorandum from SMG to IER, JSC Re: Domestic Hill A&E Results, dated 09/16/94, with attached Hill A&E U.S. Operations Variance Analysis (Cash Basis), dated 09/02/94; Hill A&E U.S. Operations Variance Analysis, dated 09/02/94; Hill A&E Accounts Payable Ageing on 09/01/94; Hill A&E Overseas Corp. Comparative Balance Sheet 31 July, 1994; Hill A&E Overseas Corp. Vendor Transaction Register on 08/01/94, dated 08/01/94 |
| 176 | Memorandum from SMG to IER Re: February Results, dated 03/21/94, with attached Hill A&E Consolidated Income Statement February 28, 1994 ($000); Hill A&E Consolidated Balance Sheet February 28, 1994 ($000); Hill A&E Statement of Cash Flow February 28, 1994 ($000) |
| 177 | Hill A&E Consolidated Income Statement for the Year Ending December 31, 1994 ($000) |
| 178 | Hill A&E Statement of Cash Flow December 31, 1994 ($000) |
| 179 | Hill A&E Consolidating Worksheet Excludes Intercompany Accounts, dated 12/31/94 |
| 180 | Hill A&E Consolidated Balance Sheet December 31, 1994 ($000) |
| 181 | Budget Planning-1994 (Total Hill A&E U.S.), dated 08/03/94 |

| 182 | 1994 Cash Budget (Consolidated Hill A&E), dated 08/17/94 |
| 183 | Hill A&E U.S. Operations Variance Analysis, dated 08/03/94 |
| 184 | Budget Planning-1994 (Hill A&E U.S.), dated 12/11/92 |
| 185 | Budget Planning –1994 (Total Hill A&E U.S.), dated 01/11/95 |
| 186 | Budget Planning-1994 (Total Hill A&E U.S.), dated 10/06/94 |
| 187 | Hill A&E U.S. Operations Variance Analysis, dated 10/05/94 |
| 188 | Hill A&E U.S. Operations Variance Analysis, dated 10/06/94 |
| 189 | Fax cover sheet from Stan Gloss to Jim Cassano, dated 04/29/94, with attached Hill A&E April Cash Estimates |
| 190 | Memorandum from SMG to LFS Re: Forecast Assumptions, dated 05/18/94 |
| 191 | Variance Analysis-1993 (Department Hill A&E U.S.), dated 01/12/94 |
| 192 | 1993 Actuals (Consolidated Hill A&E), dated 01/17/94 |
| 193 | Hill A&E Statement of Cash Flow December 31, 1993 ($000) |
| 194 | Hill A&E Core Business Income Statement December 31, 1993 ($000) |
| 195 | Budget Planning-1993 (Hill A&E U.S.), dated 05/12/93, 3:06 PM |
| 196 | Budget Planning-1993 (Hill A&E U.S.), dated 05/12/93, 3:15 PM |
| 197 | 1993 Budget Plus Actuals (Consolidated Hill A&E), dated 07/06/93 |
| 198 | Fax cover sheet from Stan Gloss to IER/JSC/JLD, dated 01/19/93, with attached memorandum from S.M. Gloss to I.E. Richter, dated 01/19/93 Re: U.S and U.K. Cash Projections; Hill A&E January Cash Estimates; Hill A&E Overseas Corp. 1993 Cash Flow Breakdown |
| 199 | Budget Planning 1993 (Hill A&E U.S.), dated 12/11/92 |
| 200 | Budget Planning-1993 (Hill A&E U.S.), dated 03/19/93 |
| 201 | Budget Planning-1993 (Hill A&E U.S.), dated |

| | |
|---|---|
| | 01/29/93 |
| 202 | Hill A&E Accounts Payable Ageing on 5/12/93, dated 05/12/93 |
| 203 | Letter from Larry Schwartz to Jim Cassano, dated 11/09/93 |
| 204 | Fax cover sheet from Bill Tucker/LFS to IER, dated 03/02/92, with attached memorandum from LFS to IER Re: Cash Crisis, dated 03/02/92 |
| 205 | Memorandum from LFS to IER Re: Cash Flow Projection, dated 02/03/92, with attached WKLYCASH.XLS, dated 02/03/92; CASHACT.XLS, dated 02/03/92; Employee Expenses over 60 Days by 2/15 |
| 206 | Fax cover sheet from IER to Bill Tucker Re: Attached Memo to Hill A&E Managers, dated 03/06/92, with attached memorandum from Irvin E. Richter to Hill A&E Managers |
| 207 | Memorandum from Bill Tucker and Stan Gloss to IER Re: Critical Cash Issues, dated 03/04/92, with attached Summary of Critical Cash Needs |
| 208 | Interoffice memorandum from Stan Gloss to Ira Brind Re: Cash Update Report, dated 12/17/92, with attached Hill A&E Cash Register Week of 12/14/92 |
| 209 | E-mail from Mary M. Wilkins to Irvin E. Richter Re: Agenda 3/10/92 Meeting, dated 03/09/92 |
| 210 | E-mail from Laurence F. Schwartz to Irvin E. Richter Re: 1992 Flexible Benefits, dated 11/20/91 |
| 211 | Powerstation Texas, Inc. Monthly Profit & Loss April 30, 1993 |
| 212 | Hill A&E Cash Requirement Analysis 03/08/91 |
| 213 | Fax cover sheet from Larry Schwartz to Irv Richter, dated 03/11/91, with attached memorandum from LFSchwartz to Irv Richter Re: Cash Requirements, dated 03/11/91; Hill A&E Cash Requirement Analysis 03/08/91 |
| 214 | Hill A&E Statement of Cash Flow February 28, 1994 ($000) |
| 215 | Hill and Subsidiaries for the Years Ended December 31, 1996 and 1995 |
| 216 | Hill and Subsidiaries For the Year Ended December 31, 1995 |
| 217 | Hill International, Inc. and Subsidiaries For the Year Ended December 31, 1993 |
| 218 | Hill and Subsidiaries Report on Audits of |

| | |
|---|---|
| | Consolidated Financial Statements for the years ended December 31, 1990 and 1989 |
| 219 | Hill Groups, Inc. and Subsidiaries Report on Audit of Consolidated Financial Statements for the year ended December 31, 1989 |
| 220 | Memorandum from JS Cassano to IE Richter Re: Hill A&E Balance Sheet, dated 06/30/95, with attached Hill A&E Consolidated Balance Sheet May 31, 1995 ($000); Hill A&E Budget Planning-1995 (Total Hill A&E U.S.), dated 06/09/95 |
| 221 | Hill A&E Accounts Payable Analysis Activity as of 03/31/96 |
| 222 | Hill A&E Advances, dated 03/17/92 |
| 223 | Budget Planning-1993 (Hill A&E U.S.), dated 07/06/93 |
| 224 | Variance Analysis-1993 (Hill A&E U.S.), dated 05/12/93 |
| 225 | Interoffice memorandum from S.M. Gloss to L.F. Schwartz Re: Critical Cash Shortfall, dated 04/16/93, with attached Hill A&E A/P Problems, dated 04/16/93; Powerstation A/P Problems, dated 04/16/93 |
| 226 | Interoffice memorandum from S.M. Gloss to L. F. Schwartz Re: Cash Request, dated 02/24/93, with attached Hill A&E Immediate Cash Requirement February 24, 1993; Hill A&E February Cash Estimates |
| 227 | Routing Request from Erin to Irv, dated 05/14/93, with attached Hill A&E Actual vs. Budget First Quarter, 1993 ($000), Variance Analysis-1993 (Hill A&E U.S) (Accrual Basis), dated 04/16/93; Variance Analysis-1993 (Hill A&E U.S) (Cash Basis), dated 04/16/93; |
| 228 | Interoffice memorandum from S. Gloss to J. Cassano, J. DiStefano, R. Emma Re: Criminal Liability Issue, dated 02/16/93, with attached Connecticut Employment Law Letter |
| 229 | Hill A&E Payroll Liability Status (1/29-2/12, 2/19, 2/15) |
| 230 | A/P Problems, dated 05/12/93 |
| 231 | Hill A&E Payroll Liability Status (2/19, 2/26, 3/5) |
| 232 | Memorandum from J.S. Cassano to I.E. Richter Re: Hill A&E Performance, dated 10/07/94, with attached Hill A&E U.S. Operations Variance |

| | |
|---|---|
| | Analysis, dated 10/06/94; Hill A&E U.S. Operations Variance Analysis, dated 10/05/94; Budget Planning-1994 (Total Hill A&E U.S.), dated 10/06/94; |
| 233 | Employee Advance Accounts 9/30/95 |
| 234 | Memorandum from SMG to CHE/RFE Re: Payroll Status Report, dated 09/28/95, with attached Hill A&E Payroll, and Hill A&E Payroll Tax Analysis |
| 235 | Memorandum from SMG to CHE Re: Payroll Status Report, dated 09/14/95, with attached Hill A&E Payroll |
| 236 | Hill A&E Income Statement For the Years Ending December 31 ($000) |
| 237 | Memorandum from SMG to JSC, CHE, RFE Re: Payroll Issue, dated 01/03/96, with attached Hill A&E Payroll, and Hill A&E Payroll Tax Analysis |
| 238 | Memorandum from SMG to JSC, CHE, RFE Re: Payroll Status, dated 12/08/95, with attached Hill A&E Payroll Tax Analysis, and Hill A&E Payroll |
| 239 | Hill A&E Accounts Payable Ageing on 3/31/96, dated 03/31/96 |
| 240 | Hill A&E Soundview Commerce Associates Account Analysis 4/8/96 |
| 241 | Certificate of Ownership and Merger (ArtSoft and Hill A&E) (DE), dated 05/28/96 |
| 242 | Hill A&E Written Consent of the Sole Director, dated 05/01/95 |
| 243 | Powerstation Texas, Inc. Year-to-Date Profit & Loss April 30, 1993 |
| 244 | American National Bank Certificate as to Corporate Resolutions of Hill A&E (names crossed off), dated 01/15/91 |
| 245 | American National Bank Certificate as to Corporate Resolutions of Hill A&E, dated 01/15/91 |
| 246 | Barclay's Bank PLC Resolution (Hill A&E (U.K.)), dated 11/27/90 |
| 247 | 1992 Forecast (Hill A&E U.S.), dated 09/18/92 |
| 248 | Memorandum from LFS to IER Re: Agenda for Meeting August 12, dated 08/11/91 |
| 249 | Hill A&E Application for Tax Registration Number (CT), dated 01/04/91 |
| 250 | Hill A&E Application for Registration (Michigan), dated 01/04/91 |
| 251 | Letter from Stan Gloss to PAT (Dirk & Betty), |

| | |
|---|---|
| | dated 02/24/95 |
| 252 | Hill A&E Check to PAT (#2758), dated 10/22/92 |
| 253 | ArtSoft stock certificate for 39 shares to Irvin Richter, dated 08/07/87 |
| 254 | ArtSoft stock certificate for 13 shares to William Doyle, dated 08/07/87 |
| 255 | ArtSoft stock certificate for 48 shares to Hill International, Inc., dated 08/07/87 |
| 256 | ArtSoft stock certificate for 48 shares to Hill Group, Inc., dated 12/23/88 |
| 257 | Memorandum from SMG to IER Re: December Hill A&E and Consolidated Results, dated 01/17/95, with attached Hill A&E Consolidated Balance Sheet December 31, 1994 ($000); Hill A&E Consolidated Income Statement December 31, 1994 ($000); Hill A&E Statement of Cash Flow December 31, 1994 ($000); Hill A&E U.S. Operations Variance Analysis, dated 01/11/95, 4:05 PM; Hill A&E U.S. Operations Variance Analysis (Cash Basis), dated 01/11/95, 4:05 PM; Hill A&E U.S. Operations Variance Analysis, dated 01/11/95, 4:09 PM; Hill A&E U.S. Operations Variance Analysis (Cash Basis), dated 01/11/95, 4:09 PM |
| 258 | Memorandum from SMG to Erin Leschak Re: Balance Sheets & A/P registers requested by JSC, dated 09/16/94, with attached Hill A&E Comparative Balance Sheet August 31, 1994; Hill A&E Accounts Payable Ageing on 09/01/94, dated 09/01/94; Hill A&E Overseas Corp. Comparative Balance Sheet 31 July, 1994; Hill A&E Overseas Corp. Vendor Transaction Register on 08/01/94, dated 08/01/94 |
| 259 | Memorandum from S.M. Gloss to J.S. Cassano Re: December Reports, dated 01/18/94, with attached Hill A&E Consolidated Income Statement December 31, 1993 ($000); Hill A&E Core Business Income Statement December 31, 1993 ($000); Hill A&E Consolidated Balance Sheet December 31, 1993 ($000); Hill A&E Statement of Cash Flow December 31, 1993 ($000); 1993 Actuals (Consolidated Hill A&E), dated 01/17/94; Variance Analysis-1993 (Hill A&E U.S.), dated 01/12/94; Variance Analysis-1993 (Hill A&E U.S.) (Cash Basis), dated 01/12/94 |
| 260 | Memorandum from S.M. Gloss to I.E. Richter Re: November Results, dated 12/09/93, with attached |

43

| | |
|---|---|
| | Hill A&E Summary of Core U.S. Operations November 30, 1993 ($000); Variance Analysis-1993 (Hill A&E U.S.), dated 12/02/93; Variance Analysis-1993 (Hill A&E U.S.) (Cash Basis), dated 12/02/93 |
| 261 | Powerstation Texas Accounts Payable Ageing on 4/30/93, dated 04/30/93 |
| 262 | Hill A&E Comparative Balance Sheet April 30, 1993 |
| 263 | Hill A&E Comparative Balance Sheet 5/31/93 |
| 264 | Hill A&E Advances 1989 through 03/95, dated 06/03/97 |
| 265 | Promissory note (between Hill A&E and Irvin E. Richter), dated 11/26/91 |
| 266 | Security Agreement General Lien (between Hill A&E and Irvin E. Richter), dated 11/26/91 |
| 267 | CT UCC-1 Financing Statement (Hill A&E (debtor), Irvin E. Richter (secured party)), dated 12/05/91 |
| 268 | NJ UCC-1 Financing Statement (Hill A&E (debtor), Irvin E. Richter (secured party)), dated 12/10/91 |
| 269 | Commitment letter from Commerce Bank N.A. to Irvin E. and Janice L Richter, dated 08/01/91, with attached check from Irvin E. and Janice Richter to Commerce Bank (#1817), dated 08/13/91 |
| 270 | Assignment of Note (Commerce Bank N.A. to Irvin E. and Janice L. Richter), dated 11/27/91 |
| 271 | Loan and Security Agreement (between Hill A&E and Hill), dated 04/01/94 |
| 272 | Replacement Line of Credit Note (between Hill and Hill A&E), dated 04/01/94 |
| 273 | CT UCC-1 Financing Statement (Hill A&E (debtor), Hill (secured party)), dated 06/07/94 |
| 274 | NJ UCC-1 Financing Statement (Hill A&E (debtor), Hill (secured party)), dated 06/08/94 |
| 275 | NJ UCC-3 Statement of Subordination (Hill A&E (debtor), Irvin E. Richter (secured party)), dated 09/28/94 |
| 276 | CA UCC-1 Financing Statement (Hill A&E (debtor), Hill (secured party)), dated 10/18/94 |
| 277 | CA UCC-1 Financing Statement (Hill A&E (debtor), Irvin E. Richter (secured party)), dated 10/24/94 |
| 278 | CT UCC-3 Statement of Subordination (Hill A&E (debtor), Irvin E. Richter (secured party)), dated 10/31/94 |
| 279 | Cherry Hill, NJ Mortgage, dated 11/27/91 |
| 280 | Longport, NJ Mortgage, dated 11/27/91 |

| 281 | Hill A&E Unanimous Consent of Board of Directors, dated 11/27/91 |
| 282 | CT UCC-3 Statement of Assignment of Security Agreement (Hill A&E (debtor), Commerce Bank, N.A. (secured party)), dated 10/31/94 |
| 283 | Statement of Purpose of Loan (Irvin E. and Janice L. Richter to Commerce Bank, N.A.), dated 11/27/91 |
| 284 | Budget Planning-1992 (The Powerstation), dated 09/18/92 |
| 285 | Invoice # IX-1014 from PAT to Hill A&E, dated 04/01/92 |
| 286 | Invoice # IX-1013 from PAT to Hill A&E, dated 12/20/91 |
| 287 | Hill International, Inc. and Subsidiaries For the Years Ended December 31, 1994 and 1993 |
| 288 | Hill Summary of Loans to HAESI as of 5/31/96 |
| 289 | Hill Summary of Loans to Hill A&E as of December 31, 1997 |
| 290 | Interoffice memorandum from S.M. Gloss to J.L. DiStefano Re: Cash Status, dated 12/28/92, with attached Hill A&E January Cash Estimates; Hill A&E December Cash Estimates; Memorandum from WMT to LFS Re: Cash Needs for Layoffs, dated 12/28/92 |
| 291 | Interoffice memorandum from LFS to IER Re: Various Items, dated 01/15/92, with attached Cash Forecast; memorandum from S.M. Gloss to L.F. Schwartz Re: Cash for Weeks Ending 1/17/92 and 1/24/92, dated 01/14/92; Budget Planning –1992 (Hill A&E), dated 01/14/92; memorandum from S.M. Gloss to L.F. Schwartz Re: Weekly Status Report, dated 01/14/92; Financial Status Report ($000), dated 01/14/92; Hill A&E (U.K.) Financial Status Report (£ 000), dated 01/14/92; ageing report notes; Hill A&E Account Payable Ageing on 01/13/92, dated 01/13/92; and Hill A&E Accounts Receivable Ageing 01/13/92, dated 01/13/92 |
| 292 | March Cash Forecast, dated 02/10/92 |
| 293 | Memorandum from J.L. DiStefano to S.M. Gloss Re: February Operating Results, dated 03/12/92, with attached Hill A&E Accounts Receivable Analysis February 29, 1992 ($000); Hill A&E Consolidated Balance Sheet February 29, 1992 ($000); Hill A&E Statement of Cash Flow February 29, 1992 ($000); Hill A&E Summary of Operations February 29, 1992 |

| | |
|---|---|
| | ($000) |
| 294 | Hill A&E Advances, dated 07/02/92 |
| 295 | Hill A&E Immediate Cash Requirement February 24, 1993 |
| 296 | Hill A&E February Cash Estimates, faxed 02/24/93 |
| 297 | Hill A&E Cash Register Week of 12/14/92 |
| 298 | Hill A&E Consolidated Balance Sheet May 31, 1995 ($000) |
| 299 | Letter from Robert J. Daunt to Ms. Jeanne Nolen Re: Remaining ARTSOFT-PAT Documents, dated 09/01/88, with attached draft Stock/Asset Option Grant Agreement, dated 09/01/88, and draft Employment Agreement (of Dirk A. Epperson), dated 09/01/88 |
| 300 | Letter from Jeanne E. Nolen to Mr. Robert T. Daunt Re: Stock/Asset Option Agreement, dated 10/19/88, with attached draft of Stock/Asset Option Agreement |
| 301 | Memorandum from James S. Cassano to Irvin E. Richter Re: Hill A&E, dated 08/07/90 |
| 302 | Hill A&E Advances, dated 06/11/91 |
| 303 | Hill A&E Advances, dated 12/31/91 |
| 304 | Hill A&E Advances, dated 02/13/95 |
| 305 | Hill & Subsidiaries Detailed Balance Sheet 01/31/94, dated 09/30/94 |
| 306 | Hill & Subsidiaries Detailed Balance Sheet 03/31/94, dated 09/30/94 |
| 307 | Hill & Subsidiaries Detailed Balance Sheet 04/30/94, dated 09/30/94 |
| 308 | Hill & Subsidiaries Detailed Balance Sheet 05/31/94, dated 09/30/94 |
| 309 | Hill & Subsidiaries Detailed Balance Sheet 06/30/94, dated 09/30/94 |
| 310 | Hill & Subsidiaries Detailed Balance Sheet 07/31/94, dated 09/30/94 |
| 311 | Hill & Subsidiaries Detailed Balance Sheet 08/31/94, dated 09/30/94 |
| 312 | Hill & Subsidiaries Detailed Balance Sheet 10/31/94, dated 09/30/94 |
| 313 | Hill Ledger Detail Report From Period 1994/1 to 1994/10, dated 11/20/94 |
| 314 | Hill Ledger Report From Period 1994/01 to 1994/12, dated 01/23/95 |
| 315 | Closing binder (Irvin and Janice Richter's $1.1 |

| | |
|---|---|
| | Million Loan from Commerce Bank), dated 11/26/91 |
| 316 | Memorandum from JS Cassano to IE Richter Re: Hill A&E Capitalization, dated 02/10/95, with attached Hill A&E Consolidated Balance Sheet December 31, 1994 ($000) |
| 317 | Letter from Larry Schwartz to Dirk Epperson, dated 01/30/92 |
| 318 | Invoice # IX-1015 from PAT to Hill A&E, dated 07/01/92 |
| 319 | Invoice #IX-1016 from PAT to Hill A&E, dated 10/01/92 |
| 320 | Invoice #IX-1017 from PAT to Hill A&E, dated 01/01/93 |
| 321 | Invoice # IX-1018 from PAT to Hill A&E, dated 04/01/93 |
| 322 | Invoice #IX-1019 from PAT to Hill A&E, dated 07/01/93 |
| 323 | Invoice #IX-1020 from PAT to Hill A&E, dated 10/01/93 |
| 324 | Letter from Dirk Epperson to Larry Schwartz, dated 06/04/92 |
| 325 | E-mail from DAE to SMG Re: PAT Payments, dated 09/25/92 |
| 326 | Letter from Irvin E. Richter to Dirk Epperson, dated 06/26/92, with attached $5,000 check from Irvin E. and Janice Richter to Hill A&E (#1891), dated 06/26/92 |
| 327 | Letter from Larry Schwartz to Dirk Epperson and Betty Schneider, dated 09/21/94 |
| 328 | Letter from Larry Schwartz to Dirk Epperson and Betty Schneider, dated 11/28/94 |
| 329 | Check from Hill A&E to PAT(#2758), dated 10/22/92 |
| 330 | Check from Hill A&E to PAT (#1242), dated 02/24/95 |
| 331 | Letter from Robert Sullivan to Larry Schwartz, dated 03/30/95 |
| 332 | Summons and Complaint (1995 Action), dated 10/04/95 |
| 333 | Appearance of Ronald Cohen (1995 Action), dated 10/25/95 |
| 334 | Answer to Complaint (1995 Action), dated 11/10/95 |
| 335 | Motion for Enlargement of Time to Amend Complaint (1995 Action), dated 12/14/95 |
| 336 | Report of Parties' Planning Meeting (1995 |

47

| | |
|---|---|
| | Action), dated 02/27/96 |
| 337 | Letter from Robert Sullivan to Robert B. Flynn Re: Epperson and Schneider v. Hill Arts (1995 Action), dated 04/04/96 |
| 338 | Plaintiffs' First Set of Interrogatories to Defendant (1995 Action), dated 03/22/96 |
| 339 | Letter from Robert B. Flynn to Robert Sullivan Re: Epperson v. Hill Arts & Entertainment Sys., Inc., Docket No. 395 CV 1231, dated 05/06/96 |
| 340 | Letter from Robert B. Flynn to Robert Sullivan Re: Epperson v. Hill Arts & Entertainment Sys., Inc., Docket No. 395 CV 1231, dated 05/15/96, with attached Confidentiality Order draft (1995 Action), dated 05/15/96 |
| 341 | Letter from Robert B. Flynn to Robert Sullivan, dated 06/12/96 |
| 342 | 1992 Forecast (U.K. Subsidiary), dated 09/18/92 |
| 343 | Defendant's Objections and Responses to Plaintiffs' First Request for Production of Documents (1995 Action), dated 06/12/96 |
| 344 | Motion to Compel Further Responses to Interrogatories and Request for Production of Documents (1995 Action), dated 07/23/96 |
| 345 | Defendant's Memorandum in Response to Plaintiffs' Motion to Compel Further Responses (1995 Action), dated 08/14/96 |
| 346 | Affidavit of Robert B. Flynn (1995 Action), dated 08/14/96 |
| 347 | Consensual Motion to Modify the Pretrial Plan (1995 Action), dated 08/29/96 |
| 348 | Motion of Tyler Cooper & Alcorn to Withdraw as Counsel to Defendant Hill A&E (1995 Action), dated 09/11/96 |
| 349 | Application For Prejudgment Remedy (1995 Action), dated 07/31/96 |
| 350 | Ruling on Pending Motions (1995 Action), dated 10/08/96 |
| 351 | Motion For Entry of Default of Corporation Defendant for Failure to Appear by Counsel and Refusal to Comply with Discovery Order (1995 Action), dated 01/31/97 |
| 352 | Default Judgment (1995 Action), dated 04/23/97 |
| 353 | Letter from Dirk Epperson and Betty Schneider to Larry Schwartz, dated 10/11/94 |

| 354 | Check from Hill A&E to PAT(#4228), dated 09/09/94 |
| 355 | Check from Hill A&E to PAT (#4291), dated 10/07/94 |
| 356 | Hill A&E Lease/Loan Analysis March 30, 1993 |
| 357 | Memorandum from LFS to IER Re: $200,000 wire, dated 03/13/92 |
| 358 | Letter from David L. Richter to HAESI Software, Inc., dated 11/11/96, with attached Certification of delivery of Erin E. Leschak, dated 11/11/96 |
| 359 | Resume of Steve N. Economu |
| 360 | Fax cover sheet from Dan Afrasiabi to Mr. James Cassano, dated 03/21/96, with attached Proposed Term Sheet for the Acquisition of the Assets of Hill A&E by Entertainment Express; Entertainment Express Terms of "Series A" Preferred Stock Private Placement Offering |
| 361 | Letter from Scott A. Burri to James S. Cassano, dated 02/06/96 |
| 362 | Engagement letter from Howard, Lawson & Co. to Irvin E. Richter, dated 05/07/96, with attached Hill Indemnification Provisions to Fairness Opinion Engagement Letter, dated 05/07/96 |
| 363 | Letter from James S. Cassano to Mr. Scott Burri, dated 01/05/96, with attached Business Plan |
| 364 | Entertainment Express January 1996 Business Plan #4 |
| 365 | Checks from Hill to Commerce Bank |
| 366 | Check from Hill A&E to PAT (#4337), dated 10/31/94 |
| 367 | Check from Hill A&E to PAT (#4487), dated 01/10/95 |
| 368 | Check from Hill A&E to PAT (#4515), dated 01/24/95 |
| 369 | Hill A&E PAT Payment History |
| 370 | Letter from David L. Richter to The Honorable Joan G. Margolis Re: Epperson v. Hill Arts & Entertainment Systems, Inc., Docket No. 395CV2131 (DJS), dated 11/06/96 |
| 371 | Letter from David L. Richter to The Honorable Joan G. Margolis Re: Epperson v. Hill Arts & Entertainment Systems, Inc., Docket No. 395CV2131 (DJS), dated 10/08/96 |
| 372 | Letter from Betty Schneider to Larry Schwartz, dated 11/11/94, with attached letter from Dirk Epperson and Betty Schneider to Larry Schwartz, |

49

| | |
|---|---|
| | dated 10/11/94 |
| 373 | Memorandum of Status Conference (1995 Action), dated 10/08/96 |
| 374 | Letter from Robert B. Flynn to Robert Sullivan Re: *Epperson v. Hill Arts & Entertainment Sys., Inc.*, Docket No. 395CV2131, dated 08/23/96 |
| 375 | Letter from Robert B. Flynn to Robert Sullivan Re: *Epperson v. Hill Arts & Entertainment Sys., Inc.*, Docket No. 395CV2131, dated 08/21/96 |
| 376 | Motion for Enlargement of Time to Amend Complaint (1995 Action), dated 12/04/95 |
| 377 | Ruling on Motion to Dismiss (1995 Action), dated 03/24/98 |
| 378 | Memorandum Opinion and Order (1995 Action), dated 03/23/98 |
| 379 | Schedule A: New Program Customer Payment History Prior to 12/31/92 |
| 380 | Letter from Robert B. Flynn to Robert Sullivan, Esq. Re: *Epperson v. Hill Arts & Entertainment Sys., Inc.*, Docket No. 3:95 CV 2131, dated 06/17/96, with attached Schedule A: New Program Customer Payment History Prior to 12/31/92; Schedule B: Schedule of Royalties Accrued by Performing Arts Technologies |
| 381 | Interoffice memorandum from LFS to JLD Re: PAT Amendment to Custom Software Development Agmt., dated 07/31/89, with attached Amendment to Custom Software Development Agreement, dated 06/19/89 |
| 382 | Memorandum from JS Cassano to IE Richter Re: Hill A&E Performance – August 1995, dated 10/02/95, with attached Sales Results – 1995 Year to Date; Sales Prospects & Projections Month of September 1995; Memorandum from SMG to LFS Re. Month-end Financial Report – August, dated 09/14/95; Employee Advance Accounts 8/31/95; Cash Receipts; Hill A&E U.S. Operations Variance Analysis, dated 09/14/95 |
| 383 | Fairness Opinion, dated 05/31/96 |
| 384 | Entertainment Express Business Plan January 25, 1995 |
| 385 | Entertainment Express Acquisition of Certain Assets and Assumption of Certain Liabilities of Hill Arts & Entertainment Systems, Inc., Volumes 1 through 3, dated 05/31/96 |

| 386 | Letter of Mutual Understanding (between Ventana Global, Ltd. And Hill A&E and Entertainment Express), dated 03/31/96, with attached Entertainment Express Proposed Capitalization Table |
| 387 | Engagement agreement letter from Ventana Global, Ltd. to Entertainment Express and Hill A&E, dated 04/19/96 |
| 388 | Certificate of Amendment of Hill A&E (DE), dated 05/31/96 |
| 389 | Certificate of Incorporation of The Entertainment Express, Inc. (DE), dated 01/25/95 |
| 390 | Stock and Warrant Purchase Agreement (between Hill A&E and Hill), dated 05/31/96 |
| 391 | Convertible Promissory Note (between Entertainment Express, Inc. and Hill A&E), dated 05/31/96 |
| 392 | First Amendment to the Loan and Security Agreement (between Hill A&E and Hill), dated 05/31/96 |
| 393 | Letter agreement from Irvin E. Richter to Hill and Hill A&E Re: Sales of Assets, dated 05/31/96 |
| 394 | Collateral Pledge Agreement (between Hill A&E and Hill), dated 05/31/96 |
| 395 | Collateral Pledge Agreement (between Hill A&E and Irvin E. Richter), dated 05/31/96 |
| 396 | Hill A&E Forecast of Revenues from Sales of Systems, dated 09/13/92 |
| 397 | CT UCC-3 (Hill A&E (debtor), Irvin E. Richter (secured party)) (undated) |
| 398 | NJ UCC-3 (Hill A&E (debtor), Irvin E. Richter (secured party)) (undated) |
| 399 | CA UCC-2 (Hill A&E (debtor), Irvin E. Richter (secured party)) (undated) |
| 400 | NJ UCC-1 (Hill A&E (debtor), Hill (secured party) (undated) |
| 401 | Letter from David L. Richter to HAESI Software, Inc., dated 10/18/96, with attached Certification of delivery by Erin E. Leschak, dated 10/18/96 |
| 402 | Budget Planning-1993 (The Powerstation), dated 11/30/92 |
| 403 | Hill A&E February Cash Estimates |
| 404 | Hill A&E January Cash Estimates |
| 405 | Year to Date Profit & Loss-Hill A&E April 30, |

| | |
|---|---|
| | 1993 |
| 406 | Monthly Income Statement - Total Company April 30, 1993 |
| 407 | The Powerstation Comparative Balance Sheet April 30, 1993 |
| 408 | Monthly Profit & Loss - The Powerstation April 30, 1993 |
| 409 | The Powerstation, Inc. Year-to-Date Profit & Loss April 30, 1993 |
| 410 | Powerstation Texas, Inc. Comparative Balance Sheet April 30, 1993 |
| 411 | Hill A&E Consolidated Worksheet Excludes Intercompany Accounts |
| 412 | Hill A&E Advances After Bank Agreement |
| 413 | Hill A&E Years Ending December 31 (000's) |
| 414 | (Exhibit A) Issuance of Series A Preferred Stock September 30, 1996 |
| 415 | Press release: "Entertainment Express to Sell Tickets on Net," Copyright 1996 Billboard Publications, Inc., dated 09/07/96 |
| 416 | Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories (1995 Action), dated 06/12/96 |

The above list does not include rebuttal and impeachment exhibits.

12. **Deposition Testimony.**

#12   DEFENDANTS IRVIN RICHTER AND HILL INTERNATIONAL'S OFFER OF DEPOSITION TESTIMONY

In the event that either or both Plaintiffs are not available at trial, Defendants intend to have each Plaintiff testify by deposition at trial. Defendants propose to read the following transcript pages into evidence:

| Deposition | Pages |
|---|---|
| Dirk Epperson | 7-10, 12-18, 26-31, 35-37, 38, 43, 44-46, 52-55, 59-62, 64 |

| Betty Schneider | 7, 8, 9-10, 19-26, 32-33, 35, 49-50, 52-53 |

13.    **Requests for Jury Instructions.**

This is a non-jury case.

14.    **Anticipated Evidentiary Problems.**

### PLAINTIFFS' ANTICIPATED EVIDENTIARY PROBLEMS

Plaintiffs object to any reference to any Arthur Anderson audit as hearsay.

Plaintiffs object to the introduction or calling by Defendants of any documents or witnesses not produced in discovery.

### #14 - DEFENDANTS' MOTION IN LIMINE RE: COLLATERAL ESTOPPEL

Defendants Irvin Richter ("Richter") and Hill International, Inc. ("Hill") (together, the "Hill Defendants") hereby move in limine to preclude Plaintiffs, Dirk Epperson and Betty Schneider, from relitigating in the above-captioned matter issues previously litigated and decided in a prior related action between Plaintiffs and the Hill Defendants known as Epperson v. Entertainment Express, Inc., 338 F.Supp. 2d 328 (D. Conn. 2004), aff'd, 159 Fed. Appx. 249 (2d Cir. 2005), cert. denied, 126 S. Ct. 2296 (U.S. 2006) (the "Fraudulent Transfer Action"). In the Fraudulent Transfer Action, the Court determined that the Hill Defendants held valid perfected security interest in the assets of Hill Arts & Entertainment Systems, Inc. ("Hill A&E") and the proceeds of such assets, a Convertible Note. The Court determined that such security interests well exceeded the value of Hill A&E's assets and the Convertible Note.

As set forth in the attached memorandum, under the doctrine of collateral estoppel, Plaintiffs should not be permitted to relitigate these issues in the instant action nor should they

be permitted to relitigate the factual findings made by the Court in support of its determination of these issues.

WHEREFORE, the Hill Defendants request that their Motion in Limine be granted.

### #14 - DEFENDANTS' MOTION IN LIMINE RE: PAROL EVIDENCE

Defendants Irvin Richter ("Richter") and Hill International, Inc. ("Hill") (together, the "Hill Defendants") hereby move to preclude any oral testimony by Plaintiffs, Dirk Epperson and Betty Schneider, that they or their company, Performing Arts Technology, Inc., received oral assurances that either of the Hill Defendants would capitalize the software development project contemplated by the agreement between PAT and ArtSoft, Inc.

The Hill Defendants are filing a Memorandum in Support of their Motion in Limine Re: Parol Evidence.

WHEREFORE, the Hill Defendants request that their Motion in Limine be granted.

### #14 - DEFENDANTS IRVIN RICHTER AND HILL INTERNATIONAL'S MOTION TO PRECLUDE

Defendants Irvin Richter and Hill International, Inc. (the "Hill Defendants") hereby move pursuant to Fed. R. Civ. P. 37(c)(1) to preclude the testimony of Plaintiffs' expert witness, Walter C. King, on the grounds that Plaintiffs did not disclose this expert witness until March 8, 2007 in connection with the preparation of the Joint Pretrial Memorandum, which date was almost 8 years after this case was filed and almost 6 years after the date for the disclosure of Plaintiffs' expert witnesses established the Final Scheduling Order. As set forth in the Memorandum in Support of Defendants' Motion to Preclude, Plaintiffs' delinquent disclosure of their expert witness is not substantially justified and to permit Mr.

54

King to testify would be extremely prejudicial to the Hill Defendants, because this case is on the eve of trial, the Hill Defendants have not had an opportunity to depose Mr. King, retain their own expert rebuttal witness or even see Mr. King's report. Defendants also seek the costs of this Motion.

A memorandum of law and an affidavit of the undersigned in support of this Motion are being filed herewith.

### # 14 - MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE RE: COLLATERAL ESTOPPEL

l.    Introduction

Defendants Irvin Richter ("Richter") and Hill International, Inc. ("Hill") (together, the "Hill Defendants") submit the instant Memorandum in support of their Motion in Limine to prevent Plaintiffs, Dirk Epperson and Betty Schneider ("Plaintiffs") from relitigating in the instant action (the "Instant Action") issues previously litigated and decided in a prior related action between Plaintiffs and the Hill Defendants, among others, known as Epperson v. Entertainment Express, Inc., 338 F. Supp. 2d 328 (D. Conn. 2004), aff'd, 159 Fed. Appx. 249 (2d Cir. 2005), cert. denied, 126 S. Ct. 2296 (U.S. 2006) (the "Fraudulent Transfer Action"). In the Fraudulent Transfer Action, this Court determined that Richter and Hill held valid perfected security interests in the assets of Hill Arts & Entertainment Systems, Inc. ("Hill A&E") and the proceeds of such assets, a Convertible Note, which security interests for exceeded the value of the assets and the Convertible Note. For the reasons set forth below, under the doctrine of collateral estoppel, Plaintiffs should not be permitted to relitigate this issue in the Instant Action nor should they be permitted to relitigate the

subsidiary factual determinations made by the Court in support of its determination of this issue (collectively the "Disputed Issues").

ll.    Findings in the Fraudulent Transfer Action

The Court found in the Fraudulent Transfer Action that Hill had loaned Hill A&E "about $12 million" and that Hill became a secured creditor of Hill A&E. Id. at 330.  In support of these findings, the Court made several ancillary findings of fact, including the following:  "On April 1, 1994, Hill A&E and Hill entered into a Loan and Security Agreement. In this agreement, the parties stated the following: '[Hill A&E] has borrowed from [Hill] for several years on a line of credit. [Hill A&E] and [Hill] wish to renew this Line of Credit Loan in the amount of $12,000,000 for another five year period.'" Id. at 338 (internal citations omitted). The Court further found that, that the agreement stated that

> [Hill] shall establish for [Hill A&E] a $12,000,000 line of credit ("Line of Credit Loan") pursuant to which advances have been made and, in [Hill's] discretion, additional advances for the payment of obligations of [Hill A&E] may be made by [Hill] and for payment of interest on this Line of Credit Loan may be made from time to time up to a maximum aggregate outstanding principal balance of Twelve Million ($12,000,000.00) Dollars. The Line of Credit Loan shall accrue at the rate of Seven (7%) per annum.

Id.

The Court also found that, "[t]he agreement further provided that Hill would take a security interest in 'collateral,' which is defined as 'all Accounts Receivable, Equipment, Inventory, Contract Rights and General Intangibles of Borrowers and Guarantor, all of the foregoing whether now owned or hereafter acquired'. . . , 'now owned or hereafter acquired by [Hill A&E] and all cash and non-cash proceeds thereof and proceeds of proceeds,'" Id. (citations omitted). Additionally, the Court found that, "Hill A&E made a Replacement Line of

Credit Note payable to Hill on April 1, 1994.  UCC-1 statements with respect to Hill's

security interest were filed in Connecticut on June 7, 1994, New Jersey on June 8, 1994,

and California on October 18, 1994." Id.   The Court found that "[b]oth statements set forth

the following property as subject to the security interest:

> All 'Accounts', 'Contracts', 'Contract Rights', 'Chattel Paper', 'Instruments',
> 'Documents', 'General Intangibles', 'Inventory', 'Equipment', and 'Fixtures' as each
> term is defined in the Uniform Commercial Code as enacted in the State of New
> Jersey, all deposits and bank accounts, all other personal property, tangible or
> intangible, all books and records relating to the foregoing and all proceeds and
> products thereof and substitutions, additions and accessions thereto, now existing or
> hereafter acquired, wherever located.

Id.

The trial court further determined that, "[a]s of the date of the sale [of Hill A&E's

assets to Entertainment Express], Hill A&E owed Hill $8,402,909.18 in principal and

$3,782,000.00 in interest pursuant to the April 1, 1994 Loan and Security Agreement." Id.

at 340.

The Court in the Fraudulent Transfer Action also made findings with respect to a loan

from Richter to Hill A&E. The Court found that "[o]n November 26, 1991, Hill A&E made a

promissory note payable to Richter with the principal amount of $1,100,000.00. The note

was payable on demand, with an interest rate at the prime rate as set by Commerce Bank,

N.A. plus 1.5%." Id. at 337. The Court further found, "on November 26, 1991, Hill A&E

executed a security agreement in all of Hill A&E's personal property as collateral for the

promissory note. UCC-1 financing statements with respect to Richter's security interest

were filed in Connecticut on December 5, 1991, in New Jersey on December 10, 1991 and

in California on October 24, 1994." Id. The Court determined that "[t]he security agreement

and the UCC-1 statements cited the following property as subject to the security interest granted to Richter:

> All 'Accounts', 'Contracts', 'Contract Rights', 'Chattel Paper', 'Instruments', 'Documents', 'General Intangibles', 'Inventory', 'Equipment', and 'Fixtures' as each term is defined in the Uniform Commercial Code as enacted in the State of New Jersey, all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located."

Id. at 337-338.

Additionally, the Court found that, "[s]ubsequent to Hill A&E and Hill's agreement, Richter recorded a subordination of his security interest to that of Hill. On September 8, 1994, Richter filed a UCC-3 Statement of Subordination in New Jersey, which certified that he had subordinated his security interest in Hill A&E's property to Hill's security interest. Richter's October 24, 1994 UCC-1 statement, which was filed in California, also indicated that Hill's interest was superior to Richter's. On October 31, 1994, Richter filed a UCC-3 statement of subordination in Connecticut reflecting the same." Id. at 338-39.  The Court found that on the date of the asset sale, May 31, 1996, Hill A&E "owed Richter $682,344.00 . . . which was also secured." Id. at 340.

The Court determined that "[o]n May 31, 1996, Hill A&E sold substantially all of its assets to [Entertainment Express], and changed its name to 'HAESI'. Payment was in the form of a convertible note to HAESI from [Entertainment Express] in the amount of $3,000,000.00, with interest to accrue at a rate of 8% per year. The principal was due on May 31, 2001. Interest on the convertible note was to be paid annually on May 31 of each year, the first payment of which was to be paid in stock, and each payment thereafter in

either stock or cash, at [Entertainment Express'] discretion. The convertible note gave the

holder the right to convert any amount of the principal balance thereof into [Entertainment

Express ] stock." Id. at 339-40 (footnote omitted).

The Court found that as Hill A&E's "secured creditors, Hill and Richter took liens on

the convertible note as proceeds from the asset sale." Id. at 340. Additionally, the Court

found that, "[a]s a condition of the asset sale to [Entertainment Express], both Hill and

Richter released their security interests on the assets transferred to [Entertainment

Express], and substituted the convertible note, and any payments made thereunder, as

collateral for their loans to [Hill A&E]. Hill and Richter subsequently filed UCC-1 statements

in New Jersey listing the following collateral as subject to their respective security interests:

> Debtor's interest in the $3,000,000 Convertible Promissory Note ('Note') from
> Entertainment Express, Inc. to Debtor dated May 31, 1996; all shares of stock
> hereafter acquired by Debtor as interest or upon conversion of the Note; all interest,
> dividends and distributions payable with respect to the foregoing (whether or not the
> same constitute general intangibles); and all proceeds of the foregoing."

Id.  Finally, the Court found that, "Hill, which is located in New Jersey, took possession of the

convertible note following the asset sale, and payments under the convertible note were

made to Hill. Hill then foreclosed on the note on November 11, 1996." Id. (The foregoing

factual findings of the Court may hereinafter be collectively referred to as the "Court's

Factual Findings").

Based upon the Court's Factual Findings, the Court determined that "Hill A&E's

property, and any property transferred to HAESI on May 31, 1996, specifically the

convertible note, was encumbered by security interests that exceeded the value of the

property, . . ." and that "Hill and Richter had perfected security interests well in excess of the

value of both Hill A&E's property and the convertible note payable." Id. at 342. The Court

further determined that Hill's and Richter's security interests "are 'valid liens' that exceeded

the value of the collateral, . . ." meaning that each such lien was "'a charge against or an

interest in property to secure payment of a debt or performance of an obligation, and

includes a security interest created by agreement, . . .'" Conn. Gen. Stat. § 52-552b(2), and

that each lien was "'effective against the holder of a judicial lien subsequently obtained by

legal or equitable process or proceedings.'" Conn. Gen. Stat. § 52-552b(13). Id. The Court

also ruled that "[t]he original security interest in Hill A&E's property covered proceeds from

the sale of the property, and therefore covered the convertible note. Id. at 344 n.14. (The

foregoing legal conclusions may hereinafter collectively be referred to as the "Court's Legal

Conclusions"). (The Court's Factual Findings and the Court's Legal Conclusion may be

collectively referred to as the "Disputed Issues").

III.    ARGUMENT

 The Doctrine of Collateral Estoppel Precludes the Relitigation of the Court's
 Factual Findings and the Court's Legal Conclusions

 The doctrine of issue preclusion or collateral estoppel bars a party from relitigating in

a second proceeding an issue that was fully and fairly litigated in a prior proceeding.

Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 146 (2d Cir. 2005); Marvel Characters, Inc.

v. Simon, 310 F.3d 280, 288 (2d Cir. 2002). Collateral estoppel applies when: (1) the

issues in both proceedings are identical; (2) the issue was actually litigated and actually

decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the

issue; and (4) the resolution of the issue was necessary to support a valid and final

judgment on the merits.  Riley v. United States, 78 Fed. Appx. 774, 776 (2d Cir. 2003).

Federal courts apply federal law in determining the preclusive effect of a federal judgment.

Marvel Characters, 310 F.3d at 286.

### 1.    The Issues in Both Cases are Identical

The first requirement for the application of collateral estoppel – that the issues in both

proceedings are identical – is easily satisfied here.  In both actions, Plaintiffs dispute the

existence of the loans from Hill and Richter to Hill A&E, the validity of the security interests

held by Hill and Richter in Hill A&E's assets and whether the security interests exceeded the

value of Hill A&E's assets and the Convertible Note.  See Second Amended Complaint,

Instant Action, Docket #12, Count One ¶ 9(c); Plaintiffs' Memorandum of Law in Support of

Motion for Summary Judgment, Instant Action, Docket # 60, at 13, 14, 16, 20, 21; Plaintiffs'

Separate Statement of Facts Pursuant to Local Rule 9(c)2, Instant Action, Docket # 70,

Statements 70-72, 82, 83, 101, 102, 103; Complaint, Fraudulent Transfer Action, Docket

#1, Second Cause of Action ¶ 2 and Prayer for Relief ¶ 2; Memorandum of Law in

Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs'

Cross Motion for Summary Judgment, Fraudulent Transfer Action, Docket # 61 & 66

("Plaintiffs' Summ. Judg. Mem."), at 3-4, 6, 8, 9-12; Plaintiffs' Local Rule 9(c)2 Statement,

Fraudulent Transfer Action, Docket # 64, ¶ ¶ 4, 9-19, 26-31.  Thus, the Disputed Issues are

identical in both proceedings.

### 2.    The Disputed Issues Were Actually Litigated and Decided

As to the second requirement for the application of the doctrine of collateral

estoppel, the Disputed Issues were actually litigated and decided in the Fraudulent Transfer

Action, as both parties addressed these issues extensively in their summary judgment briefs in the Fraudulent Transfer Action.  See briefs cited supra at p. 7.  See also Corrected Memorandum in Support of Defendants Entertainment Express, Inc.'s n/k/a Advantix Inc.'s and Hill International Inc.'s Motion for Summary Judgment, Docket # 42 ("Defendants' Summ. Judg. Mem.") at 2-6, 12-17; Appearing Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, Docket # 70, at 4-5, 20-23; Defendants Hill International Inc.'s and Entertainment Express, Inc. n/k/a/ Advantix, Inc.'s Reply to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Docket # 79, at 1-2, 4-15, 18-20; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Cross Motion for Summary Judgment, Docket # 81, at 1-5, 8-9.       In its decision on the parties' cross motions for summary judgment in the Fraudulent Transfer Action, the Court found, inter alia, that "Hill loaned Hill A&E about $12 million and became a secured creditor of Hill A&E."  Epperson v. Entertainment Express, Inc., 338 F. Supp. 2d at 330.  The Court also found that at the time of the sale, Hill A&E owed Richter $682,344.00 which was also secured. Id. at 340. The Court further determined that Hill and Richter held perfected security interests in Hill A&E's assets and the Convertible Note, that such security interests were valid liens and that the security interests exceeded the value of Hill A&E's assets and the Convertible Note. Id. at 342.

For purposes of the doctrine of collateral estoppel, the Disputed Issues have been finally decided, as trial court decisions on summary judgment constitute decisions on the merits and are entitled to full preclusive effect. Country Rd. Music, Inc. v. MP3.com, Inc., 279 F. Supp. 2d 325, 328-29 (S.D.N.Y. 2003) (applying doctrine of collateral estoppel to bar

relitigation of issues that were "raised and resolved" on summary judgment in prior actions);

TufAmerica, Inc. v. Hammond, No. 99 Civ. 10369 (CSH), 2002 U.S. Dist. LEXIS 9258, at

*18 (S.D.N.Y. May 22, 2002) (finding that decisions on summary judgment deal with the

sufficiency of the proof and are entitled to preclusive effect); Jeffreys v. Teamsters Local

Union No. 1150, Civ. No. 3:97CV1538 (AHN), 2001 U.S. Dist. LEXIS 7368, at *8-13 (D.

Conn. Feb. 28, 2001), aff'd 28 Fed. Appx. 92 (2d Cir. 2002) (applying doctrine of collateral

estoppel to bar relitigation of issues decided on summary judgment in another action).  Thus,

because the Disputed Issues were actually litigated and decided, the second requirement

for application of collateral estoppel has been satisfied.

> 3.    Plaintiffs had a Full and Fair Opportunity to Litigate the Disputed
>        Issues

As to the third requirement for the application of collateral estoppel, Plaintiffs had a

full and fair opportunity to litigate the Disputed Issues in the Fraudulent Transfer Action.

Appropriate considerations in determining whether a plaintiff had a full and fair opportunity

to litigate an issue in a prior action are: (1) a plaintiffs' incentive to vigorously litigate an

issue in a prior action; (2) the presence of procedural opportunities in the second case

which were unavailable in the earlier case; (3) the existence of inconsistent judgments; and

(4) whether, through no fault of its own, a plaintiff was deprived of crucial evidence or

witnesses in the earlier action.  TufAmerica, 2002 U.S. Dist. LEXIS 9258 at *25-26.  None

of the foregoing considerations apply here.  Plaintiffs were clearly motivated to litigate the

Disputed Issues in the Fraudulent Transfer Action, as these issues were determinative of

the outcome of the Fraudulent Transfer Action, which was whether Hill A&E's assets and the

Convertible Note were "assets" within the meaning of the Uniform Fraudulent Transfer Act , Conn. Gen. Stat. § Conn. Gen. Stat. § 52-552b(2), because they were encumbered by valid liens, and therefore subject to the UFTA.  As noted above, both parties provided extensive submission about the Disputed Issues in their pleadings and briefs.  Plaintiffs, in particular, addressed these issues in at least 20 pages in 4 filings.  See Complaint, Fraudulent Transfer Action, Docket #1, Second Cause of Action ¶ 2 and Prayer for Relief ¶ 2; Plaintiffs' Summ. Judg. Mem., Fraudulent Transfer Action, Docket # 61 & 66 at 3, 6, 8, 10-12; Plaintiffs' Local Rule 9(c)2 Statement, Fraudulent Transfer Action, Docket # 64, ¶¶ 9-10; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Cross Motion for Summary Judgment, Fraudulent Transfer Action Docket #81, p. 1, 4-5.

Second, there are no procedural opportunities present in the Instant Action which were unavailable in the Fraudulent Transfer Action. Both cases were pending in this Court, and the same discovery, procedural and evidentiary rules are applicable to both cases. Plaintiffs availed themselves of full discovery and appellate opportunities in the Fraudulent Transfer Action, including appealing the trial court's decision to the United States Court of Appeals for the Second Circuit on two occasions and attempting to appeal the final decision to the United Sates Supreme Court. Additionally, Plaintiffs also had access to the same witnesses and evidence in the Fraudulent Transfer Action as they do in the Instant Action.  Thus, the third requirement for application of collateral estoppel has been met.  See Marvel Characters, Inc. v. Simon, 310 F.3d at 286 (stating that collateral estoppel operates to "prevent parties from contesting matters they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and

64

vexation of multiple lawsuits").

### 4.    The Resolution in the Fraudulent Transfer Action of the Disputed Issues was Necessary to Support the Decision in that Case

Fourth and finally, the resolution of the Disputed Issues was necessary to support a valid and final judgment on the merits of the Fraudulent Transfer Action.  As stated above, one of the issues in the Fraudulent Transfer Action was whether Hill A&E's assets, which were sold to Entertainment Express, were "assets" within the meaning of the UFTA, because such assets were encumbered by valid liens that exceeded the value of the transferred assets.  Epperson v. Entertainment Express, Inc., 338 F. Supp. 2d at 342.  The Court's findings regarding the amount of the loan from Hill to Hill A&E, the amount owed by Hill A&E to Richter, and the Hill Defendants' status as secured creditors were necessary to the determination that Hill A&E's property and the proceeds of such property, the $3 million Convertible Note, were fully encumbered and therefore not "assets" under the UFTA. Because the assets and the Convertible Note were not "assets" under the UFTA, the Court found that  Plaintiffs could not maintain an action against Defendants for allegedly fraudulently transferring such assets.  Id.  The Court wrote, "[b]ecause Hill A&E's property, and any property transferred to HAESI on May 31, 1996, specifically the convertible note, was encumbered by security interests that exceeded the value of the property, plaintiffs may not pursue a remedy under UFTA." Id.  Thus, the fourth and final requirement for the application of collateral estoppel has been met.

## IV.    CONCLUSION:

For the foregoing reasons, Defendants' Motion In Limine to preclude Plaintiffs from

relitigating issues that Hill's and Richter had valid security interests in Hill A&E's assets and the Convertible Note, which security interests exceeded the value of Hill A&E's assets and the Convertible Note and from relitigating the Court's Factual Findings, already decided in the Fraudulent Transfer Action, should be granted.

## #14 - AFFIDAVIT OF CAROLYN W. KONE IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE

I, Carolyn W. Kone, being duly sworn hereby depose and say:

1.      I am counsel for the Defendants Irving Richter and Hill International. Inc. in the above-captioned matter.

2.      On March 8, 2007, I received an email from Plaintiffs' counsel, Robert Sullivan, listing Plaintiffs' witnesses as part of the parties' Joint Trial Memorandum.  This list identified Walter C. King, a certified public accountant as Plaintiffs' expert witness, who was expected to testify at trial.  Mr. King had not previously been disclosed by Plaintiffs as an expert witness in this case.  Additionally, no expert report was provided to the undersigned counsel, nor was Mr. King curriculum vitae's provided to the undersigned counsel.  The date established by the Court for the disclosure of expert witnesses for this case was July 31, 2001.

3.      On March 9, 2007, I emailed Mr. Sullivan and asked that he remove Mr. King's name from Plaintiffs' List of Witnesses.

4.      I thereafter spoke to Mr. Sullivan and he told me that he would not remove Mr. King's name from Plaintiffs' Witness List.

66

5.        I hereby certify that I conferred with counsel for Plaintiffs in an effort in good faith to resolve by agreement the issues raised by Defendants' Motion to Preclude without the intervention of the Court, I have been unable to reach such an agreement.

## #14 - MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE

I.    Introduction

In this almost 8 year old alter ego case, Plaintiffs, Dirk Epperson and Betty Schneider, disclosed to Defendants Irvin Richter and Hill International, Inc. (collectively the "Hill Defendants") for the first time, on March 8, 2007, in connection with the preparation of the Joint Trial Memorandum that they intend to call an expert witness at trial, Walter C. King, a certified public accountant. Plaintiffs did not provide an expert report from Mr. King. Defendants hereby move pursuant to Fed. R. Civ. P. 37(c)(1) to preclude the testimony of Mr. King on the grounds that Plaintiffs did not disclose this expert witness until almost 6 years after the date set for disclosure of Plaintiffs' expert witnesses in the Final Scheduling Order, such belated disclosure is not substantially justified and to permit Mr. King to testify at trial would be highly prejudicial to the Hill Defendants. The Hill Defendants also seek the costs of this motion.

II.    Factual Background

Plaintiffs filed this alter ego case on June 30, 1999 in the United States District Court for the District of New Jersey. On April 24, 2001, the Court (Rosen, Magistrate Judge) entered a Final Scheduling Order. Paragraph 3 of the Final Scheduling Order provides the following:

All experts' reports on behalf of plaintiffs shall be served upon counsel for defendants

67

not later than July 31, 2001. All experts' reports on behalf of defendants shall be served upon counsel for plaintiffs not later than September 14, 2001. Each such report should be accompanied by the <u>curriculum</u> <u>vitae</u> of the proposed expert witness. **No expert opinion testimony shall be admitted at trial with respect to any witness for whom this procedure has not been timely followed.** Depositions of proposed expert witnesses shall be concluded by September 30, 2001. (Bold emphasis added).

Paragraph 8 of the Final Scheduling Order states the following:

**THE FAILURE OF A PARTY OR ATTORNEY TO OBEY THIS ORDER MAY RESULT IN IMPOSITION OF SANCTIONS UNDER RULE 16(f), FED. R. CIV. P.**

A copy of the Final Scheduling Order is attached hereto as Exhibit A.

On September 17, 2001, the Honorable Stanley S. Brotman, United States District Judge, with the parties' consent, transferred this case to this Court pursuant to 28 U.S.C. § 1404(a).

Plaintiffs did not serve an expert's report or curriculum vitae on the Hill Defendants on July 31, 2001 nor did Plaintiffs disclose an expert. Rather, on March 8, 2007, in connection with the preparation of the Joint Trial Memorandum, Plaintiffs emailed to the Hill Defendants a List of Witnesses, which included the following:

Walter C. King
Walter C. King and Associates
991 Post Road East, #2
Westport, CT 06880
Mr. King is a member of the American Institute of Certified Public Accountants, the Connecticut Society of Certified Public Accountants, The Institute of Business Appraisers, Inc., the BSOP Association and the American Society of Appraisers-Business Valuation. His Curriculum Vitae is attached.[1] He is expected to testify as an expert witness inter alia, that HAESI was grossly undercapitalized. The basis for his opinion is the financial statements and other materials which have been identified as exhibits in this trial memorandum. He is expected to testify as to the actual capitalization of the HAESI and other related companies, based, again, upon the financial data contained in the exhibits. He is expected to testify that the transferees of the assets gained a significant advantage over the creditors,

_____

1 Mr. King's Curriculum Vitae was not attached to the email sent on March 8, 2007.

This was the first notice that the Hill Defendants had that Plaintiffs intend to call an expert witness at trial.  No expert report was provided.

III.    Argument

Fed. R. Civ. P. 26(a)(2)(A) provides that in addition to the disclosures required by Rule 26(a)(1), "a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Evid. 702, 703 and 705 pertain to testimony by expert witnesses. Rule 26(a)(2)(B) requires that the disclosure of the identity of the expert witness be accompanied by an expert's report, and Rule 26(a)(2)(C) states that "[t]hese disclosures shall be made at the times and in the sequence directed by the court." "This rule affords parties 'reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" Kaufman v. National Railroad Passenger Corporation, 3:02cv1700 (PCD), 2004 U.S. Dist. LEXIS 414 *4 (D. Conn. Jan. 15, 2004)(internal citations omitted).

If a party does not disclose its expert witness as required by Rule 26(a)(2), Fed. R. Civ. P. 37(c)(1) states that, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . , is not, unless such failure is harmless, permitted to use as evidence at trial,  . . . any witness or information not so disclosed." Rule 37 (c)(1) also provides that the court may impose other appropriate sanctions, including payment of reasonable attorney's fees caused by the failure to disclose. Id. The preclusion sanction under Rule 37(c)(1) for a violation of Rule 26(a) is "automatic" and "is appropriate unless

there is 'substantial justification' for the failure or the failure to make disclosure is harmless."
Id. at 9.  Giladi v. Strauch, 94 Civ. 3976 (RMB)(HBP), 2001 U.S. Dist. LEXIS 4645 *8-9
(S.D.N.Y. April 16, 2001)(precluding plaintiff's experts from testifying when plaintiffs failed to
give complete list of cases in which plaintiff's experts had testified over the prior 4 years).

   In this case, there is no substantial justification for Plaintiffs delaying for almost 8
years after this case was filed and almost 6 years after the deadline for disclosing their
expert witness to disclose Mr. King as their expert witness.  According to Plaintiffs' List of
Witnesses, Mr. King apparently will testify about topics that Plaintiffs have been litigating
about for many years, i.e. whether Hill Arts and Entertainment Systems, Inc. ("Hill A&E") was
"grossly undercapitalized, the conversion rate of the Convertible Note that Hill A&E received
after its assets were sold to Entertainment Express, Inc. ("Entertainment Express"), the
valuation of the assets sold to Entertainment Express, and the accounting methods used by
Hill A&E with respect to loans made by the Hill Defendants to Hill A&E.  These topics are
ones that Plaintiffs have written about extensively in this case, particularly when opposing
the Hill Defendants' Motion for Summary Judgment.  See Epperson v. Richter, No.
3:01CV1798 (DJS), 2004 U.S. Dist. LEXIS 19631 (Sept. 24, 2004).  There is absolutely no
justification and certainly no "substantial justification", for Plaintiffs' failure to disclose Mr.
King until March 8, 2007.  In fact, Plaintiffs' counsel had admitted that he has known about
Mr. King's proposed testimony for some time.  Certainly Plaintiffs' Rule 26 violations "were
not due to circumstances beyond Plaintiff's control, nor were they due to the fortuitous
discovery of new evidence that could not have been produced in accordance with the
schedule ordered by the Court."  Giladi, 2001 U.S. Dist. LEXIS 4645 at *21.

Additionally, Plaintiffs' failure to disclose their expert witness is obviously prejudicial to the Hill Defendants. "'The burden to prove . . . harmlessness rests with the dilatory party.'" Design Strategies, Inc. v. Davis, 367 F. Supp. 2d 630, 635 (S.D.N.Y. 2005) (internal citation omitted) (precluding plaintiff's experts from testifying when plaintiff missed the 90 day deadline for expert witness disclosure). In this case, it would be extremely prejudicial to the Hill Defendants to permit Plaintiffs to offer the testimony of Mr. King. The Hill Defendants have not had the opportunity to review Mr. King's report, if there is one, or to take his deposition. The Hill Defendants further have not had the opportunity to engage their own expert to rebut Mr. King's proposed testimony. This case is on the eve of trial. If late discovery were permitted, it would have to be conducted on an expeditious basis, which would be prejudicial to the Hill Defendants, who are preparing for trial, and would impose additional costs on the Hill Defendants. See Giladi, 2001 U.S. Dist. LEXIS 4645 at *20 (finding that defendants were prejudiced by the plaintiff's failure to provide adequate experts' reports, because the trial was 6 weeks away and defendants would be required to complete depositions of plaintiff's experts, provide their own experts for deposition and prepare for trial on an expedited basis); Design Strategies, 367 F. Supp. 2d at 648 (finding prejudice where expert witness was not disclosed until 1½ years after discovery was closed and denying request to reopen discovery, because if discovery were reopened, defendants would be required to investigate the proposed expert's qualifications and the final resolution of the case would be delayed); Dunn v. Zimmer, Inc., 3:00CV1306 (DJS), 2005 U.S. Dist. LEXIS 3505 at *4-5 (D. Conn. March 9, 2005) (finding that when rebuttal expert had not been disclosed until 4 months after deadline for disclosure had been passed and defendant

71

had filed a motion for summary judgment, witnesses' testimony would be precluded, and discovery would not be reopened, because to do so would be disruptive and costly to defendant); Applera Corp. v. MJ Research Inc., 220 F.R.D. 13, 19 (D. Conn. 2004)(precluding testimony by experts under both Fed. R. Civ. P. 37(b)(2) and 37(c)(1) and not permitting discovery to be reopened where defendants failed to comply with Court's scheduling order regarding both identifying experts and disclosing their reports, expert disclosures were made on the eve of trial, case was almost 6 years old, expert discovery had long been closed, one of the defendants had been asked about expert disclosures and had refused to respond, the defendant had not alerted the Court that it was intending to identify additional experts, and plaintiff never knew about the identity of the experts and had no opportunity to conduct discovery of the experts' opinions); Kaufman, 2004 U.S. Dist. LEXIS 414 at *5-7 (precluding testimony by expert witness when expert was not identified until 7 months after deadline to identify expert had expired, because defendant would be unfairly prejudiced by delinquent disclosure as it would not be able to properly assess expert report, prepare a defense and engage its own independent medical expert to examine plaintiff); Croom v. Western Connecticut State University, Civ., No 3:00cv1805 (PCD), 2002 U.S. Dist. LEXIS 27371 at * 7-8 (D. Conn. April 3, 2002)(precluding testimony of expert witness where pretrial order ordered disclosure of expert witness, expert witness was not identified until 2 days later and no expert report was served on defendant).

"[W]hile trial courts have discretion to determine whether or not a substantial justification exists and whether or not a failure to disclose is harmless, if the trial court finds that there is no substantial justification and the failure to disclose is not harmless, preclusion

72

is mandatory." <u>Design Strategies</u>, 367 F. Supp. 2d at 634. Accordingly, because Plaintiffs'

failure to disclose its expert witness until almost 6 after such disclosure was due is not

substantially justified and the Hill Defendants would be seriously prejudiced if such expert

were permitted to testify, the Hill Defendants' Motion to Preclude should be granted.

IV.     Conclusion

For the foregoing reasons, Defendants' Motion to Preclude should be granted, and

Defendants should be awarded the costs of this motion.

## EXHIBIT A

**Exhibits are not being included in the Pretrial Memorandum**

## #14 MEMORANDUM IN SUPPORT OF MOTION IN LIMINE RE: PAROL EVIDENCE

I.     INTRODUCTION

In this corporate veil piercing case, Plaintiffs, Dirk Epperson and Betty Schneider

("Plaintiffs"), have indicated in their List of Witnesses, which is part of the parties' Joint

Pretrial Memorandum, that they intend to call Mr. Epperson to testify "as to the assurances

he received as to the intended capitalization of the project." To the extent that Mr. Epperson

intends to introduce evidence that he received oral assurances that either or both Defendant

Hill International, Inc. ("Hill") or Defendant Irvin Richter ("Richter") (collectively the "Hill

Defendants") would fund the software development project described in agreement (the "Agreement") between Plaintiffs' company, Performing Arts Technology, Inc. ("PAT"), and ArtSoft, Inc. ("ArtSoft"), the predecessor of Hill Arts & Entertainment Systems, Inc. ("Hill A&E"), such evidence is barred by the parol evidence rule. Such oral evidence directly contradicts the plain terms of the Agreement which provide in pertinent part, "[t]he contract relationship created hereby is between specific entities, and does not include corporate parents, subsidiaries or affiliates . . ."2 It is undisputed that  Hill International was an affiliate of ArtSoft, and Mr. Richter was a shareholder of ArtSoft and Hill.

II.     FACTUAL BACKGROUND

On August 2, 1988, PAT, which was owned by Plaintiffs, and ArtSoft, which was at that time owned by Richter, Hill and a third party, entered into a Custom Software Agreement. At the time of the making of the contract, Richter held a controlling interest in Hill. Paragraph 25.5 of the Agreement provides in pertinent part: "**The contract relationship created hereby is between specific entities, and does not include corporate parents, subsidiaries or affiliates**." (emphasis added). The Agreement also stated in paragraph 24 that, "[t]his Agreement supersedes all proposals, oral or written, and all negotiations, conversations or discussions between the parties relating to this Agreement." A copy of the Agreement is attached behind Exhibit A. At the time of the making of the contract, Richter held a controlling interest in Hill and was a shareholder in ArtSoft. Accordingly, Hill and ArtSoft were affiliates.

In 1995, Plaintiffs, the shareholders of PAT, which was subsequently dissolved,

---

2 Such evidence is also inadmissible hearsay. Fed. R. Evid. 802.

brought suit against Hill A&E for failure to pay royalties claimed to be due under the Agreement. A default judgment was entered in 1997 against Hill A&E. In this case, Plaintiffs seek to hold Hill and Richter liable for such default judgment. Plaintiffs claim in the Joint Pretrial Memorandum that at trial, Mr. Epperson will testify that he received assurances regarding the intended capitalization of the project.

III.    ARGUMENT

    A.    The Parol Evidence Rule Bars Plaintiffs from Introducing Evidence that Assurances Were Provided that Hill and/or Richter Would Capitalize the Project that is the Subject of the Agreement

    1.    Choice of Law

A federal court sitting in diversity applies the choice of law rules of the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941). Under Connecticut's choice of law rules, a Connecticut court will apply the state law agreed to by the parties in their contract to determine the substantive issues in the case. Gannet Co., Inc. v. Register Publishing Co., 428 F. Supp. 818, 824 (D. Conn. 1977). Paragraph 25.2 of the Agreement states, "[t]he validity and performance of this Agreement shall be governed by New York law."

    2.    New York Law

Under New York law, the parol evidence rule is "a rule of substantive, not evidentiary law." Transnor (Bermuda), Ltd. v. BP North America Petroleum, Conoco Inc., 736 F. Supp. 511, 519 n.10 (S.D.N.Y. 1990). "Under New York law, . . . , if a contract states that all of the parties' agreements are merged in the written document, parol evidence is not admissible

75

to vary, or permit escape from, the terms of the integrated contract." <u>Mfrs. Hanover Trust Co.</u> <u>v. Yanakas</u>, 7 F.3d 310, 315 (2d Cir. 1993).

 The parol evidence rule applies even if the party seeking to introduce the oral evidence claims that there were oral misrepresentations that induced the party to enter into a contract provided that the oral misrepresentations are inconsistent with specific recitals in the contract. <u>Citibank, N.A. v. Plapinger</u>, 66 N.Y.2d 90, 94-95 (1985) (holding that claim that guarantors had been fraudulently induced to enter into guarantee by banks' fraudulent misrepresentation that borrower would be extended an additional line of credit were properly dismissed, when language of guarantee indicated it was absolute and unconditional, and stating that if guarantors were permitted to maintain claim, court would be condoning a fraudulent misrepresentation by guarantors of their own intentions with respect to the guaranty); <u>Grumman Allied Industries v. Rohr Industries, Inc.</u>, 748 F.2d 729, 735(2d Cir. 1984) (stating that where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations, the parol evidence rule bars the introduction of any evidence concerning the misrepresentations); <u>Galvatron Industries Corp. v. Greenberg</u>, 96 A.D.2d 881 (2d Dep't 1983) (holding that parol evidence about defendant's alleged fraud would be precluded when disclaimer in purchase agreement stated that plaintiff was fully familiar with financial condition of seller and disclaimed reliance on any representations made by seller); <u>Manufacturers Hanover Trust Co. v. Restivo</u>, 169 A.D.2d 413, 414 (1st Dep't 1991), <u>appeal dismissed</u>, 77 N.Y.2d 989 (1991) (ruling that claims that bank representative fraudulently represented that guarantees were temporary and conditional upon bank's advances to borrower were barred by parol evidence rule, since guarantee

76

language stated that guarantees were continuing and unconditional); <u>Marine Midland Bank, N.A. v. CES/Compu-Tech, inc</u>., 147 A.D.2d 396, 397 (1st Dep't 1989) (holding that contractual disclaimer in which defendant waived right to assert defenses, setoffs and counterclaims in action relating to a note barred defense of fraudulent inducement under parol evidence rule); <u>Bank Leumi Trust Co. v. Block 3102 Corp</u>., 180 A.D.2d 588, 589 (1st Dep't 1992) (mem) (holding that where guaranty stated that it was absolute and unconditional, guarantor could not claim fraudulent inducement under the parol evidence rule); <u>Bibeault v. Advanced Health Corp</u>., No. 97 Civ. 6026(WHP), 2002 U.S. Dist. LEXIS 225, at *10-14(S.D.N.Y. 2002) (dismissing fraudulent inducement claim regarding value of shares of stock, when subscription agreement stated that plaintiff was not relying on information other than that provided in the offering documents and that share price was set at an arbitrary price and writing,"[d]isclaimers may provide meaningful notice that a signatory may not rely on a prior oral representations when they specifically encompass the subject matter of the representations")**;** <u>Lucas v. Oxigene, Inc</u>., No. 94 Civ. 1691(MBM), 1995 U.S. Dist. LEXIS 12575, at *9-11 (S.D.N.Y. 1995), <u>aff'd</u>, 1996 U.S. App LEXIS 5586 (2d Cir. 1996) (stating that even if contract does not state that plaintiff is not relying on any oral representations, parol evidence bars plaintiff from proving he relied on oral promise that his option rights would not be diminished when he signed an agreement that clearly abrogated those rights, and writing that parties should be prevented from perpetrating a fraud by deliberating misrepresenting their true intentions at the time of the signing of the agreement).

In this case, parol evidence similarly may not be admitted to prove that Mr. Epperson

received assurances that the intended capitalization of the project that is the subject of the

Agreement would come from either Hill or Richter. The Agreement was complete on its face

(see paragraph 24), and, therefore, under New York law was integrated as a matter of law.

Battery S.S. Corp. v. Refineria Panama, S.A., 513 F.2d 735, 739 (2d Cir. 1975). The

Agreement, itself, specified that the contractual relationship was only between ArtSoft and

PAT and did not include affiliates, such as Hill or Richter. Accordingly, any testimony that Mr.

Epperson had been given oral assurances that either Hill or Richter would fund the contract

contradicts this plain language of the Agreement and thus is not admissible under the parol

evidence rule. See Transnor, 736 F. Supp. at 519. Under these circumstances, to allow Mr.

Epperson to testify that he had received assurances that Hill and/or Richter would fund the

software development program would itself be perpetrating a fraud, because PAT would be

permitted to have deliberately misrepresented its true intentions at the time of the signing of

the Agreement. See Plapinger, 66 N.Y.3d 90, 94-95; Lucas, 1995 U.S. Dist. LEXIS 12575,

at *9-11.

     B.    Connecticut Law

     Even if Connecticut law is applied to this case, Plaintiffs may not introduce parol

evidence to prove assurances of capitalization of the Agreement by Hill and/or Richter.

Under Connecticut law, "[t]he parol evidence rule is:

> 'premised upon the idea that when the parties have deliberately put their
> engagements into writing, in such terms as import a legal obligation, without any
> uncertainty as to the object or extent of such engagement, it is conclusively
> presumed, that the whole engagement of the parties, and the extent and manner of
> their understanding, was reduced to writing. After this, to permit oral testimony,
> or prior or contemporaneous conversations, or usages [etc.], in order to learn what
> was intended, or to contradict what is written, would be dangerous and unjust in

the extreme . . .'

Colliers, Dow and Condon, Inc. v. Schwartz, 77 Conn. App. 462, 466, 469 (2003)(internal

citations omitted). "Parol evidence offered solely to vary or contradict the written terms of an

integrated contract is, therefore legally irrelevant." Id. (finding that trial court wrongly relied on

parol evidence to vary an express term of a contract and stating that parol evidence could

not be introduced to establish an oral misrepresentation where the pleadings did not

specifically allege fraud). See also Hood v. Verardi, No. 3:98 CV 1524(CFD), 2002 U.S.

Dist. LEXIS 3513, at *11-12 (D. Conn. Feb. 20, 2002) (applying Connecticut law and

holding that parol evidence rule precluded court from considering in a breach of contract

action, oral representations that plaintiff would be given one year employment contract when

written contract stated that plaintiff would be an employee at will).

Under Connecticut law, if there is no allegation in the complaint that the plaintiff held

a position of unequal bargaining power, a merger clause will be considered conclusive

proof of the parties' intention to create a fully integrated contract and will operate to bar the

introduction of parol evidence. Benvenuti Oil Co., Inc. v. Foss Consultants, 64 Conn. App.

723, 727 (2001) (holding that where complaint did not allege that plaintiff held a position of

unequal bargaining power, merger clause in contract was conclusive evidence of the intent

to create a completely integrated agreement and parol evidence was precluded). See also

Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479, 504-05

(2000) (holding that trial court improperly considered extrinsic evidence where settlement

agreements contained merger clauses, and parties had relatively equal bargaining power).

In the instant case, there is no allegation in the complaint that PAT held a position of

unequal bargaining power with respect to the Agreement.3 Similarly, in this case, there is a merger clause in the Agreement. Accordingly, there is conclusive proof that PAT and ArtSoft intended that the Agreement would be a completely integrated contract, and Plaintiffs should not be permitted to introduce evidence that Hill or Richter would be funding the Agreement. Such evidence contradicts the plain terms of the Agreement – which is that the bargain made was between PAT and ArtSoft only and not with any other affiliated party, including Hill or Richter.  Therefore, oral testimony regarding alleged promises of capitalization from Hill or Richter is barred by the parol evidence rule.4

> As stated by the Connecticut Appellate court:

> '[C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . .. Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts.'* (Citation omitted; emphasis added.)

Id. at 505-06.

IV.    CONCLUSION

For the foregoing reasons, the Hill Defendants' Motion in Limine Re: Parol Evidence should be granted.

---

3 Also, it is beyond preadventure there was unequal bargaining power between PAT and ArtSoft. Both were small software companies involved in the same line of business, and PAT was represented both by a lawyer and a business consultant. (See transcript of the deposition of Dirk Epperson, pp. 27-29, 44-45, attached as Exhibit B.)
4 Although, under Connecticut law, "parol evidence may be introduced to show that the legal effect of a term was misrepresented," and that such misrepresentation was relied upon by a party when entering into a contract, the pleadings must allege such misrepresentation.

## <u>EXHIBIT  A</u>

**Exhibits are not being included in the Pretrial Memorandum**

---

<u>Colliers,</u>, 77 Conn. App. at 470. In this case, there is no allegation in Plaintiffs' complaint that the legal effect of a term of the Agreement was misrepresented to PAT.

# EXHIBIT B

**Exhibits are not being included in the Pretrial Memorandum**

15.    **Proposed Findings and Conclusions.**

## PLAINTIFFS= FINDINGS OF FACT AND CONCLUSIONS OF LAW

Five Legal Proceedings will be addressed herein.  They are identified as follows:

1.    <u>Connecticut 1</u> - Docket No. 3:95CV2131 (DJS)

Dirk Epperson and Betty Schneider v. Hill Arts & Entertainment Systems, Inc.

Filed 10/14/95

Default Judgment entered 4/23/97

2.    <u>Connecticut 2</u> - Docket No. 3:95CV2131 (DJS)

Dirk Epperson and Betty Schneider v. Hill Arts & Entertainment Systems, Inc., Hill Arts &

Entertainment Systems, Inc. n/k/a HAESI Software, Inc., Entertainment Express, Inc., Hill

International, Inc. and Irvin Richter

This action took the form of an Amended Complaint filed in Connecticut 1. It added Alter Ego and Fraudulent Conveyance counts and new defendants, as indicated.

Filed March 12, 1997

Dismissed March 23, 1998

3.    Connecticut 3 - Docket No. 3:99CV0778 (DJS)

Dirk Epperson and Betty Schneider v. Entertainment Express, Inc., n/k/a Advantix, Inc., Irvin Richter, Hill International, Inc., Hill Arts & Entertainment Systems, Inc. n/k/a Haesi Software, Inc.

Fraudulent Conveyance, only

Filed 4/27/99.

Dismissed 3/31/00

Reinstated by Second Circuit March 7, 2001

Dismissed September 24, 2004

4.    New Jersey/Connecticut 4 - Docket No. 1:99CV3053 (SSB)

Dirk Epperson and Betty Schneider v. Irvin Richter, Hill International, Inc.,Hill Arts & Entertainment Systems, Inc. n/k/a HAESI Software, Inc.

Subject action: Alter Ego Only

Filed 6/30/99 in New Jersey

Transferred on Consent to Connecticut and assigned Docket No. 3:01CV1798 (AWT) AE

5    California - Docket No. 00CC06393

Dirk Epperson and Betty Schneider v. Tickets.com, Inc., Irvin Richter, Hill International, Inc., Hill Arts & Entertainment Systems, Inc. n/k/a Haesi Software, Inc.

Filed May 26, 2000

Dismissed July 24, 2001

In 1988 Plaintiff Dirk Epperson (EPPERSON) was asked to develop a new ticketing software program for Irvin Richter=s (RICHTER) corporation, Hill Arts & Entertainment Systems, Inc. (HAESI)[5].  HAESI was in the business of selling ticketing software to the arts and entertainment industry.  EPPERSON understood HAESI to be owned and controlled by either RICHTER or RICHTER=s other corporation (HILL).  The negotiations for the written contract with HAESI were handled by representatives of HILL.  At that time, HAESI was known as Artsoft (ARTSOFT), and was held out by HILL as a HILL GROUP company.  EPPERSON agreed to provide the services to HAESI based upon assurances that RICHTER would be funding what EPPERSON understood to be a significant financial undertaking for HAESI.

EPPERSON[6] successfully developed the software (ANew Program@), in accordance with a written contract.  HAESI and RICHTER openly acknowledged owing EPPERSON $210,000 in written correspondence exchanged throughout the period 1991-1994.  EPPERSON was

_____

[5]

  HAESI is an acronym for Hill Arts & Entertainment Systems, Inc.  In connection with an asset transfer occurring in May, 1996 (discussed below), Hill Arts & Entertainment Systems changed its name to HAESI, SOFTWARE, Inc.  For simplicity sake, the corporation will be referred to herein as HAESI.

[6]  The software was developed by a Performing Arts Technology, Inc., a corporation whose shareholders consisted of Plaintiffs Dirk Epperson and Betty Schneider.  The

persuaded by HAESI to invoice it for quarterly payments, which he did.  Only sporadic payments were made.  They were not timely, and full payment was never made.

In June, 1992 EPPERSON advised HAESI that, in view of the non-payment, Aregrettably@, the only way he could see to compel payment was to withhold services from HAESI.

Citing temporary cash flow problems and predicting significant short-term improvement, RICHTER persuaded EPPERSON not to press for immediate payment.  Forwarding $5,000 in RICHTER=s personal funds (not HAESI=s funds), RICHTER sought and obtained EPPERSON=s patience and forbearance.  During this process HAESI and RICHTER admitted, repeatedly, in writing, that the money was owing.

Feeling he was being Astrung along@, EPPERSON finally sued HAESI in October, 1995 in U.S. District Court for the District of Connecticut (Connecticut 1).  HAESI filed an answer ***denying*** that the money was due, notwithstanding the numerous written admissions to the contrary.  In March, 1996 Plaintiffs propounded written discovery requests seeking HAESI=s basis for denying liability, given the multiple written admissions by HAESI that the money was owing.  In May, 1996 HAESI=s counsel (Robert Flynn [FLYNN] of Tyler, Cooper & Alcorn [TYLER]) requested and obtained from EPPERSON=s counsel (Robert Sullivan [SULLIVAN]) courtesy enlargements of time to respond to the discovery.

In June, 1996, not having received responses by the agreed date, SULLIVAN demanded responses.  The Aresponses@ finally produced proved to be a sham and a delay tactic.  EPPERSON moved the court to compel further responses.  At the same time, in view of

---

corporation was later dissolved, with the assets, including this action, distributed to Plaintiffs.

the evasive tactics,  EPPERSON moved the court to grant a pre-judgment attachment of

HAESI=s assets.  Although the court later granted the plaintiffs= request for prejudgment

attachment, the assets had already been transferred as is demonstrated below.

FLYNN responded by agreeing to produce the discovery on a date certain, to wit:

September 11, 1996.  When SULLIVAN arrived to pick up the agreed discovery, however,

FLYNN handed him TYLER=s motion to withdraw as counsel of record, citing as grounds that:

> The relationship with the client has become such that we are
> unable to perform our obligations, duties and responsibilities as
> officers of the Court.

On October 8, 1996, Magistrate Judge Joan Glazer Margolis conducted a telephone

status conference, which addressed the motions to compel, to withdraw as counsel and to

attach assets.  In view of the pending motion to withdraw as counsel, FLYNN had arranged for

RICHTER=s son, David Richter, corporate secretary of  HAESI, to appear by telephone, in

addition to SULLIVAN and FLYNN.

During that telephone court appearance, David Richter disclosed, for the first time, that

in May, 1996 while the courtesy enlargements of time to respond to the discovery were

pending, HAESI had transferred all of its assets to another corporation, and that nothing

remained which could be attached.

The court then granted TYLER=s motion to withdraw, and ordered HAESI to appear by

counsel and to produce the agreed discovery.  The court also granted EPPERSON leave to file

a motion for an order authorizing the filing of an amended complaint to address the fraudulent

conveyance claims raised by David Richter=s disclosure.

Later that day (October 8, 1996), claiming he had somehow misspoken, David Richter wrote to Magistrate Margolis, representing to the court that HAESI had Asold substantially all of its assets,@ that the Aproceeds of the sale consisted of $3,000,000 in the form of a convertible promissory note,@ that the proceeds Aremain assets of HAESI,@ that the assets had been pledged to AHAESI=s secured lenders (who are owed collectively approximately $11,000,000 plus interest,@ and that with respect to the asset transfer, Aa fairness opinion was provided by an independent investment banking firm.@

It would be over a year before plaintiffs were afforded the opportunity to review the Afairness opinion@.

HAESI neither appeared by counsel, nor did it comply with the discovery order.  Indeed, on November 6, 1996 David Richter wrote to the court advising that HAESI would not be appearing by counsel and would not be opposing EPPERSON=s motion to amend the complaint.

On April 23, 1997 this court granted EPPERSON=s motion for entry of judgment against HAESI in the total sum of $422,466 for A Y having failed to appear by counsel and further having failed to comply with the court=s order to produce certain discovery Y@

Following entry of judgment against HAESI, EPPERSON issued post-judgment interrogatories to HAESI.  No one ever responded to those interrogatories.

At the time of the Margolis status conference in October, 1996, complete diversity still existed.  Plaintiffs were citizens of Northern California.  RICHTER had transferred the assets to ENTERTAINMENT EXPRESS which, like HAESI, was a Delaware Corporation doing business in Connecticut.  Indeed, ENTERTAINMENT EXPRESS had merely taken over the business of

HAESI in its Guilford, Connecticut location.  The proposed amended complaint set forth diversity as the basis for the court=s jurisdiction.  Although David Richter wrote to Magistrate Margolis on November 6, 1996 advising that no opposition would be raised to the motion to amend, he did not tell the court that he and his father (again, both lawyers) had already brought about the destruction of diversity, so that the amended complaint, when filed, would not be within the court=s jurisdiction.  (See below)

In December, 1996 the court granted EPPERSON=s motion for leave to amend the complaint to pursue the fraudulent transfer and alter ego claims, adding as defendants ENTERTAINMENT EXPRESS, HILL and RICHTER.  The amended Complaint was filed on March 12, 1997 (Connecticut 2).

In June, 1997, however, these Anew defendants@ utilizing new counsel, Brenner, Salzman & Wallman (BRENNER), filed a motion to dismiss on the grounds that diversity no longer existed.  They presented the affidavit of W. Thomas Gimple, the new President of ENTERTAINMENT EXPRESS (which had changed its name to Advantix, Inc.)  Mr. Gimple reported: ABeginning in November, 1996 I began moving the managerial and certain other operations of Advantix to California.@  He further reported that "[b]y March 12, 1997, Advantix was largely being managed from Orange County, California.@

This reflects that one month after being ordered by Magistrate Margolis to appear by counsel and produce discovery, RICHTER and his son not only defied those orders, they transferred enough of the corporate activity of the fraudulent transferee to California to defeat the jurisdiction of this court, without providing plaintiffs any notice of the change in circumstances.

As is seen below, ***at the same time***, they also purportedly foreclosed out HAESI's interest in the Convertible Promissory Note (NOTE) referenced by David Richter in his letter to Magistrate Margolis.

Here too, one month after assuring this court that the proceeds of the note would Aremain assets of HAESI@ , he arranged for the removal of the Note by a purported foreclosure of the Note by HILL.

The June, 1997 Motion to Dismiss also contained the affidavit of RICHTER, submitted in support of his claim that the court should not subject him to personal jurisdiction with respect to the alter ego and fraudulent transfer claims.  His carefully crafted affidavit (presented at a time when he had refused to produce demanded discovery) reads AOn or about March 12, 1997, and at all times since, I have been ***a*** stockholder and director of Hill Arts & Entertainment Software, Inc., n/k/a HAESI Software, Inc., Hill International, Inc. and an ***indirect*** stockholder in Advantix, Inc.@  Emphasis Added.

The  Afairness opinion@, however, later obtained by plaintiffs (discussed next) demonstrated two things.  The first is that RICHTER was the ***sole shareholder and director*** in HAESI.  The second is that through his family company, R4 Holdings, LLC, RICHTER owned ***80%*** of ENTERTAINMENT EXPRESS (Advantix).

During a status conference conducted by Judge Squatrito in January, 1998 in the Connecticut 2 action, new counsel BRENNER made the claim that the same Afairness opinion@ referenced by David Richter, which his father had obtained in connection with the asset transfer, would, somehow, defeat plaintiffs= claims that the transfer was improper.  Judge Squatrito ordered that the Afairness opinion@ be produced, immediately.

89

Counsel for Anew defendants@ then produced the Afairness opinion,@ a three volume compilation of documents, purporting to justify, in one way or another, the transfer. It was, in fact, an elaborate paperwork rouse masterminded by RICHTER in order to make the transfer of assets from an undercapitalized corporation to himself and HILL appear not to be fraudulent or otherwise unfair to the creditors. Close examination of the opinion and related documents reveals the following:

- Prior to the transfer, AY Irvin Richter, either individually or through certain immediate family members is the controlling shareholder of Hill, Hill A&E, and Entertainment Express.@

- ENTERTAINMENT EXPRESS was a new corporation established by RICHTER.

- RICHTER=S 80% interest in ENTERTAINMENT EXPRESS (8,000,000 shares) was purchased for $800. The other 20% was purchased by Laurence Schwartz and James Cassano for $100, each.

- Before the asset transfer the management team of HAESI and HILL consisted of RICHTER, David Richter, Laurence Schwartz and James Cassano.

- Following the transfer, the management of transferee ENTERTAINMENT EXPRESS consisted of RICHTER, David Richter, Laurence Schwartz and James Cassano.

- Following the transfer, ENTERTAINMENT EXPRESS had the same assets, clients, employees, management, contracts, address, telephone number, and web site as HAESI

- RICHTER, himself, was the ***sole shareholder and director*** in HAESI;

- HAESI=s assets (including the software developed by EPPERSON) were transferred to ENTERTAINMENT EXPRESS.

- The only consideration provided for the assets was the issuance by ENTERTAINMENT EXPRESS of a $3 Million Aconvertible preferred note@ (NOTE).

- The ANOTE@ is a fraud. It was designed to create the illusion of an obligation by ENTERTAINMENT EXPRESS to pay $3 Million for the assets. Close examination demonstrates that ENTERTAINMENT EXPRESS was required to make **_no_** actual monetary payments to HAESI. At most, it would be required to convert the debt into stock at conversion rates that were a **_minimum_** of **_4,900_** times the price paid by RICHTER for his stock. In short, it would cost HAESI or its creditors $4,900,000 to purchase the same stock for which RICHTER, Cassano and Schwartz paid $1,000.

- HILL and RICHTER took immediate control of the NOTE, assigning to themselves security interests in said NOTE, purportedly to satisfy pre-existing debt.

- In November, 1996, HILL Aforeclosed@ on the NOTE, divesting HAESI of any benefits which may flow from the note.

- HAESI received nothing in exchange for the NOTE.

- The Afairness opinion@ turned out to be nothing more than an opinion, sought by RICHTER, that the transaction was A**_fair@ to HILL_**, RICHTER=s other corporation, which served as a conduit for the fraud.

- The opinion did **_not_** address whether the transaction was fair to Plaintiffs or anyone other than RICHTER=s corporation HILL.

91

- HAESI was grossly undercapitalized, as is demonstrated by the Afairness opinion@ financial statements appearing as Exhibit R (Notes to Howard, Lawson opinion, Exhibit 1). In 1991, the corporation had a negative capitalization of $1,000,000, which RICHTER claims was money owed to him. That negative capitalization jumped to $9 million during 1992. The income statements and balance sheets reflect no current activity (increase in assets or expense) which would produce an outflow of $8 million. The additional $8 million in negative capitalization consisted of monies which RICHTER claims were owing to HILL. In short, the entire $9 million in negative capitalization consisted of monies claimed by RICHTER to be owed to HAESI sole shareholder RICHTER and/or HILL, the essence of undercapitalization.

- After creating for RICHTER and HILL the apparent status of secured creditors of HAESI, RICHTER consumed any benefits which could conceivably be produced by the NOTE, by having HAESI execute liens on the NOTE in favor of RICHTER and HILL.

A particularly telling fact is HILL=s Aforeclosure@ of the NOTE in November, 1996. In May, 1996, RICHTER divested HAESI of its assets and its ability to generate income, by transferring the assets to his new corporate creation, ENTERTAINMENT EXPRESS. He granted to himself and his other corporation, HILL, security interests in the NOTE. The first Apayment@ on the NOTE was due on May 31, 1997. In November, 1996, however, when HAESI is purportedly not paying HILL on a non-existent prior obligation -- RICHTER=S having deliberately crippled HAESI by transferring its assets -B RICHTER had HILL foreclose, divesting HAESI of any chance of receiving the proceeds of the note. November, 1996 was

one month following the conference during which the Connecticut court ordered HAESI to produce discovery. The court had also scheduled prejudgment attachment proceedings which would have permitted plaintiffs to assert claims against the proceeds of the NOTE. Also significant is that HILL, itself was, financially, seriously impaired at the time of the transfer. See Hill International, Inc. v. National Railroad Passenger Corporation, 957 F.Supp. 548 (1996).

Moreover, the defendants, themselves, valued HAESI=s at $20M, or higher, in, inter alia, a Business Plan prepared by them and in press releases boasting of capital injections.

The post-judgment interrogatories issued by plaintiffs specifically demanded disclosure of the nature and amount of payments, if any, made by and between Richter=s entities, in particular those relating to the $3M Convertible Preferred note. Again, there were no responses.

Another telling fact is that HAESI=s financial statements reported capital contributions from Aparent Hill@ for a significant period of time. Those Acontributions@ however, were reclassified in favor of HILL as loans, resulting in the existence of an enormous negative capitalization, or Agross undercapitalization.@

On March 23, 1998, Hon. Dominic J. Squatrito dismissed Connecticut 2 as to the new defendants, on the basis that diversity no longer existed. Judge Squatrito did not reach the claims, also raised by defendants, that there was no personal jurisdiction over RICHTER since he lived in New Jersey. The relevance of this non- finding to this case is addressed below.

The next filings by EPPERSON were guided by the 1996 case Peacock v. Thomas, 516 U.S. 349, 116 S.Ct. 862 (1996). In Peacock, the U.S. Supreme Court recognized the long standing rule that supplemental enforcement jurisdiction would permit a district court to take

jurisdiction over post-judgment enforcement proceedings, notwithstanding an intervening lack of diversity. The court held however, that that principle would not necessarily apply to a new, independent action to pursue an alter ego claim.

For that reason, Plaintiffs filed two actions, an April 27, 1999 complaint for Fraudulent Transfer in Connecticut (Connecticut 3) where, according to <u>Peacock</u>, the court had Supplemental Enforcement Jurisdiction, and a June 30, 1999 Alter Ego complaint in New Jersey (New Jersey/Connecticut 4), where complete diversity existed, and where RICHTER could not claim a lack of personal jurisdiction.

Defendants responded to the New Jersey/Connecticut 4 Fraudulent Conveyance action by ***twice*** moving the New Jersey court to stay or dismiss the New Jersey proceedings under the Afirst filed rule@, claiming that Asame@ proceedings were purportedly pending against the Asame@ parties in a court another court with jurisdiction. They made this claim, even though it was not the same action and did not involve the same parties. Moreover they, had challenged and continued to challenge the Connecticut Court=s jurisdiction. Despite repeated briefing demonstrating that their assertions were not accurate, the defendants claimed that the New Jersey action could not go forward because the Asame@ action was pending in Connecticut.

That was not the only jurisdictional circuitry advanced by the defendants. (See below.) Defendants also refused to respond to their discovery obligations in New Jersey, requiring plaintiffs to prepare motions to compel.

In the meantime, on March 31, 2000 Judge Squatrito granted defendants= motion challenging the Connecticut Court=s jurisdiction as to the Connecticut 3 Fraudulent Conveyance action.

Plaintiffs= appealed that dismissal to the United States Court of Appeals for the Second Circuit.  Plaintiffs also filed a precautionary action in California (California Action) where asset transferee ENTERTAINMENT EXPRESS claimed to be located.  This filing was intended to guard against the possibility that the Second Circuit may let stand the dismissal of Connecticut 3.

Defendants responded to the California Action by challenging jurisdiction.  They also wrote to the Second Circuit Court of Appeals claiming that the Appeal should not proceed since Plaintiffs had a forum in California.

As a result, at that point, the following jurisdictional state of affairs existed:

-    The Defendants were telling the Second Circuit that the Connecticut court had no jurisdiction:

-    The were telling the New Jersey court that it should not proceed because of the Connecticut Court=s jurisdiction;

-    They were telling the California Court that it had no jurisdiction;

-    They were telling the Second Circuit that it should dismiss the appeal of the Connecticut 3 dismissal because the plaintiffs had a forum in California.

Judge Squatrito=s March 31, 2000 dismissal was based upon his acceptance of the defendants= argument that <u>Peacock</u> would not provide Supplemental Enforcement jurisdiction as to the Connecticut 3 Fraudulent Conveyance action.  On March 7, 2001, however, the United States Court of Appeals for the Second Circuit reversed said ruling, holding under <u>Peacock</u> that defendants may not effectively divest a U.S. District Court of jurisdiction by transferring

assets to a non-diverse party. <u>Epperson v. Entertainment Express, Inc.</u>, 242 F.3d 100, (2d Cir.

2001).

The Second Circuit reversal returned the Connecticut 3 Fraudulent Transfer case to this

court.   In light of said return. Plaintiffs dismissed the California case.

 In New Jersey, on July 17, 2001, the Hon. Stanley S. Brotman presided over the second

of defendants= motions to stay or dismiss.  At that time, in recognition of the Second Circuit=s

return of the Connecticut 3 Fraudulent Conveyance action to the Connecticut Court=s docket,

Judge Brotman suggested the transfer of the New Jersey/Connecticut 4 alter ego case (subject

case) to this court.

The defendants consented, authorizing Judge Brotman, in writing, to transfer the New

Jersey/Connecticut 4 to this court, only to then press this court=s alleged lack of jurisdiction over

RICHTER.  This prompted Judge Squatrito, in a written opinion dismissing Connecticut 3 on

statute of limitations grounds, to rebuke RICHTER=s challenge, observing:

> Richter has forfeited his personal jurisdiction defense consenting to a transfer of
> the Third Action to Connecticut for the sake of convenience without informing
> the court of his intention to assert a lack of personal jurisdiction in Connecticut.
> The record of the proceedings before Judge Brotman reveals that Richter
> requested a transfer under the "first filed rule" and eventually consented to
> transferring the Third Action to Connecticut without informing Judge Brotman
> that he had a pending objection to personal jurisdiction in Connecticut.  Richter
> has thus placed this court in a difficult predicament: the Second Action was
> transferred from New Jersey to Connecticut so that it may be heard with the
> Third Action in the interest of convenience. In the Second Action, which was
> originally filed in Connecticut, Richter contests personal jurisdiction. If the slate
> were clean, and Richter's personal jurisdiction defense was well founded, one
> viable option for this court to consider would be to transfer the Second Action to
> New Jersey, where Richter would have no personal jurisdiction objection, so
> that plaintiffs' claims could be decided on the merits. On the flip side of the coin,
> had he been fully apprised of the situation, Judge Brotman presumably would
> have had misgivings about transferring the Third Action to Connecticut at

Richter's request when Richter had raised a personal jurisdiction defense before this Connecticut court in the Second Action. To re-examine the propriety of Connecticut as a forum at this stage of the litigation as a whole would be to countenance an **expensive and intolerable jurisdictional carousel**.

Judge Squatrito-s Memorandum of decision in D:99CV778 dated September 24, 2004, pages 12-13, Emphasis Added.

The New Jersey/Connecticut 4 is now before this court and has been tried to completion.

## DISCUSSION

1. <u>CHOICE OF LAW</u>

Plaintiffs seek to disregard HAESI's corporate entity and hold HILL, RICHTER, or both HILL and RICHTER liable for the April 23, 1997 default judgment entered against HAESI. HAESI is incorporated under the law of Delaware, and its principal place of business is located in Connecticut. Defendants urge the court to apply the law of Delaware, as the subject action was transferred to Connecticut pursuant to 28 U.S.C. 1404(a).

The court finds that there is little difference in the general standards applied by courts in Delaware and Connecticut. Because the application of either Connecticut or Delaware law will not impact the court's decision with respect to the pending motions, the law of the forum state, which is Connecticut, applies to plaintiffs' claims. <u>See</u> <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>cf.</u> <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 639 & n.40 (1964) (holding that when a case is transferred to a different venue pursuant to 28 U.S.C. 1404(a), the transferee court applies the choice of law principles of the transferor forum if failure to do so would "significantly affect the outcome of the case"). Defendants cite authority holding that the state of incorporation should govern the question of whether the corporate form should be disregarded.

97

See, e.g., Restatement (Second) of Conflict of Laws ' 309 (1971). Reference to this authority,

however, is necessary only when there is a conflict between the laws of two interested states.

2. PIERCING THE CORPORATE VEIL

According to Connecticut law,

> Courts will disregard the fiction of separate legal entity when a corporation "is a
> mere instrumentality or agent of another corporation or individual owning all or
> most of its stock." Hoffman Wall Paper Co. v. City of Hartford, 114 Conn. 531,
> 535 [(1932)]. . . "Under such circumstances, the general rule which recognizes
> the individuality of corporate entities and the independent character of each in
> respect to their corporate transactions and the obligations incurred by each in
> the course of such transactions will be disregarded, where, as here, the
> interests of justice and righteous dealing so demand." Connecticut Co. v. New
> York. N.H. & H.R. Co., 94 Conn. 13, 26 [(1919)].

Zaist v. Olson, 154 Conn. 563, 573-74 (1967). The Connecticut Supreme Court has

recognized two theories for disregarding the corporate entity. The first is the "instrumentality"

theory:

> The instrumentality rule requires, in any case but an express agency, proof of
> three elements: (1) Control, not mere majority or complete stock control, but
> complete domination, not only of finances but of policy and business practice in
> respect to the transaction attacked so that the corporate entity as to this
> transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud or
> wrong, to perpetrate the violation of a statutory or other positive legal duty, or a
> dishonest or unjust act in contravention of plaintiff's legal rights; and (3) The
> aforesaid control and breach of duty must proximately cause the injury or unjust
> loss complained of.

Zaist v. Olson, 154 Conn. 563, 575 (1967). "The instrumentality rule imposes individual liability

for corporate actions upon a shareholder, director, or officer of a corporate entity that is, in

economic reality, the instrumentality of the individual." Campisano v. Nardi, 212 Conn. 282,

291 (1989). Generally speaking, liability under the instrumentality approach is imposed where

98

the corporate form is used to perpetrate some kind of wrongful act for the benefit of one who controls the corporation.  See Zaist, 154 Conn. at 578.  ("On the basis of the referee's report, the court could properly conclude that Olson so completely controlled East Haven that that corporation had 'no separate mind, will or existence of its own'; . . . that the control was used to perpetrate an unjust act in contravention of the plaintiffs' rights; and that it caused the unjust loss complained of.").

Second, "[t]he identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." Angelo Tomasso. Inc. v. Armor Const. & Paving. Inc., 187 Conn. 544, 560 (1982).  The Connecticut Supreme Court has defined the identity rule as follows:

> If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

Angelo Tomasso. Inc., 187 Conn. at 554 (quoting Zaist, 154 Conn. at 576).  The identity theory has also been applied to hold an individual liable for the obligations of a corporation.[7]  See Saphir v. Neustadt, 177 Conn. 191, 211 (1979); Zaist, 154 Conn. at 578; Toshiba America Medical Systems. Inc. v. Mobile Medical Systems. Inc., 53 Conn. App. 484, 492 (1999); Davenport v. Quinn, 53 Conn. App. 282, 303 (1999); See Kreaos v. Latest Line, Inc., 929 F.

---

[7]  The court finds that both Richter, as an individual, and Hill, as a corporation, would be held liable for the April 23, 1997 default judgment entered against HAESI under either Delaware or Connecticut law.

Supp. 600, 604 (D. Conn.) ("The identity rule is usually applied in situations where two corporate entities are controlled as one enterprise because of the existence of common shareholders, directors and officers and the lack of observance of corporate formalities. '. . . This rule, however, has also been applied to find individual stockholders liable."), vacated in part, 951 F. Supp. 24 (D. Conn. 1996). Generally speaking, the identity rule imposes liability when two corporations or a corporation and an individual should properly be considered one in the same.  See Zaist, 154 Conn. at 578 ("The court could, with equal propriety, reach the conclusion that the identity of Olson and Olson, Inc. was such that a judgment against Olson, Inc. [and Olson] was warranted.").

The question before the court is whether RICHTER and HILL dominated HAESI and used HAESI for an improper purpose that caused injury to plaintiffs, or whether the relationship between RICHTER, HILL, and HAESI was such that they should properly be considered one entity.  See Angelo Tomasso. Inc., 187 Conn. at 561.  ("The issue of whether the corporate veil is pierced presents a question of fact.").   The court concludes that RICHTER and HILL did dominate and use HAESI for an improper purpose that caused injury to plaintiffs.  The court also finds that the relationship between RICHTER, HILL and HAESI was such that they should properly be considered one entity.

RICHTER and HILL exercised control over HAESI's affairs, including the original transaction giving rise to the breach of contract suit and the default judgment.  In <u>Zaist</u>, the seminal case with respect to piercing the corporate veil in Connecticut, the Connecticut Supreme Court stated that [t]he only reasonable meaning to attach to the transaction spread upon this record is that East Haven [the corporation alleged to be Olson's alter ego] undertook no obligation of its own to the plaintiffs, was financially unable to cope with the actual transaction, and reaped no benefit from it.  The undertaking throughout was Olson's, planned and carried out through his various other corporate creatures for his own and Olson, Inc.'s enrichment, a part of which, if the plaintiffs were denied a recovery, would consist of the amount which East Haven, as the plaintiff's ostensible debtor, is unable to pay because Olson and Olson, Inc. have not provided the final necessary funds.  <u>Zaist</u>, 154 Conn. at 577-78.

Plaintiffs developed a new software program pursuant to an August 2, 1988 contract with HAESI's predecessor in interest.  RICHTER, as the financial driving force behind the thicket of corporate activity recounted in the record, participated in the procurement of the contract and reaped the benefit of plaintiffs' labor.  Plaintiffs have presented enough evidence for this court to conclude that RICHTER dominated HAESI's affairs and was able to manipulate corporate transactions to avoid compensating plaintiffs for the benefit they conferred upon him even when they obtained a judgment therefor.

Plaintiffs have also presented ample evidence that defendant HAESI was grossly undercapitalized, notwithstanding RICHTER=s assurances that he and/or HILL would provide sufficient capital to financially support the development being undertaken.  <u>See</u>, <u>e.g.</u>, <u>Zubik v. Zubik</u>, 384 F.2d 267, 273 (3d Cir. 1967) ("The defrauded creditor or 'victim' of a business

transaction with an undercapitalized corporation, for instance, often has a strong case for piercing the veil of a 'sham' corporation. . . . The controversy in such cases invariably involves some degree of reliance by the plaintiff, contributing to the fraud, or undue advantage or trick accenting the injustice.") (applying admiralty law); Angelo Tomasso, Inc., 187 Conn. at 556-57 ("the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs."). See also, Segan Const. Corp. v. Nor-West Builders, Inc., 274 F.Supp 691 ("Such severe undercapitalization is not a factor which the court may ignore. See Zaist v. Olson, supra note 29, at 569, 227 A.2d at 555.) Id., Fn 32.

The very claim by RICHTER and HILL that what appeared on HAESI's financial statements as capitalization was in fact the product of borrowing to be repaid to RICHTER and HILL reflects not only the gross undercapitalization of HAESI, but domination and control of HAESI by RICHTER and HILL.  As Olson and Olson, Inc., in Zaist, had not provided the necessary funds, so too, RICHTER and HILL have not provided the necessary funds.

Defendants argue that the court may not apply the instrumentality theory and hold RICHTER or HILL liable for HAESI's obligation because defendants' conduct does not amount to fraud or illegality.  The Connecticut Supreme Court has stated the following regarding this issue: The second element of the instrumentality test addresses the kind of misconduct that will impose personal liability on an individual who has exercised complete domination over a corporation in total disregard of its existence as a separate entity.  We have found such misconduct, even absent fraud or illegality, when the individual in control has used a corporate instrumentality to avoid personal liability that he had previously assumed. Camcisano v. Nardi,

212 Conn. 282, 292 (1989). "The instrumentality rule merely requires the trial court to find that the defendants committed an unjust act in contravention of the plaintiff's legal rights." Toshiba America Medical Systems, Inc. v. Mobile Medical Systems, Inc., 53 Conn. App. 484, 491 (1999).

Plaintiffs have presented sufficient evidence that defendants' conduct is sufficiently wrongful to justify disregarding the corporate form.

Here, the evidence supports the conclusion that HAESI's failure to pay the balance owed on the August 2, 1988 contract culminated in the entry of the April 23, 1997 default judgment. Thus, the wrongdoing includes the failure to satisfy a judgment in addition to the failure to pay the balance of a sum due under a contract. As opposed to the mere breach of a contract, the use of the corporate form to avoid paying an obligation incurred by contract that is reduced to a judgment is sufficient to satisfy the instrumentality rule. See Davenport v. Quinn, 53 Conn. App. 282, 301 (1999) (considering the diversion of assets from corporate entity in order to avoid payment of judgment in favor of plaintiff a wrongful act with respect to the transaction in satisfaction of the instrumentality test); Toshiba America Medical Systems. Inc., 53 Conn. App. at 491-92 (rejecting argument that the evidence demonstrated no wrongful act as required by the instrumentality rule because the evidence supported the conclusion that defendant diverted funds from the corporation to avoid paying the balance due under contracts with the plaintiff); cf. Campisano v. Nardi, 212 Conn. 282, 293 (1989) ("Implicit in the plaintiffs' claim of error is the proposition that the instrumentality rule is triggered whenever individual control of a corporation is coupled with a breach of contract by the corporation. We know of no authority for so far-reaching a proposition. The plaintiffs do not claim that the defendant used

his control over the corporation in order to commit or to avoid liability for any personal wrongful act."); Mobil Oil Corp. v. Linear Films. Inc., 718 F. Supp. 260, 269 (D. Del. 1989) ("The law requires that fraud or injustice be found in the defendants' use of the corporate form.")

Also, defendants argue that plaintiffs have not demonstrated a sufficient nexus between HILL's and RICHTER's alleged control and the transactions involving plaintiffs themselves. Defendants cite Angelo Tomasso, Inc. v. Armor Construction & Paving. Inc., 187 Conn. 544 (1982) in support of this argument. In Angelo Tomasso, Inc., the plaintiffs sued the defendant corporation, and its two officers as individual guarantors, on a sum due on a line of credit. See id. at 547. The individuals then filed a third-party claim against Pierre Lemieux seeking to hold him liable for the defendant corporation's debt. See id. The Connecticut Supreme Court applied the instrumentality theory and held that, although the third-party plaintiffs provided evidence that Lemieux dominated the defendant corporation's affairs, the third-party plaintiffs did not demonstrate a nexus between Lemieux's control and the execution of the personal guarantees. See id. at 558-59. The Court further stated that "[t]he fact that the corporate veil could be disregarded for some purposes does not mean that it must be disregarded for all purposes." rd. at 559; cf. 1 Fletcher Cvc. Corp. ' 43 at 711-15 (Perm. Ed. 1999) ("There is a presumption of separateness the plaintiff must overcome to establish liability by showing that the parent is employing the subsidiary to perpetrate a fraud and that this was the proximate cause of the plaintiff's injury. Merely showing control, in the absence of an intent to defraud or escape liability is insufficient to overcome that presumption. Although wrongdoing by the parent need not amount to plain fraud or illegality, the injured party must show some connection between its injury and the parent's improper manner of doing business- without that connection,

even when the parent exercises domination and control over the subsidiary, corporate separateness will not be recognized."). Given the circumstances of HAESI's failure to pay the contractual balance, and the fact that the contractual obligation was reduced to a judgment, the court finds that Plaintiffs have proved the required nexus between RICHTER and HILL's domination of HAESI and HAESI's obligation to plaintiffs. Plaintiffs have demonstrated that, at the time they entered into the August 2, 1988 agreement, they understood RICHTER to be in control over HAESI and HILL, and that they would ultimately answer to RICHTER. Plaintiffs' evidence therefore, that RICHTER and HILL controlled HAESI is sufficiently connected to the original contract negotiations. Further, plaintiffs cite numerous dilatory litigation tactics on the part of defendants in the First Action, which supports the claim that defendants were trying to stall or delay satisfaction of HAESI's obligation to plaintiffs.

Plaintiffs have provided ample evidence that RICHTER, either by himself or through his family or related entities, controlled HAESI, HILL and ENTERTAINMENT EXPRESS. The entities shared common officers, directors and shareholders, with RICHTER clearly in control. HAESI⹀s assets were transferred to a new entity which consisted, for the most part, of the same individuals and entities that comprised HAESI before the transfer. Plaintiffs have satisfied the identity test set forth in <u>Zaist</u>.

## CONCLUSION

Plaintiffs having satisfied both the instrumentality and identity tests as outlined above, it is hereby ordered that HAESI⹀s corporate veil shall be disregarded and that defendants RICHTER and HILL are held liable to plaintiffs as to that certain judgment entered against HAESI and in favor of Plaintiffs on April 23, 1997.

### #15 - DEFENDANTS HILL INTERNATIONAL, INC. and IRVIN RICHTER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.    PROPOSED FINDINGS OF FACT

    A.    History And Background of Hill Arts & Entertainment Systems, Inc. – ("Hill A&E")

    1.    Laurence Schwartz founded ArtSoft, Inc., a Connecticut Corporation, in 1984 ("Connecticut ArtSoft"). In order to fund Connecticut ArtSoft, Mr. Schwartz took out a Small Business Administration loan, which he and his mother personally guaranteed. He was the President of Connecticut ArtSoft and its successor corporation until 1996.

    2.    Defendants Irvin Richter ("Mr. Richter") and Hill International, Inc. ("Hill") were not involved in the founding of Connecticut ArtSoft or the initial capitalization of Connecticut ArtSoft.

    3.    Connecticut ArtSoft developed a computer system for automating ticketing, fundraising and accounting for theaters and sold such system to arts organizations.

    4.    From 1984-1987, Connecticut ArtSoft grew. By 1987, it had between 10 and 20 employees and 10 and 100 customers.

    5.    Connecticut ArtSoft was located first in Wallingford and later in Guilford, Connecticut.

    6.    On August 7, 1987, Mr. Richter purchased 39 shares in Connecticut ArtSoft. Mr. Richter was Chairman and CEO of Hill, an international construction consulting and construction management firm that provides services to governmental institutions and the private sector and is located in New Jersey ("Hill"). At the same time, Hill bought 48 shares of Connecticut ArtSoft and William J. Doyle, the then President of Hill, bought 13 shares of

Connecticut ArtSoft. Together, Richter, Hill and Doyle thereby owned 100% of the outstanding shares of Connecticut ArtSoft. On December 23, 1988, Hill Group, Inc. purchased Hill's 48 shares of Connecticut ArtSoft.

7.     At the time of the purchase of its interest, Hill invested $75,000 in Connecticut ArtSoft.

8.     After this acquisition of Connecticut ArtSoft, Mr. Richter and Mr. Doyle were the directors of the company.

9.     ArtSoft, Inc., a Delaware corporation, was incorporated on June 30, 1987 ("Delaware ArtSoft").

10.     Five thousand shares of Delaware ArtSoft stock were authorized. Mr. Richter purchased 390 shares, Hill purchased 480 shares and Mr. Doyle purchased 130 shares of stock.

11.     Mr. Richter was the sole director and President of Delaware ArtSoft. James Distefano, a Hill employee, was the treasurer of Delaware ArtSoft and Arnon Garonzik, another Hill employee, was the secretary.

12.     In 1989, Jeanne Nolen replaced Mr. Garonzik as the corporate secretary of Delaware ArtSoft.

13.     On February 27, 1990, Delaware ArtSoft purchased all of the outstanding shares of Connecticut ArtSoft then held by Mr. Richter, Mr. Doyle and Hill.

14.     On April 13, 1990, Delaware ArtSoft and Connecticut ArtSoft merged with Delaware ArtSoft becoming the successor corporation.

15.    The merged company changed its name to Hill Arts & Entertainment Systems, Inc. ("Hill A&E").

16.    Mr. Richter was the sole director of Hill A&E at this time and thereafter.

17.    On July 1, 1991, Mr. Richter purchased Hill's shares of Hill A&E, and on May 27, 1992, Mr. Richter purchased Mr. Doyle's shares in Hill A&E.  After that date, Mr. Richter was the sole shareholder of Hill A&E.

18.    Mr. Richter owns 66.7% of the stock of Hill. He acquired his stock in Hill in 1981.  Mr. Richter's sons, David and Brady, each own 16.7% of Hill. David Richter and Brady Richter acquired their shares of Hill in 1993.  Since 1995, certain employees of Hill have held options to acquire stock of Hill.

19.    Hill A&E elected officers for Hill A&E by means of Informal Action of the Sole Director, as permitted under Delaware law. Mr. Schwartz, who was not an officer, director or shareholder of Hill, continued to serve as President of Hill A&E until May 1996.

20.    Stanley Gloss, the controller of Hill A&E, who was not an officer, director, or shareholder of Hill, was a Vice President and Assistant Treasurer of Hill A&E.

21.    Andrew J. Dennis and Donald R. Youngberg, employees of Hill A&E, who were not officers, directors, or shareholders of Hill, were elected Vice Presidents of Hill A&E.

22.    Plaintiff Dirk Epperson was a Vice President of Hill A&E and was not an officer, director, or shareholder of Hill.

23.    Because after July 1, 1991, there was only one shareholder of Hill A&E, shareholder meetings were unnecessary, and all necessary action on the part of Hill A&E's

shareholder was taken by written consent in accordance with Delaware law. There is a record of actions taken by the written consent of Hill A&E's shareholder. Prior to July 1, 1991, actions by Hill A&E's shareholders were taken by written resolution, as permitted under Delaware law.

24.    Because Mr. Richter was the sole Director of Hill A&E, and prior to that time he was sole Director of Delaware ArtSoft, it was unnecessary to hold official board of directors meetings, and all necessary action was done by written consent of Hill A&E's director in accordance with Delaware law. There is a record of actions taken by written consent of Hill A&E's director.

25.    Hill A&E maintained a corporate minute book that included its Articles of Incorporation and Bylaws.

B.    PAT Contract

26.    Plaintiffs were the sole owners of stock in a California corporation known as Performing Arts Technology, Inc. ("PAT"). Plaintiff Dirk Epperson holds a Bachelor in Science degree in physics from Harvey Mudd College in Los Angeles, California and a Masters in Fine Arts degree in theatre engineering from the Yale University School of Drama.

27.    Plaintiff Betty Schneider, who is married to Dirk Epperson, holds a Bachelor in Arts from Oberlin College in Ohio.

28.    Mr. Epperson founded PAT in 1977 or 1978.

29.    PAT, like Connecticut ArtSoft, developed software for performing arts organizations.

30.     In 1987, Mr. Schwartz, on behalf of Connecticut ArtSoft, began negotiating with Plaintiffs for the acquisition of PAT. Mr. Schwartz met with Mr. Epperson and PAT's consultant.  Mr. Epperson wanted to sell PAT, because he wanted to return to programming and not run a company, and Ms. Schneider no longer wanted to work in the computer field. The plan was for PAT to stop selling its software and for Connecticut ArtSoft to take over PAT's customers. In addition, Mr. Epperson would port Connecticut ArtSoft's software (make it run on a different system) and design and work on a new version of the software ("New Program").

31.     Mr. Schwartz met with PAT's key employees in December 1987.

32.     In March 1988, Mr. Schwartz sent Mr. Epperson letters concerning their negotiations.

33.     In April 1988, Mr. Schwartz finalized the negotiations with Mr. Epperson for a joint venture.

34.     On April 18, 1988 and May 13, 1988, Mr. Schwartz, on behalf of Connecticut ArtSoft, sent Mr. Epperson Letters of Intent confirming their discussions regarding PAT performing certain software development services for Connecticut ArtSoft and PAT granting Connecticut ArtSoft an option to purchase its stock subject to the payment of a maximum royalty fee.  In addition to a monthly fee for porting Connecticut ArtSoft's software and developing the New Program, the Letter of Intent provided that if the new software was successful, Connecticut ArtSoft would pay certain royalties upon receipt of payments from customers during a three year period.  Mr. Epperson signed the Letters of Intent on April 28, 1988 and May 17, 1988, respectively.

35.    In May 1988, Mr. Schwartz announced to Connecticut ArtSoft employees that there would be a joint venture between Connecticut ArtSoft and PAT.  In May 1988, Connecticut ArtSoft also issued a press release announcing a joint venture between Connecticut ArtSoft and PAT to port Connecticut ArtSoft's software and to develop the New Program.

36.    PAT's counsel and Connecticut ArtSoft's counsel negotiated the drafting of the August 2, 1988 Custom Software Development Agreement (the "Agreement") between PAT and Connecticut ArtSoft and related documents. Hill's general counsel provided legal services to Connecticut ArtSoft in such negotiations.

37.    Mr. Richter did not participate in the negotiations with PAT which culminated in the Agreement.  The negotiations on behalf of Connecticut ArtSoft were conducted by Mr. Schwartz.  There was no representation by Mr. Richter that he or Hill would fund any portion of the PAT contract.  There was no representation by Hill that it would fund any part of the contract.  Neither PAT nor Plaintiffs were told that they would ultimately answer to Mr. Richter or Hill.

38.    Both Mr. Epperson and Ms. Schneider understood at the time that they signed the Agreement that PAT was entering into a contract with Connecticut ArtSoft and that Connecticut ArtSoft was a separate corporation from Hill and was an entity separate from Mr. Richter.

39.    Both Mr. Epperson and Ms. Schneider had been involved in numerous contracts before PAT entered into the Agreement with Connecticut ArtSoft.  However, PAT

111

did not require a guaranty of Connecticut ArtSoft's obligations under the Agreement from either Hill or Mr. Richter.

40.    Further, although each understood the concept of obtaining security for an agreement, PAT did not require that its agreement with Connecticut ArtSoft be secured.

41.    In Mr. Epperson's discussions with his and PAT's counsel, it was decided that there was no need for a recorded lien on the assets of Connecticut ArtSoft to secure Connecticut ArtSoft's obligations to PAT or Plaintiffs.

42.    Mr. Epperson does not recall asking for or seeing a financial statement from Connecticut ArtSoft.

43.    Mr. Epperson does not recall if he investigated if Connecticut ArtSoft had any indebtedness before PAT signed the agreement with Connecticut ArtSoft.

44.    Ms. Schneider does not recall if she had any information showing the financial status of Connecticut ArtSoft, such as financial statements, books or records, or if she made any inquires about these issues before PAT signed the agreement with Connecticut ArtSoft.

45.    On August 2, 1988, Mr. Schwartz, on behalf of Connecticut ArtSoft entered into the Agreement.  The Agreement expressly provided an explicit waiver of claims against Connecticut ArtSoft's parents and affiliates of Connecticut ArtSoft. Hill was an affiliate of Connecticut ArtSoft.  The Agreement states: **"The contract relationship created hereby is between specific entities and does not include corporate parents, subsidiaries or affiliates."**  Further, the Agreement provides that it "supercedes all proposals, whether oral

or written and all negotiations, conversations or discussion between the parties relating to [the] Agreement."

46.    The parties' counsel also negotiated a Stock/Asset Option Grant Agreement and an Employment Agreement for Mr. Epperson.

47.    On April 1, 1989, Mr. Schwartz signed the Employment Agreement on behalf of Connecticut ArtSoft.

48.    In 1988, the year in which Connecticut ArtSoft entered into the Agreement, it had assets of $672,000 and working capital of $67,000. In addition, it had revenues of $1,921,000.  In addition, Hill had loaned it $691,000, which Hill was not demanding immediate repayment of.  It was anticipated that the royalties to be paid to PAT under the Agreement would be paid from the sales of the New Program Software to be developed under the Agreement. Connecticut ArtSoft was adequately capitalized for its undertaking with PAT under the Agreement.

49.    Between August 2, 1988 and June 1989, PAT began developing the New Program, which was later known as ArtSoft/SQL and SportSoft/SQL.  Neither Mr. Richter nor Hill in any way supervised the work performed by PAT under the Agreement.  PAT was compensated $7,000 for this work each month.

50.    Ten months into the Agreement, Connecticut ArtSoft and PAT entered into an Amendment to the Agreement dated June 19, 1989 (the "Amendment").  The Amendment was signed by Mr. Schwartz on behalf of Connecticut ArtSoft.  Under the Amendment, the parties acknowledged that the performance of the porting of Connecticut ArtSoft's existing software had been completed and that PAT had been fully compensated for such porting

services.  The parties also acknowledged that the parties had proceeded with the development of the New Program software and that PAT had been fully compensated by Connecticut ArtSoft for all development services though June 19, 1989.  Under the Amendment, PAT was not required to continue to develop the New Program. Additionally, the Amendment confirmed that all of the employees of PAT had terminated their employment with PAT and had been hired by Connecticut ArtSoft, including Mr. Epperson. Finally, the Amendment provided that except as specifically provided by the Amendment, all of the terms of the Agreement would remain unchanged and in full force and effect.

51.     The Amendment changed the compensation provisions in the Agreement with regard to the development of the New Program software.  Instead of receiving a monthly retainer, Connecticut ArtSoft and PAT agreed that PAT would receive a fee based upon a percentage of fees that Connecticut ArtSoft received for the use of the new software for a period of three years subject to a maximum royalty fee of $250,000 (the "Maximum Royalty Fee").  The Amendment also provided that Connecticut ArtSoft would pay $40,000 to PAT, which Connecticut ArtSoft did pay in 1989 and that this $40,000 payment would be applied towards the Maximum Royalty Fee.  Neither Hill nor Mr. Richter negotiated the Amendment. For the 1989 fiscal year, the year during which the Amendment was executed, Hill A&E had total assets of $1,625,000. As of 1989, Hill had loaned it $1,378,000, which Hill was not demanding immediate repayment of.

52.     PAT's employees, including Mr. Epperson, became Connecticut ArtSoft's employees in April 1989. Mr. Epperson became Vice President of Development.  On April 1, 1989, Connecticut ArtSoft also took over responsibility for PAT's expenses. Mr. Schwartz

issued a memorandum to his staff directing them to take certain actions as a result of these events. Mr. Epperson remained an employee of Connecticut ArtSoft and its successor, Hill A&E, until he quit in 1993.

53.    As of April 1, 1989, when Connecticut ArtSoft took over the development of the New Program, known as Gemini and also known as ArtSoft/SQL and SportSoft/SQL, such program was in the early stages of development.  Connecticut ArtSoft completed the development of ArtSoft/SQL and SportSoft/SQL.  After April 1, 1989 Mr. Epperson was paid a salary by Connecticut ArtSoft for developing the New Program.

54.    The ArtSoft/SQL and SportSoft/SQL software initially developed by PAT and subsequently completed and revised over the next six years by Connecticut ArtSoft (later known as Hill A&E), was used in Hill A&E's business and benefited Hill A&E and was not used in Hill's business or personally by Mr. Richter. After April, 1989, Hill A&E spent significant sums completing, changing and upgrading the New Program that PAT had initially developed. The first installation of an ArtSoft/SQL program for a client was in January 1991, almost two years after PAT's obligation to develop the software had terminated. The SportSoft/SQL program was not installed until much later. The sales of ArtSoft/SQL and SportSoft/SQL fell far below expectations.

C.    Relationship Between Hill A&E and Hill and Mr. Richter

55.    After Mr. Richter and Hill became shareholders in Connecticut ArtSoft in 1987, Mr. Schwartz continued to be in charge of the day-to-day operations of the company. Mr. Richter had almost no involvement with the daily operations of Connecticut ArtSoft.

56.    Mr. Schwartz performed the same functions as he had before Mr. Richter acquired his interest in Connecticut ArtSoft.  Mr. Schwartz continued to make sure that sales were made, he collected receivables, and he was involved in the overall design and development of software.  Additionally, Mr. Schwartz continued to be involved in budgeting, managing cash day-to-day, and making decisions as to what bills would be paid.  He was involved in advertising and designing marketing campaigns, and attended and gave speeches at trade shows.

57.    In 1988, Mr. Schwartz hired Stanley Gloss to be Connecticut ArtSoft's controller. As stated above, Connecticut ArtSoft merged with Delaware ArtSoft in 1990 and the merged corporation changed its name to Hill A&E. Unless stated specifically otherwise, references hereafter to Hill A&E include its predecessor, Connecticut ArtSoft. Mr. Schwartz made decisions regarding hiring, job positions, salaries, laying off of employees and restructuring of Hill A&E. He and Mr. Gloss also determined employees' fringe benefits, negotiated payment plans with creditors and determined which creditors would be paid.

58.    Hill A&E generally employed approximately 40 employees and at certain points employed up to 58 or more employees. Hill A&E's employees were very committed, working long hours, including weekends, without overtime pay. There were weekly manager meetings and quarterly meetings of all employees.

59.    Hill A&E's employees were organized by product line until August 1992, when Mr. Schwartz and Mr. Gloss reorganized Hill A&E. At that time, Hill A&E's employees were reorganized along functional responsibilities, i.e., sales, marketing, development, engineering, etc. Hill A&E prepared market analyses of its products, sales projections,

business development plans, sales reports, and similar documents. It developed a corporate strategy/mission statement and held a corporate retreat. Hill A&E had three divisions: ArtSoft, ArtSoft Management Services (AMS) and SportSoft.

60.     Hill A&E had offices in Connecticut, California and England and set up a corporation, Hill A&E Overseas Corp., to manage its overseas business. Hill A&E had its own newsletter.

61.     Hill A&E sold its ticketing software to theaters across the country and in Europe.

62.     Mr. Schwartz was authorized to sign contracts on behalf of Hill A&E and was the only person who signed customer contracts.

63.     Mr. Schwartz and other Hill A&E employees negotiated customer and supplier contracts, settlement of claims, pursued Hill A&E's claims against third parties, and dealt directly with counsel who represented Hill A&E.

64.     Mr. Schwartz also negotiated acquisitions by or partnerships with other companies. There were numerous news articles about Hill A&E's activities which highlighted Mr. Schwartz's leadership role in the company.

65.     Hill A&E maintained its own bank accounts separate and distinct from Hill's accounts, prepared its own budgets, cash forecasts, ageing reports and financial statements, and had its own assets.

66.     Hill A&E applied for tax registrations in Connecticut and Michigan, filed its own state and federal tax returns for each year that the company operated and, in 1995 hired an outside auditor.

117

67.    While employed at Hill A&E, Mr. Gloss had check signing authority.

68.    As President of Hill A&E, Mr. Schwartz was given pretty wide discretion as long as he met the budget and the numbers, and he did what he thought was appropriate, including freezing salaries or reducing salaries, rather than laying people off.

69.    Mr. Schwartz and Mr. Gloss reported to Mr. Richter and others at Hill about the financial status of Hill A&E, as well as the status of projects.  When Hill A&E sought to borrow funds from Hill, it would oftentimes describe the uses for such funds. Some Hill employees sought to make suggestions about how to cut expenses and increase revenues of Hill A&E, particularly when Hill A&E was seeking funds from Hill to meet its cash needs. Mr. Schwartz undertook to restructure Hill A&E and close certain of its operations in order to save money.

70.    Mr. Schwartz would meet with Mr. Richter at Mr. Richter's offices in New Jersey annually and at times monthly or quarterly or he would speak with Mr. Richter on the telephone.

71.    Mr. Schwartz prepared an agenda for his meetings with Mr. Richter.

72.    In general, memos would flow from Hill A&E to Mr. Richter rather than vice versa.

73.    Mr. Schwartz would "do battle" with Mr. Richter and other Hill employees with respect to Hill A&E's budget, which Mr. Schwartz prepared, and would oftentimes disagree with Hill's employees and Mr. Richter concerning Hill A&E's business.

74.    Mr. Richter "like any good investor" would question Mr. Schwartz's budget, try to poke holes in it and give suggestions. He would refer Mr. Schwartz to consultants and to sales leads.

75.    In Mr. Schwartz's view, Mr. Richter was not interested in controlling the process with respect to customer contracts, but rather just wanted to know what was going on.

76.    With respect to major decisions, such as the closure of the Power Station business, Mr. Schwartz sought Mr. Richter's approval.

77.    Because Hill had greater buying power due to its size, it would purchase or lease certain products and services and then bill Hill A&E for those services. For example, Hill had a relationship with attorneys to perform work for the Hill affiliated companies.  When Hill A&E needed certain legal work done, Hill's attorney might perform the work. If such work was done by outside counsel, Hill A&E was responsible for paying the bill.

78.    Similarly, Hill purchased medical insurance for its own employees and for Hill A&E employees, because the premiums for Hill were less than they would have been to Hill A&E due to the larger size of the employee population that insurance was being purchased for. Hill A&E designated the type of insurance that it wanted for its own employees, and Hill would pay the premiums and then bill Hill A&E.

79.    A similar arrangement existed with American Express, and the cards issued to Hill A&E employees were in the name of Hill A&E.

80.    Additionally, the payroll for Hill A&E was done through a payroll service hired by Hill.  Hill A&E would send the payroll service directly the payroll taxes for Hill A&E's own

employees directly to the payroll service. When Hill A&E was short of cash, Hill would pay the payroll taxes for Hill A&E and make deposits into Hill A&E's 401(k) plan on behalf of Hill A&E and then add such amounts to Hill A&E's loan from Hill. Hill would also make payments on Hill A&E's leases that it had guaranteed when Hill A&E was short of cash and then add such payments to Hill A&E's debt to Hill.

81. On the Hill A&E side, Hill A&E purchased computers for Hill and for certain affiliates or subsidiaries of Hill in 1989 and 1990, because Hill A&E could get a better rate for its own customers if it purchased computers in large quantities.

82. Hill A&E billed Hill and the Hill subsidiaries and affiliated companies for the computers purchased for these entities and expected to be paid for them.

83. Hill A&E provided computer consulting (MIS) services to Hill.  The cost for these services was deducted from Hill A&E's debt to Hill in December 1990.

84. Mr. Richter did not withdraw any funds from Hill A&E for his own use.

85. Hill did not withdraw any funds from Hill A&E for its own use.

D.    Hill A&E's Financial Problems and Loans from Mr. Richter and Hill

86. Initially, when Hill and Mr. Richter became shareholders of Connecticut ArtSoft in 1987, Mr. Schwartz would include in his budget for Hill A&E an amount to be borrowed from Hill.

87. The goal of Hill A&E was to build a business, generate sales and be self-sustaining.

88. When Hill A&E requested cash from Hill, Hill would wire funds to Hill A&E's account.  When Hill A&E requested that vendors be paid directly, Hill would send checks

directly to the vendors in the amount specified by Hill A&E.  At the time these payments were made, Hill would enter the cash loans and the payments to thirds parties in its general ledger system.  Amounts lent by Hill to Hill A&E were also reflected on Hill A&E's unaudited financial statements, on Hill A&E's cash flow statements, Hill A&E's cash forecasts, and on Hill's audited financial statements.  Although certain unaudited balance sheets of Hill A&E for a period of time from mid-1992 until 1995 did not reflect such amounts as loans but rather for a short period classified such amounts as capital contributions in order to attract investors to Hill A&E, after an audit of Hill A&E's books conducted in 1995, such balance sheets for 1993, 1994 and 1995 were restated to reflect the Hill loans. During that same period, Hill A&E's cash flow statements and cash forecasts and all of Hill's financial records always reflected the funds provided by Hill to Hill A&E as loans.

89.    Beginning in June and July 1990, Hill A&E reported to Hill increases in projected losses and cash flow deficits and an increase in a need for borrowings.

90.    This increase was due to a collapse in sales and increased licensing costs for software.

91.    Computerized records generated from Hill's General Ledger show that through December 31, 1989, Hill had loaned Hill A&E $1,433,227.  In 1990, Hill lent Hill A&E $1,866,272.43, which included cash advances as well as the payment of insurance, legal fees and other matters on behalf of Hill A&E.  Hill did not demand immediate repayment of these loans or immediate payment of interest on these loans.

92.    Subsequently, in 1991, Hill A&E's cash needs became acute, because its deposits for its future system sales had slowed.

93.    In 1991, Hill A&E's sales were half of its budgeted amount.

94.    Hill continued to loan funds to Hill A&E. The total loaned in 1991 by Hill to Hill A&E was $1,070,241.54, after repayments, which total also included cash advances, insurance payments and the payments of professional fees.  By the end of 1991, Hill had loaned Hill A&E a total of $4,369,740.97.

95.    In the fall of 1991, Mr. Richter and his wife took out mortgages on their home and on their vacation property from Commerce Bank, and on November 26, 1991, lent Hill A&E $1.1 million.

96.    This loan was authorized by a corporate resolution of Hill A&E and was evidenced by a promissory note ("Richter Note") which bore interest at the rate charged by Commerce Bank plus 1.5%. Commerce Bank required, as a condition of its loan to Mr. and Mrs. Richter, that the Richter Note be assigned to the bank if the proceeds were not used as an equity injection for Hill A&E.

97.    To secure the loan, Hill A&E entered into a security agreement (the "Richter Security Agreement") under which Hill A&E granted to Mr. Richter a security interest in all "'Accounts,' 'Contracts,' 'Contract Rights,' 'Chattel Paper,' 'Instruments,' 'Documents,' 'General Intangibles,' 'Inventory,' 'Equipment,' and 'Fixtures,' as each such term is defined under the Uniform Commercial Code as enacted in the State of New Jersey, all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located" (the "Richter Security Interest"). The Security Agreement was assigned to Commerce Bank.

98.    On December 5, 1991, a UCC-1 Financing Statement was filed with the Secretary of State of Connecticut listing Hill A&E as the Debtor and Mr. Richter as the Secured Party covering Hill A&E's Assets described above and "all proceeds and products thereof, substitutions, additions and accessions hereto, now existing or hereafter acquired, wherever located."

99.    On December 10, 1991, a UCC-1 Financing Statement listing Hill A&E, as the Debtor, and Mr. Richter, as the Secured Party, was filed with the Secretary of State of New Jersey, covering the following collateral of Hill A&E: "all 'Accounts,' 'Contracts,' 'Contract Rights,' 'Chattel Paper,' 'Instruments,' 'Documents,' 'General Intangibles,' 'Inventory,' 'Equipment,' and 'Fixtures,' as each such term is defined under the Uniform Commercial Code as enacted in the State of New Jersey, all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located."

100.    The Security Agreement was required by Commerce Bank as a condition of its granting a mortgage to Mr. and Mrs. Richter on their home, so that Mr. Richter could loan Hill A&E money.

101.    The proceeds of this loan were used to repay Hill a portion of its loan to Hill A&E.

102.    Hill A&E did not enter into the Richter Security Agreement in order to avoid paying PAT or Plaintiffs royalties.  Hill A&E entered into the Richter Security Agreement because the Richter Security Agreement was required as a condition of Commerce Bank's

loan to Mr. and Mrs. Richter, the proceeds of which loan were loaned to Hill A&E. At the

time of the Richter Security Agreement, neither PAT nor Plaintiffs had brought any claim

against Hill A&E for past due royalties.

103.    Hill A&E's financial troubles continued in 1992, because its sales during the

prior year had been slow.

104.    Hill A&E continued to borrow funds from Hill in 1992 in order to survive. In

1992, Hill loaned Hill A&E $2,303,379.02. The total owing at the end of 1992 was

$6,673,119.19. However, Hill had "issues" with its banks concerning loaning money to Hill

A&E.

105.    In 1993, Hill A&E's financial situation did not improve, and Hill continued to

loan Hill A&E money in order for Hill A&E to meet cash shortfalls and pay critical vendors.

Hill loaned Hill A&E $1,498,038.26 in 1993, including cash loans, payments to vendors,

contributions to the 401k plan, payment of payroll taxes, and payment of leases. The total

loaned by Hill to Hill A&E at the end of 1993 was $8,171,158.25.

106.    The loans made by Hill to Hill A&E permitted Hill A&E to meet its daily

expenses, including its payroll obligations to its employees, including Mr. Epperson, and

funding the development and improvement of the New Program. Hill did not demand

repayment of the loans during these years. Nevertheless, Hill A&E made repayments of the

loans from Hill on two different occasions – one in November 1991 in the amount of

$1,089,025 and the other in December 1991 in the amount of $10,975. In addition, certain

MIS services provided by Hill A&E to Hill's subsidiaries were treated as repayment of Hill

A&E's debt to Hill.  As of April 1, 1994, Hill A&E owed Hill the principal amount of $8,171,158.25.

107.    On or about April 1, 1994, Hill A&E and Hill entered into a Loan and Security Agreement (the "Hill Security Agreement") under which Hill A&E acknowledged that it had borrowed funds from Hill for several years prior to April 1, 1994 on a line of credit loan.  The Security Agreement further provided that Hill would continue to make additional advances for the payment of Hill A&E's obligations and for the payment of interest to Hill on the line of credit loan, at Hill's discretion, up to a maximum of $12 million (the "Hill Line of Credit Loan").  To secure the Hill Line of Credit Loan, Hill A&E granted Hill a security interest in all of Hill A&E's collateral including "all cash and non-cash proceeds of such collateral and proceeds of proceeds."  In April 1994, there was an improvement in Hill A&E's financial situation. Cash receipts were close to cash estimates and the difference between cash requirements and cash receipts was narrowed to a little over $17,000.

108.    On or about April 1, 1994, Hill A&E executed a Replacement Line of Credit Note made payable to Hill in the maximum principal amount of $12 million with interest at the per annum rate of 7%, which note evidenced the Line of Credit Loan.

109.    On June 7, 1994, a UCC-1 Financing Statement was filed with the Secretary of State of Connecticut naming Hill as creditor and Hill A&E as the Debtor covering the following collateral: "all 'Accounts,' 'Contracts,' 'Contract Rights,' 'Chattel Paper,' 'Instruments,' 'Documents,' 'General Intangibles,' 'Inventory,' 'Equipment,' and 'Fixtures,' as each such term is defined under the Uniform Commercial Code as enacted in the State of Connecticut, all deposits and bank accounts, all other personal property, tangible or

intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located (the "Hill Connecticut Financing Statement").

110.    On June 7, 1994, a UCC-1 Financing Statement was filed with the Secretary of State of New Jersey naming Hill as the Secured Party and Hill A&E as the Debtor and covering the following collateral: "all 'Accounts,' 'Contracts,' 'Contract Rights,' 'Chattel Paper,' 'Instruments,' 'Documents,' 'General Intangibles,' 'Inventory,' 'Equipment,' and 'Fixtures,' as each such term is defined under the Uniform Commercial Code as enacted in the State of New Jersey, all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located" (the "Hill New Jersey Financing Statement").

111.    On September 28, 1994, a Statement of Subordination was filed with the Secretary of State of New Jersey naming Hill A&E, as the Debtor, and Irvin Richter, as the Secured Party, subordinating all rights under Mr. Richter's New Jersey Financing Statement (File #1431107) filed in December 1991 to the rights of Hill under the Hill Financing Statement (File No. 1574802) filed in June 1994.

112.    On October 18, 1994, a Form UCC-1 was filed with the Secretary of State of California naming Hill A&E, as the Debtor, and Hill as the Secured Party covering the following assets: "all 'Accounts,' 'Contracts,' 'Contract Rights,' 'Chattel Paper,' 'Instruments,' 'Documents,' 'General Intangibles,' 'Inventory,' 'Equipment,' and 'Fixtures,' as each such term is defined under the Uniform Commercial Code as enacted in the State of California,

all deposits and bank accounts, all other personal property, tangible or intangible, all books and records relating to the foregoing and all proceeds and products thereof and substitutions, additions and accessions thereto, now existing or hereafter acquired, wherever located" (the "Hill California Financing Statement").

113.    On October 24, 1994, a UCC-1 Financing Statement was filed with the California Secretary of State listing Hill A&E as the Debtor and Mr. Richter as the Secured Party, covering Hill A&E's Assets described above including proceeds of such assets and "substitutions, additions and accessions hereto" (the "Richter California Financing Statement").

114.    The Richter California Financing Statement filed on October 24, 1994, indicated that such Financing Statement was subject to and subordinate to the Hill California Financing Statement.

115.    On October 31, 1994, a Statement of Subordination was filed with the Secretary of State of Connecticut naming Hill A&E, as the Debtor, and Irvin Richter, as the Secured Party, subordinating all rights under Mr. Richter's Connecticut Financing Statement filed in December 1991 to the rights of Hill under the Hill Connecticut Financing Statement filed in June 1994.  During the period that the above-referenced financing statements were filed, Hill A&E was generating a profit. In fact, in 1994, Hill A&E earned a profit and considered granting its employee stock options.

116.    After April 1, 1994, Hill continued to make advances to Hill A&E and make payments on behalf of Hill A&E.  The total loaned by Hill to Hill A&E at the end of 1994 was $8,398,744.87.  Furthermore, in 1995, Hill made payments of $4,164.13 on behalf of Hill

A&E, which it treated as loans. The total of loans made by Hill to Hill A&E at the end of 1995 was $8,402,909.18. Hill did not make any further loans to Hill A&E.

117.    Consequently, as of May 31, 1996, in excess of $8 million in principal was due and owing under the Hill Line of Credit Loan. The approximate amount of the accrued interest as of May 31, 1996 was $3,782,000. Accordingly, the total owed under the Hill Line of Credit as of May 31, 1996 was nearly $12.2 million.

118.    The loans by Hill to Hill A&E were reflected on Hill's audited financial statements prepared by an independent accounting firm for the years 1989, 1990, 1993 and 1994. These financial statements characterized funds advanced by Hill to Hill A&E as loans and not capital contributions. The Hill Security Interest was granted by Hill A&E to Hill so as to enable Hill to continue to loan funds to Hill A&E. The Hill Security Interest was not granted by Hill A&E in order to avoid paying Plaintiffs or PAT royalties or to avoid satisfying a default judgment. The Hill Security Interest was granted one and one-half years before Plaintiffs commenced litigation against Hill A&E for the payment of royalties and at a time when Hill A&E's financial picture was improving. Further, subsequent to the granting of the Hill Security Interest, Hill A&E made six payments of royalties to PAT.

119.    As of May 31, 1996, Hill A&E owed Mr. Richter approximately $682,344.40 under the Richter Loan. This amount has never been repaid.

E.    Payment of Royalties to PAT and the 1995 Litigation

120.    Under the Agreement and the Amendment, Hill A&E was required to pay royalties for a period of three years from the date of payment by Hill A&E of an initial $40,000 cash advance. The royalty period ran from August 7, 1989, the date Plaintiffs

128

received the $40,000 cash advance, to August 7, 1992. The $40,000 advance was to be credited against the Maximum Royalty Payment of $250,000.

121.    In December 1991, Mr. Schwartz and Mr. Robert McClintock, a Hill A&E employee, met with Mr. Epperson and agreed that because the calculation of royalties would be difficult and because they believed that the maximum royalty would be reached over time, PAT should invoice Hill A&E for the balance of Maximum Royalty Payment ($210,000) over a period of two years. Neither Hill nor Mr. Richter were involved in or aware of these discussions.

122.    On December 20, 1991, PAT sent Hill A&E an invoice for the first payment in the amount of $26,250.

123.    On January 30, 1992, Mr. Schwartz sent Epperson a letter stating that PAT would invoice and receive eight successive quarterly payments of $26,250 totalling $210,000.

124.    It was never Hill A&E's intention to pay the Maximum Royalty Payment unless New Program sales justified making the Maximum Royalty Payment. Mr. Schwartz was under the mistaken opinion that New Program sales would be such as to require the Maximum Royalty Payment. In fact, New Program sales from August 7, 1989 – August 7, 1992 did not justify the payment of the Maximum Royalty Payment. Licensing fees received during the royalty period were significantly less than those required for the payment of the Maximum Royalty Payment.

125.    PAT invoiced Hill A&E for the royalty payments it claimed to be due. It did not invoice either Mr. Richter or Hill for such payments.

126.    In addition, Plaintiffs wrote to Mr. Schwartz and to Mr. Gloss about not receiving payment.  These letters did not mention any claimed liability by Hill or Mr. Richter for the payments, and Mr. Schwartz also corresponded with Plaintiffs about Plaintiffs' claims.

127.    Mr. Richter first learned in June 1992 that Mr. Epperson was claiming that he was not being paid royalties, when Mr. Epperson called him.

128.    Mr. Richter sent Mr. Epperson a check from his own personal account in the amount of $5,000 because Mr. Epperson told him that he needed cash.

129.    The letter transmitting the check indicated that the $5,000 payment would be repaid by Hill A&E to Mr. Richter when the next payment was made to Mr. Epperson.

130.    From 1992 through 1995, Hill A&E made the following payments to Plaintiffs: 7/14/92--$5,000.00; 10/20/92--$26,250; 09/28/94--$1,000.00; 10/12/94--$500.00; 11/08/94--$1,000.00; 12/01/94--$500.00; 1/18/95--$1,000.00; 03/01/95--$1,000.00.  The payments made by Hill A&E to PAT under the Amendment totaled $76,250.00.

131.    With the exception of the $5,000.00 payment referenced above, the payments were made by means of checks drawn on Hill A&E's bank accounts and two payments drawn on Hill's account for which Hill A&E was billed.

132.    Except for the one $5,000 payment described above, Mr. Richter was not involved in the decisions about if, how much and/or when PAT would be paid royalties, Hill was never involved in the decision about it, how much and/or when PAT would be paid royalties.  Neither Mr. Richter nor Hill were involved in the decisions not to pay or to pay PAT

royalties, or with negotiations with PAT or Plaintiffs about payment to them. These decisions were made by Hill A&E employees.

133.    On March 30, 1995, Plaintiff's counsel, Robert Sullivan, wrote to Mr. Schwartz demanding payment of the outstanding royalties.  Attorney Sullivan also spoke with Mr. Schwartz during 1995 on at least five occasions regarding the payment of royalties. Attorney Sullivan did not address his demands to Hill or Mr. Richter.

134.    On October 4, 1995, Plaintiffs filed a suit in the United States District Court for the District of Connecticut entitled Epperson, et al. v. Hill Arts & Entertainment Systems, Inc., 3:95cv2131 (DJS) (the "1995 Action") seeking damages in the amount of $174,750.00.  Hill A&E was served with the Summons and Complaint on October 5, 1995.

135.    Hill A&E filed an appearance on October 26, 1995 and an answer to the Complaint on November 13, 1995.  The Answer denied that funds were owing to Plaintiffs, because Hill A&E had by then determined that the sales for licenses for the New Program during the royalty period had not been sufficient to require that Hill A&E pay the Maximum Royalty Payment.  The Answer, which was filed within 45 days after service of the Complaint, was not filed for reasons to delay Plaintiffs' obtaining a judgment against Hill A&E, but rather was filed, because Hill A&E believed that it had a bona fide defense to Plaintiffs' Complaint.

136.    In December 1995, Plaintiffs themselves filed two motions for extension of time to amend their complaint.

137.    On February 27, 1996, Plaintiffs and Defendant filed a Report of Parties Planning Meeting agreeing to a discovery deadline of July 15, 1996.

138.    On March 2, 1996, prior to Plaintiffs serving discovery requests on Defendant, Hill A&E served interrogatories and requests for production on Plaintiffs.  Plaintiffs requested an enlargement of time until April 18, 1996 to respond to the discovery requests.

139.    On March 22, 1996, Plaintiffs served on Hill A&E interrogatories and requests for production.  These discovery requests were extensive and sought information about all sales to every New Program customer, including those occurring after the three year royalty period, all of Hill A&E's gross revenues for an eight year period, Hill A&E's tax returns for the past eight years, Hill A&E's accounts payables and accounts receivables records for eight years, and Hill A&E's financial statements for eight years.  Plaintiffs' interrogatories and requests for production did not include any requests for information which might have disclosed that Hill A&E then intended to sell any or all of its assets to Entertainment Express, Inc. or any other party.

140.    Hill A&E requested an extension of time until May 13, 1996 (prior to the date of the Asset Sale) to respond to Plaintiffs' discovery requests.  Hill A&E did not request an extension of time in order to delay providing responses to Plaintiffs' discovery before the impending asset sale.  Rather, Hill A&E's counsel requested an extension of time because of the voluminous nature of Plaintiffs' discovery requests.

141.    On May 15, 1996, Hill A&E's counsel sent Plaintiffs' counsel a draft of a confidentiality order.  Plaintiffs' counsel refused to sign the confidentiality order.

142.    The responses to Plaintiffs' discovery requests were not produced until June 12, 1996, because additional time was required to prepare them.

143.    In Hill A&E's June 12, 1996 response to Plaintiffs' requests for production of documents, Hill A&E offered to copy and ship numerous documents, including client contracts, accounts receivable reports and invoices during the royalty period and correspondence between the parties, or to permit inspection at a mutually convenient time. Through August 14, 1996, Plaintiffs' counsel failed to respond to this offer.  Additionally, Hill A&E answered virtually every interrogatory, including listing customers to whom it sold or licensed the New Program, providing a damages analysis, providing a list of individuals knowledgeable about the subject of the litigation, providing a list of the sections of the Agreement relating to Plaintiffs' right to royalties, providing information about the relationship between Hill A&E and ArtSoft, and providing a list of Hill A&E's bookkeepers, accountants and attorneys over an eight year period.

144.    Approximately six weeks after Hill A&E responded to Plaintiffs' discovery requests, Plaintiffs filed a Motion to Compel.  Hill A&E filed a response to the Motion to Compel, dated August 14, 1996.  Plaintiffs claimed in their Motion to Compel that they were entitled to information regarding sales beyond the royalty period, that Hill A&E had improperly referred Plaintiffs to documents responsive to their interrogatories under Fed. R. Civ. P. 33(d) and that Defendant's damages analysis was not responsive to Plaintiffs' discovery requests.  Hill A&E disputed these claims in its opposition to the Motion to Compel.

145.    In August 1996, Hill A&E supplemented five interrogatory responses.

146.    In August 1996, Plaintiffs' counsel and Hill A&E's counsel reached a compromise with respect to the discovery requests and so informed the Court.  The

compromise involved Hill A&E making available to Plaintiffs certain customer information on September 11, 1996.

147.    Hill A&E did not engage in any dilatory litigation actions.  Rather, it made a good faith effort to comply with Plaintiffs' discovery requests and had a bona fide dispute with Plaintiffs as to the proper scope of their discovery requests.

148.    In August 1996, Hill A&E's counsel, Tyler, Cooper & Alcorn, requested that Hill A&E pay an additional retainer in order for such counsel to continue working on the file. The retainer was not paid since Hill A&E did not have sufficient funds to pay such retainer, and Hill A&E's counsel moved to withdraw from representing Hill A&E in the 1995 Action on September 11, 1996.  Tyler, Cooper & Alcorn did not make the discovery materials available to Plaintiffs' counsel on September 11, 1996, because it had filed a motion to withdraw as Hill A&E's counsel.

149.    In August 1996, two months after Hill A&E filed its responses to Plaintiffs' discovery, Plaintiffs filed a Motion for a Prejudgment Remedy.

150.    On October 8, 1996, Magistrate Judge Margolis held a status conference and issued rulings granting Hill A&E's counsel's motion to withdraw, ordering Hill A&E to produce discovery agreed to by the parties, and ordering Hill A&E to attempt to find substitute counsel by November 1, 1996.  The Magistrate's ruling noted that Hill A&E's representative, David Richter, Secretary of Hill A&E (by then known as HAESI Software, Inc.) had indicated that Hill A&E lacked funds with which to retain substitute counsel.  During this conference, David Richter informed the Court of the Asset Sale (as hereinafter defined) and of the liens on the proceeds of that sale, the Convertible Note (as hereinafter defined).

151.    On November 6, 1996, David Richter wrote to Magistrate Judge Margolis notifying her that Hill A&E would be unable to retain substitute counsel, and, because corporations were unable to appear pro se, it would not be appearing at a hearing scheduled for November 14, 1996 on Plaintiffs' Motion for a Prejudgment Remedy or filing any briefs or other papers in opposition to Plaintiffs' Motion to Amend their Complaint.

152.    On February 11, 1997, a default was entered against Hill A&E for failing to appear and failing to comply with the discovery order.

153.    On April 23, 1997, a default judgment was entered against Hill A&E in the amount of $422,466 (the "Default Judgment").

154.    Hill A&E did not engage in dilatory litigation tactics in the 1995 Action but rather stopped defending itself in that case because it lacked the funds to pay for a defense.

155.    Plaintiffs thereafter moved to add, as additional defendants in the 1995 Action, Hill, Mr. Richter and Entertainment Express and to assert alter ego claims against Mr. Richter and Hill and fraudulent transfer claims against Entertainment Express. Hill, Mr. Richter and Entertainment Express (as hereinafter defined) moved to dismiss these claims on the grounds of lack of complete diversity jurisdiction, because Plaintiffs and Entertainment Express were all citizens of California. The motion to dismiss was granted, and Plaintiffs did not appeal the dismissal.

F.    The Asset Sale

156.    In 1995, Hill A&E's financial situation deteriorated. Hill A&E continued to borrow from Hill.

157.    In an October 2, 1995 memorandum, authored by James Cassano, a Hill employee, and addressed to Mr. Richter, Mr. Cassano described the dire situation of Hill A&E, writing "Hill A&E has to sink or swim without the help of Hill International. Management has to look to itself for solutions."

158.    In October 1995, Hill A&E had revenues to date during that year of $1.7 million and losses to date during that year of $673,000.  There were no secretaries, nothing had been spent on marketing in a year, there had been no capital spending on computers in a year, Hill A&E owed its executive management three pay checks, it had not made contributions to its 401K plan in six months, and it was four months behind in paying its payroll taxes.

159.    Additionally, there was no cash for sales literature, no sales people on payroll and no money to pay sales people draws.  Hill A&E needed to replace its sales staff but could not attract new sales people because of its financial condition. In December 1995, Hill A&E was so far behind in its payroll and payroll taxes because of its failure to realize anticipated sales or obtain venture capital that the controller of Hill A&E, Mr. Gloss, was concerned about the ability of Hill A&E to continue in business. Hill A&E's income in 1995 was $600,000 less than its income had been in 1994, while its expenses had increased by $500,000 over the previous year's expenses.

160.    Hill A&E was operating on $100,000 less per month than was necessary. The only way to cut costs for Hill A&E would have been to change the mission of the company and eliminate development activities, which would have been precursors to the dissolution of Hill A&E.  In a memorandum from Mr. Cassano to Mr. Richter dated prior to

the filing of the 1995 Action, Mr. Cassano recommended selling Hill A&E's assets to Entertainment Express, Inc. ("Entertainment Express"). Entertainment Express was a new business organized in January 1995, nine months prior to Plaintiffs' lawsuit, in order to develop internet, telephone based and retail store ticketing for entertainment and sporting events. It was a transaction company rather than a software company. It was necessary to organize a new business in order to obtain equity financing. Entertainment Express initially planned that after it obtained such financing, it would license Hill A&E's software which would have generated substantial new revenues for Hill A&E.

161. Hill A&E's financial picture did not improve in 1996. In May 1996, Hill secured a fairness opinion from the investment banking firm of Howard Lawson & Co. (the "Fairness Opinion"). Although the Fairness Opinion analyzed whether the sale of Hill A&E's assets to Entertainment Express was fair to Hill in its capacity as a secured creditor of Hill A&E, the same analysis set forth in the Fairness Opinion would apply to determine whether the sale of Hill A&E's assets was fair to Hill A&E, which analysis was to determine the value of Hill A&E and then to determine whether the purchase price of Hill A&E's assets was "fair" in view of the value of Hill A&E.

162. The Fairness Opinion noted that from 1991-1995, revenues for Hill A&E had been up and down due to the timing of the signing and installation of new software licenses, the decline in the resale of the general purpose computer equipment and peripherals, and the fact that certain special projects had not resulted in recurring revenues.

163. The Fairness Opinion stated that no new licenses were sold for Hill A&E's SQL product in 1995 and that a loss of $235,000 was forecasted for 1996.

164.    The Fairness Opinion also stated that 1997 revenues were forecasted to decline to $3.8 million primarily due to a decline in license revenues and that an operating loss of $117,000 was also forecasted for 1997.  Additionally, the Fairness Opinion noted that Hill A&E had a negative tangible net worth of $12.1 million and that current liabilities included $1.3 million of accounts payable, $265,000 of accrued payroll and related expenses, $895,000 of deferred revenues and customer deposits, and $713,000 of notes payable to unrelated third parties.  Over one million dollars of account payables were past due over 90 days.

165.    The Fairness Opinion noted that Hill A&E had reduced expenses since 1991 primarily through a reduction in development and product engineering expense.

166.    The Fairness Opinion stated that Hill A&E was not a candidate for an Initial Public Offering because of its long history of operating losses, relatively unchanged revenues and lack of demonstrable ability to grow.  The Fairness Opinion also stated that due to the competitive pricing pressure of general purpose computing hardware, Hill A&E could not resell equipment with any profit margin.

167.    The Fairness Opinion stated the following with respect to the enterprise values of Hill A&E as of May 30, 1996:

| | |
|---|---|
| Acquisition value | $2.4 – 3.2 million |
| As Is value | $2.1 – 2.5 million |
| Wind Down value | $1.5 – 1.6 million |

168.    On April 30, 1996, Hill A&E had consolidated assets of $2.3 million and $13.2 million of consolidated liabilities.

138

169.    On May 30, 1996, Hill A&E sold substantially all of its assets (the "Asset Sale") to Entertainment Express, Inc. ("Entertainment Express"). Hill A&E as a going enterprise was moribund, and its assets had value to Entertainment Express, which was embarking into a new business venture, on-line ticketing. The Asset Sale was part of a larger transaction under which Ventana Global Ltd. ("Ventana") agreed to immediately invest at least $500,000 as part of a $3 million Private Placement of preferred stock of Entertainment Express, and Ventana purchased 1,250,000 shares of common stock.

170.    Ventana, a venture capital firm based in Irvine, California, had begun discussing with Entertainment Express the possibility of Ventana investing in Entertainment Express in 1995.

171.    As a venture capital firm, Ventana invested in start-up companies, assisted start-up companies in raising capital, and assisted start-up companies with management and financial issues.

172.    Ventana was interested in investing in and raising money for Entertainment Express, because Ventana believed that the ideas that Entertainment Express sought to develop (i.e. on-line ticketing services, and telephone and retail based ticketing for entertainment and sporting events) would, with the proper management and adequate capital, be successful and profitable. From the beginning of Ventana's negotiations with Entertainment Express, Ventana insisted as a precondition of its involvement with Entertainment Express that Entertainment Express acquire Hill A&E's assets. Ventana specifically rejected the idea that Hill A&E licensed its software to Entertainment Express.

Ventana wanted Entertainment Express to have complete control over Hill A&E's client relationships and client contacts.

173.    On April 19, 1996, Ventana, Entertainment Express and Hill A&E signed an Engagement Letter. In the Engagement Letter, Ventana agreed to assist in a private placement of Entertainment Express' preferred stock and to provide Entertainment Express with financial and management advice, including structuring the Board of Directors.  As part of this agreement, Entertainment Express agreed not to issue any additional stock without Ventana's consent, that the Board of Directors of Entertainment Express would be composed of no more than seven members, two of whom would be selected by Ventana, and that Ventana would be issued 1,250,000 shares of common stock and warrants for an additional 1,900,000 shares of common stock.  After the private placement of preferred stock, the original stockholders of Entertainment Express were to own less than 40% of the common stock of Entertainment Express, and, after an initial public offering, these shareholders were to own less than 30% of the common stock equivalents of the company. Additionally, in the Engagement Letter, Hill A&E agreed to sell its assets to Entertainment Express.

174.    It was contemplated that after the planned private placement of Entertainment Express's stock, the Richter family entity that owned stock in Entertainment Express, would not be the controlling stockholder.

175.    Further Mr. Richter and his family would only hold two seats on a seven-member board of directors.

176.    At the time of the Asset Sale, Hill A&E changed its name to HAESI Software, Inc.

177.    According to the Fairness Opinion, the value of the assets to be sold to Entertainment Express was $4,040,820, while the value of the assets to be acquired was $3,000,000, because Entertainment Express was assuming $1,000,000 in liabilities of Hill A&E.  Entertainment Express paid for Hill A&E's assets by means of a Convertible Promissory Note in the principal amount of $3 million (the "Convertible Note").  Ventana was heavily involved, on behalf of Entertainment Express, in the negotiation of the terms of the Convertible Note.  Hill substituted its first priority lien in Hill A&E's assets for a first priority lien in the Convertible Note.  Mr. Richter substituted his second priority lien in Hill A&E's assets for a second priority lien in the Convertible Note.

178.    UCC-3 Statements were filed terminating Hill's and Mr. Richter's security interests in Hill A&E's assets.

179.    Hill and Mr. Richter filed UCC-1 Statements in New Jersey describing their security interests in the Convertible Note.

180.    Hill perfected its senior lien on the Convertible Note by taking possession of it.

181.    In November 1996, Hill took title to the Convertible Note in accordance with the provisions of the Uniform Commercial Code.

182.    At the time of the Asset Sale, the outstanding principal of the loan owed by Hill A&E to Hill was in excess of $8 million, and together with interest, the debt owed by Hill A&E to Hill was nearly $12.2 million.  Accordingly, Hill lost millions of dollars as a result of its

loans to Hill A&E. The willingness of Hill to loan Hill A&E over $8 million in principal over an eight-year period (which loan, while it was secured, was secured by assets worth substantially less than the amount of the loan) without demanding immediate repayment of its debt or interest allowed Hill A&E to remain in business as long as it did.

183.    With respect to Mr. Richter's loan to Hill A&E, Hill loaned some funds to Hill A&E to repay Commerce Bank for Mr. Richter's mortgage loan on his home.

184.    Mr. Richter did not receive any other repayment of his loan to Hill A&E. As a result, $682,334.00 in principal was never repaid to Mr. Richter by Hill A&E, although he was required to repay Commerce Bank the full amount of its loan to him plus interest.  When Hill took title to the Convertible Note, Mr. Richter's second priority lien was extinguished. Mr. Richter never obtained any assets of Hill A&E.  Accordingly, Mr. Richter lost hundreds of thousands of dollars as a result of this loan.

185.    Hill A&E's assets that were sold to Entertainment Express would not have been available to satisfy the Default Judgment entered against Hill A&E in the 1995 Action, in the absence of the Asset Sale, because such assets were encumbered by valid liens to Hill and Mr. Richter well in excess of the value of such assets.

186.    Hill A&E's assets were not sold to Entertainment Express in order to avoid paying Plaintiffs' claim for royalties under the Agreement and the Amendment or in order to avoid paying the Default Judgment.  Rather, such assets were sold to Entertainment Express because Hill A&E was a moribund company, which could no longer survive, while its assets had value to a new company, Entertainment Express, which was embarking on a new venture, Internet ticketing, with an outside venture capital investor, Ventana.

II.    PROPOSED CONCLUSIONS OF LAW

A.    Choice of Law

1.    When a case is transferred to a different venue pursuant to 28 U.S.C. §

1404(a), as in this case, the transferee court applies the choice of law principles of the

transferor forum if failure to do so would "significantly affect the outcome of the case." Van

Dusen v. Barrack, 376 U.S. 612, 639 n. 40 (1964). In this instance, this action was

transferred from the District Court of New Jersey to this District. Accordingly, in order to

determine which jurisdiction's law applies to this case, this Court must look to New Jersey's

choice of law rules with respect to piercing the corporate veil.

2.    A New Jersey District Court would apply the choice of law rules of New Jersey

in a veil-piercing case. Brookside Enterprises, Inc. v. Baum, No. 92-4931, 1994 U.S. Dist.

LEXIS 18361, at *14 (D.N.J. Dec. 19, 1994). New Jersey has adopted the Restatement

(Second) of Conflicts § 309 (1971), which provides that the law of the place of incorporation

governs the liability of officers and directors for corporate debts, in the absence of proof that

another state has a more significant relationship to the issues at bar. Id.

3.    Here, Hill A&E was incorporated under Delaware law. Accordingly, Delaware

law governs the liability of Mr. Richter and Hill for Hill A&E's debts.8

––––––––––––––––––––––

8 Although, in its ruling on summary judgment, this Court determined that there was no
conflict between Delaware and Connecticut law concerning the alter ego liability of
individuals for a corporate debt, this is not the case. While in Connecticut, an individual or
corporation may be held liable under the identity rule or the instrumentality rule, as
discussed below, under Delaware law, the corporate veil may only be pierced when the
corporate form has been used to perpetrate a fraud or similar injustice. The law of the case
doctrine permits a court to change its position if it appears that the court's earlier ruling was
incorrect. Based upon subsequent Delaware authority cited below and not available to be

B.      Delaware Law

4.      Under Delaware law, the corporate veil may only be pierced under the alter ego theory if "the corporate form has been used to perpetrate a fraud or similar injustice." Gadsden v. Home Preservation Co., Inc., No. 18888, 2004 Del Ch. LEXIS 14, at *12-13 (Del. Ch. Feb. 20, 2004). A similar injustice is one such as contravention of law or contract, public wrong or "where equitable considerations among members of the corporation require it." Id. "Fraud or something like it is required" to pierce the corporate veil under Delaware law. Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989).  See also Eastman Kodak Co. v. Small Print Shops, Inc., No. 85-506-JJF9, 1988 U.S. Dist. LEXIS 17517, at *19-20 (D. Del. Jan. 7, 1988) (under Delaware law, plaintiff must establish that the corporation was formed or operated by the individual for some fraudulent purpose in order to hold the individual personally liable for the corporation's debts).

5.      In order to pierce the corporate veil under Delaware law, such fraud or injustice must be found in the defendant's use of the corporate form, for example, bad faith or a fraudulent intent in the formation of the corporation or stripping the corporation of its assets in anticipation of a potentially adverse judgment. Mobil, 718 F. Supp. at 269-70.  A breach of contract or a tort is insufficient to pierce the corporate veil under Delaware law. Id. at 268.

---

cited in Defendants' earlier briefs filed in support of their motion for summary judgment, this court should change its position regarding applying Delaware law to this case. DiLaura v. Power Authority of the State of New York, 982 F.2d 73, 77 (2d Cir. 1992); Casey v. United States, 161 F. Supp. 2d 86, 93 (D. Conn. 2001).  But see, Jacobs Vehicle Systems, Inc. v. Pacific Diesel Brake Co., 424 F. Supp. 2d 388, 392 (D. Conn. 2006) (ruling that "[g]enerally

6.    In this case, neither Hill nor Mr. Richter were involved in the formation of Hill A&E.  Accordingly, there can be no finding that these defendants formed Hill A&E for an improper purpose.

7.    Further, the evidence does not establish that Hill or Mr. Richter stripped Hill A&E of its assets in anticipation of a potentially adverse judgment against Hill A&E. Mr. Richter's lien was created in November, 1991 when Mr. Richter loaned funds to Hill A&E and was required by Commerce Bank, which had lent him funds to loan to Hill A&E.  At the time that Mr. Richter's security interest was created, Mr. Richter had no knowledge that PAT had not been paid royalties allegedly owed under the Agreement. Further, such lien was created four years before the 1995 Action was filed.

8.    Hill's lien was created in April 1994, one and one-half years before Plaintiffs had commenced any legal action against Hill A&E.  The granting of this security interest was done in order that loans could continue to be made to Hill A&E.  This is not a situation where all of the funds are removed from the company to a shareholder's personal account in order to drain the company of the resources to honor its obligations. Compare Gadsden, 2004 Del. Ch. LEXIS 14, at *14-16 (shareholder removed all funds from corporate accounts so that there would be no resources to honor construction warranties).

9.    The sale of Hill A&E's assets to Entertainment Express was also not made in order to avoid paying the Plaintiffs' Default Judgment. The sale was contemplated prior to the filing of the 1995 Action, because Hill A&E was on the verge of going out of business.

---

speaking, Connecticut law on the subject of a parent company's liability as the alter ego of its subsidiary appears to be essentially the same as the law of Delaware . . .").

Ventana would not permit Entertainment Express to license Hill A&E's software, and Hill

A&E's assets had more value if purchased by Entertainment Express than if liquidated.

Additionally, such assets were liened in amounts substantially in excess of their value and

would not have been available to satisfy Plaintiffs' Default Judgment. Accordingly, under

Delaware law, there is no alter ego liability on the part of Hill or Mr. Richter.

      C.    <u>Connecticut Law</u>

      10.    Even if this case is decided under Connecticut law, neither Hill nor Mr. Richter

is liable for Plaintiffs' Default Judgment. Under Connecticut law, "'[o]rdinarily the corporate

veil is pierced only under exceptional circumstances, for example where the corporation is a

mere shell, serving no legitimate purpose, and used primarily as an intermediary to

perpetuate fraud or promote injustice.'" <u>Angelo Tomasso, Inc. v. Armor Construction &</u>

<u>Paving, Inc.</u>, 187 Conn. 544, 557, (1982) (internal citations omitted).

      11.    "'A corporation is a separate legal entity, separate and apart from its

stockholders. . . . It is an elementary principle of corporate law that a corporation and its

stockholders are separate entities . . . .'" <u>Litchfield Asset Mgmt. Corp. v. Howell</u>, 70 Conn.

App. 133, 147 (2002) (citations omitted).  To disregard the legal fiction of a separate

corporate entity "is to act in opposition to the public policy of the state as expressed in

legislation concerning the formation and regulation of corporations." <u>Kulukundis v. Dean</u>

<u>Stores Holding Co., Inc.</u>, 132 Conn. 685, 689 (1946).  "[T]he separate existence of a

corporate entity for liability purposes represents a public policy choice, as expressed in

Connecticut's legislation governing the formulation and regulation of corporations and

limited liability companies, and that the corporate or limited liability form should not be

147

disregarded lightly." Litchfield Asset Mgmt., 70 Conn. App. at 158. The party seeking to pierce the corporate veil bears the burden of proof to prove that the corporate form should be disregarded. Old Farms Associates v. Comm'r of Revenue Services LHI, Inc., 279 Conn. 465, 489 (2006).

12.    There are two tests utilized by the Connecticut courts to pierce the corporate veil: the instrumentality rule and the identity rule. Morris v. CeeDee, LLC, 90 Conn. App 403, 414 (2005); Zaist v. Olson, 154 Conn. 563, 573-74 (1967).

(1).    Instrumentality Rule

13.    Under the instrumentality rule, three elements must be proven: (1) "control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation or a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." Zaist, 154 Conn. at 575.

(a)    Excessive Control

14.    In determining whether an entity is controlled with respect to a particular transaction, the court will assess the following factors: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of

business discretion by the allegedly dominated corporation; (7) whether the corporations

dealt with each other at arm's length; (8) whether the corporations are treated as

independent profit centers; (9) payment or guarantee of debts of the dominated corporation;

and (10) whether the corporation in question had property that was used by other of the

corporations as if it were its own." Litchfield Asset Mgmt., 70 Conn. App. at 15.  "Excessive

control" will not be found even when persons directing one corporation also direct another

corporation, as long as when directing the second corporation, such individuals are acting

in their capacity as the directors/officers of the second corporation and not the first

corporation, Philip I. Blumberg, The Law of Corporate Groups §19.02 (1st Ed. 1987).  See

also, KLM Industries Inc. v. Tylutki, 75 Conn. App. 27, 33-35 (2003) (finding that even where

company president misapplied corporate assets for personal use while debt to plaintiff

remained unpaid, because the president had informal discussions about the corporation

with the corporation's sole shareholder and director (his wife) and the corporation

maintained its own checking account and statements and filed corporate tax returns and

biannual reports, there was inadequate pervasive control of corporation to impose liability

on president as instrumentality of company).

        15.     In this case, the particular transactions attacked that Hill and Mr. Richter are

claimed to have controlled are the failure to pay the royalties alleged to be owed under the

Agreement and the Amendment, the failure to satisfy the Default Judgment entered in the

1995 Action and the alleged dilatory conduct in the 1995 Action.  See Tomasso, 187 Conn.

at 577-78 (in an alter ego case, the court can only consider evidence that defendant

exercised dominance or influence over the transaction in issue; general control of the corporate affairs of the dominated corporation is irrelevant to alter ego liability).

16.    Plaintiffs have not proven that either Hill and/or Mr. Richter controlled or dominated Hill A&E's entering into or performance of its obligations under the Agreement. The evidence establishes that contract negotiations were carried out by Mr. Schwartz and Connecticut ArtSoft's counsel, and not by Hill or Mr. Richter.  There was no representation to PAT or Plaintiffs by Mr. Richter or Hill that either would fund any portion of the PAT contract, and PAT acknowledged in the Agreement that PAT's contractual relationship was with Connecticut ArtSoft and did not include corporate partners, subsidiaries or affiliates of Connecticut ArtSoft.  The letters of intent, the Agreement and the Amendment were signed by Mr. Schwartz on behalf of Hill A&E and not by Mr. Richter or Hill.  Mr. Schwartz, and not Mr. Richter or Hill, signed the Stock/Asset Option Grant Agreement and the Employment Agreement for Mr. Epperson.  PAT also invoiced Hill A&E and not Hill or Mr. Richter for payment.  Plaintiffs understood that the Agreement was between PAT and Hill A&E. Neither Mr. Richter nor Hill did anything to indicate that they were assuming personal liability for the work to be performed under the Agreement. See Strouch v. 72 Degrees Heating & Air Conditioning, LLC, No. 568119, 2004 Conn. Super. LEXIS 2793, at *14 (Conn. Super. Ct. Sept. 24, 2004) (although plaintiff's dealings were with defendant, where brochure, proposal, application for building permit and plaintiff's payment indicated corporation was contracting party, plaintiff failed to establish that corporation was instrumentality of defendant); Dornfried v. Granquist, No. CV000502628, 2003 Conn. Super. LEXIS 1116, at *11 (Conn. Super. Ct. March 27, 2003) (where contract defined contracting entity of a

limited liability company and was signed by defendant as manager of the company, parties
to the contract were plaintiff and the company and not defendant).

17.    The evidence also does not establish that either Mr. Richter or Hill exercised
control over the performance of the Agreement.  The evidence indicates that Mr. Schwartz
made announcements to the public and Hill A&E staff regarding the new arrangements with
PAT, determined the steps that had to be taken with respect to integrating PAT employees
into Hill A&E and was in charge of the transaction.  The evidence does not establish that
that Hill or Mr. Richter supervised Plaintiffs, or that Plaintiffs reported to Hill or Mr. Richter, or
that Hill or Mr. Richter controlled or dominated the decisions as to what amounts of royalties
PAT would be paid and when PAT would be paid.  The evidence establishes that Hill A&E's
employees negotiated with Mr. Epperson the amount of royalties to be paid to PAT, and
royalty payments were made by Hill A&E with the exception of one payment of $5,000,
which was made by Mr. Richter after Mr. Epperson contacted Mr. Richter and told Mr.
Richter that Mr. Epperson needed cash.  All other payments of royalties were made by
checks drawn on Hill A&E's bank account.  See Jacobs Vehicle Systems, 424 F. Supp. 2d
at 390, 393 (holding no alter ego liability against parent corporation for subsidiary's debt,
because evidence did not establish that parent dominated subsidiary with regard to the
transactions at issue, although president of subsidiary reported to an executive of parent on
a monthly basis, did not report to his own board of directors, and did not even know if
subsidiary had its own board of directors, parent company participated in developing
subsidiary's annual plans and goals, and subsidiary's relationship with parent gave it
access to additional research and development funding, because parent's executives did

not oversee day to day operations of subsidiary).  Further, even if a shareholder does

dominate the transactions that constitute a breach of contract, if he does so in his capacity

as an officer or director of the corporation, the shareholder will not be liable under an alter

ego theory.  Sobol Family Partnership v. Cushman & Wakefield, No. 04CV044003559S,

2006 Conn. Super. LEXIS 2395, at *3-7 (Conn. Super. Aug. 9, 2006) (granting motion to

strike alter ego claim alleging that the majority stockholder of corporate tenant orchestrated

breach of lease by adopting a pretextual claim of constructive eviction, failing to pay rent,

prosecuting a relocation plan, deviating from proper accounting methods, entered into a

new lease for the corporation, failing to record in the corporate records plans for relocating

the business, and failing to call a shareholders' meeting to discuss moving the business,

because such allegations were inadequate to allege alter ego claim under the

instrumentality theory).  Compare Davenport v. Quinn, 53 Conn. App. 282, 302 (1999)

(where defendant controlled all financial transactions among his corporations and there

were no separate accounts for each corporation, first prong of instrumentality test was met).

18.    With respect to whether Hill A&E was adequately capitalized for its undertaking

with PAT, in order for a plaintiff to rely on inadequate capitalization as a factor in piercing

the corporate veil, the plaintiff must show that the corporation was grossly undercapitalized.

Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842. F.2d 1466, 1476 (3rd Cir. 1988).  A

corporation will be considered to be adequately capitalized if it has sufficient capital for the

activities it intends to undertake. William M. Fletcher, Cyclopedia of Private Corporations

§ 41.33 (Perm. Ed.) (2004). Generally, capitalization is to be measured at the time of

formation, unless the corporation substantially expands the nature of its business.  Id.;

Blumberg, supra, at 470 (subsequent inadequate capitalization resulting from adverse business operations "does not represent the type of misconduct for which imposition of liability is an appropriate response.") Here, neither Mr. Richter nor Hill was involved with the initial capitalization of Hill A&E (then known as Connecticut ArtSoft).

19.    Even if gross undercapitalization is to be measured at the time of Hill A&E's undertaking with PAT, Plaintiffs have not met their burden of proof that Hill A&E was grossly undercapitalized for its undertaking with PAT. Hill had paid $75,000 to Hill A&E for its purchase of stock in 1987, one year prior to the date of the Agreement. In 1988, Hill A&E had assets of $387,000, and the funds to pay the royalties to PAT were to come from sales of the New Program, which royalties were to be paid only if the sales were adequate to justify the payment of royalties. Moreover, both Hill and Mr. Richter loaned Hill A&E in excess of $9 million. "Gross undercapitalization" will not be found to exist where another corporation provides frequent infusions of cash, which are carried on the lending corporation's books as loans. Local 397 v. Midwest Fasteners, Inc., 779 F. Supp. 788, 793-94 (D.N.J. 1992). See also Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc., 727 F.2d 279, 284 (3d Cir. 1983) (where corporate officers mortgaged their home in an attempt to keep the corporation solvent, undercapitalization will not be found); Blumberg, supra, at §19.12 (when determining adequacy or capitalization in construction cases, the court will look at the availability of construction loans as well as the capital investment in the company, and, even if there is a limited investment, capitalization will be deemed adequate if the total funding available from all sources, including loans, was adequate for the undertaking). Because of the availability of loans from Hill as well as Hill A&E's assets and

153

the anticipated revenues from the New Program, Hill A&E was not grossly undercapitalized with respect to its obligations under the Agreement with PAT.

20.    Finally, gross undercapitalization is a question of reliance by the plaintiff. Zubik v. Zubik, 384 F.2d, 267, 273 (3d Cir. 1967) ("The controversy in such cases [regarding undercapitalization] invariably involves some degree of reliance by the plaintiff, contributing to the fraud, or undue advantage or trick accenting the injustice."), cert. denied, 390 U.S. 988 (1968).  Where a plaintiff in a contract dispute does not protect himself or herself by investigating the corporation's capital structure prior to entering into the contract or by requesting a guaranty by the shareholder who may be financially able to satisfy the judgment, the plaintiff may not rely on gross undercapitalization to support a veil piercing claim.  Fletcher, supra, at § 41.33; Paul Steelman, Ltd. v. Omni Realty Partners, 110 Nev. 1223, 1226, 885 P.2d 549 (1994); Blumberg, supra, at §§19.12 & 20.10 (a sophisticated creditor will not be permitted to pierce the corporate veil and even gross undercapitalization will be deemed irrelevant to a veil piercing claim, when a plaintiff has failed to conduct a credit investigation into the financial conditions of the company with which it is contracting, as the plaintiff will be deemed to have assumed that the risk of gross undercapitalization).  Here, Plaintiffs, as educated owners of a start-up software company who had entered into contracts before and who were represented both by counsel and a business advisor in PAT's negotiations with Connecticut ArtSoft were aware of the financial risks inherent in contracting with a software company.  Plaintiffs did not know if they requested any financial information about Connecticut ArtSoft, deliberately decided not to request a security interest in either Connecticut ArtSoft's or Hill's property

and expressly agreed in the Agreement that the contractual relationship that PAT had with Connecticut ArtSoft did not include any of Connecticut ArtSoft's affiliates or parents. Under these circumstances, Plaintiffs are not entitled to rely upon undercapitalization as a basis for their veil piercing claims.

     (b)   <u>Intent to Defraud</u>

21.    Plaintiffs also cannot meet their burden of proof regarding the second element of the instrumentality test. Plaintiffs must show an intent to defraud or escape liability to overcome the presumption of separateness between Hill A&E, Hill and Mr. Richter. Fletcher, <u>supra</u>, at 711-715.  Plaintiffs cannot establish that Hill A&E was used as an instrument of Hill or Mr. Richter to avoid a liability for a personal wrongful act to Plaintiffs, as neither Hill nor Mr. Richter had any personal liability to Plaintiffs.   <u>See</u> <u>Campisano v. Nardi</u>, 212 Conn. 282, 293-94 (1989) (". . . plaintiffs do not claim that defendant used his control over the corporation to commit or escape liability for any personal wrongful act.").  <u>Compare</u> <u>Saphir v. Neustadt</u>, 177 Conn. 191, 211, (1979) (individual defendant controlled corporation in order to divert defendant's personal liability to plaintiffs to construct and maintain roads in a development); <u>Litchfield Assets Mgmt.</u>, 70 Conn. App. at 154-155 (second element of instrumentality test satisfied by proof that defendant had used control of corporation to avoid personal debt to plaintiff).

22.    The mere breach of a contract, without proof that Hill A&E was formed in order to shelter Hill or Mr. Richter from personal obligations incurred prior to the formation of Hill A&E, or that PAT was improperly induced to enter into the Agreement, cannot establish the basis for the application of the instrumentality rule. <u>See</u> <u>Campisano</u>, 212 Conn. at 294.

23.    Plaintiffs cannot establish that Hill A&E was incorporated in order for Hill or Mr. Richter to shelter themselves from personal obligations incurred prior to the formation of Hill A&E, because Connecticut Artsoft, Hill A&E's predecessor, was incorporated by Larry Schwartz in 1984, and not by Hill or Mr. Richter, and neither Hill nor Mr. Richter at any time had a personal obligation to plaintiffs.

24.    Plaintiffs also have not established that PAT was improperly induced to enter the Agreement with Connecticut ArtSoft. In fact, neither Hill nor Mr. Richter had any role in inducing PAT to enter into the Agreement, and the Agreement forewarned PAT that it was contracting only with Connecticut ArtSoft and not with any of Connecticut ArtSoft's affiliates or parents.  Plaintiffs have admitted that at the time that PAT entered into the contract with Connecticut ArtSoft, they knew they were dealing with a corporate entity separate and apart from Hill and Richter.  See Old Farms Associates, 279 Conn. at 490 (alter ego liability would not be found where, among other factors, buyers of real estate were aware they were dealing with different entities); Blumberg, supra, at §20 (the corporate veil will not be pierced when the creditor has been put on notice that it must look to the party with which it is contracting for liability and not to any other entity, even in the presence of control of the party by another entity, because the creditor has bargained for credit of the contracting party and not for the credit of any other entity).

25.    Further, Plaintiffs are both educated individuals; they had experience with contractual relationships; they were represented both by counsel and by a business advisor, yet they chose not to require security or guaranties from Hill or Richter for Connecticut ArtSoft's obligations under the Agreement; and neither recalls investigating Connecticut

ArtSoft's financial condition before the Agreement was executed.  Further, Plaintiffs understood that the Agreement was with a corporate entity, and they invoiced Hill A&E for PAT's services and not Hill or Mr. Richter.  Even their counsel demanded payment from Hill A&E and its president, Mr. Schwartz, and not from Hill or Mr. Richter.  See Campisano, 212 Conn. at 294 n.5 (where plaintiffs were educated individuals, had never claimed that they were unaware that the contract was with a corporation and had made progress payments to the corporation, second prong of instrumentality test was not satisfied by corporation's breach of contract even through defendant controlled corporation).

26.     The failure to satisfy a default judgment even if coupled with the breach of a contract also does not satisfy the second prong of the instrumentality rule, unless the defendant had notice of the lawsuit and diverted corporate assets that would have been available to satisfy the judgment.  See Davenport, 53 Conn. App. at 302 (1999) (transfer of corporation's assets to defendant after plaintiff had filed his original complaint, and defendant had notice of plaintiff's lawsuit was made to perpetrate the violation of defendant's duty to pay judgment entered against corporation); Litchfield Asset Mgmt.,70 Conn. App. at 155 (use of corporation, by transferring personal assets into corporation, to unjustly avoid personal debt that had been reduced to judgment met second element of instrumentality rule).

27.     Similarly, where liability is premised on the transfer of assets from a corporation, such transfer must have been made for the purpose of avoiding paying the plaintiff amounts due the plaintiff.  See Toshiba America Medical Systems, Inc. v. Mobile Medical Systems, Inc., 53 Conn. App. 484 (1999) (transfer of funds from corporation to

avoid paying the plaintiff balance due it pursuant to the contract satisfied second element of instrumentality rule); United Electrical Contractors, Inc. v. Progress Guilders, Inc., 26 Conn. App. 749, 753 n.2 (1992) (transfer of real property to wife from corporation that defendant controlled to avoid payment to plaintiff satisfied second prong of instrumentality rule).

28.     Here, Hill A&E's assets were not transferred in order to avoid satisfying Plaintiffs' debt and the Default Judgment.  Mr. Richter's lien was created in November, 1991. The security interest in Hill A&E's assets was created when Mr. Richter loaned funds to Hill A&E, and was required by Commerce Bank, which had lent him funds to loan to Hill A&E.  At the time that Mr. Richter's security interest was created, Mr. Richter had no knowledge that PAT had not been paid royalties under the Agreement.  Further, such lien was created four years prior to the date that the 1995 Action was filed.

29.     Hill's lien was created in April 1994, long before Plaintiffs had threatened or commenced any legal action against Hill A&E.  The granting of this security interest was done in order that loans could continue to be made to Hill A&E.  Where an entity "pours in" loans to keep an affiliated company that is facing economic adversity in business, such loans are an indicator of the entity's good faith and fair treatment of creditor.  Blumberg, supra, at §20.0.  This is not a situation where assets were transferred in the face of known legal action or without consideration.  See Blumberg, supra, at §19.09.1 (asset stripping occurs when there is no offsetting consideration).  Compare Davenport, 53 Conn. at 282; Litchfield Asset Mgmt., 70 Conn. App. at 155.

30.     The sale of Hill A&E's assets to Entertainment Express was also not made in order to avoid paying Plaintiffs' debt and the Default Judgment. The sale was contemplated

prior to the filing of the 1995 Action, because Hill A&E was on the verge of going out of business.  Ventana would not permit Entertainment Express to license Hill A&E's software, and Hill A&E's assets had more value if purchased by Entertainment Express than if liquidated.  Additionally, such assets were liened in amounts substantially in excess of their value and would not have been available to satisfy Plaintiffs' Default Judgment under any circumstance.  See Carbonella & DeSarbo, Inc. v. Dealer's Quest, Inc., No. CV010446146, 2003 Conn. Super. LEXIS 1539, at *10 (Conn. Super. Ct. May 12, 2003) (refusing to pierce the corporate veil when defendant president and sole shareholder and director of company terminated company to which he had loaned large sums of money and transferred assets to a new company that defendant controlled, and company had failed to pay plaintiff for bills incurred during the last two months of the business relationship).

31.    Plaintiffs also cannot satisfy the second prong of the instrumentality test by relying on claims that Hill and Mr. Richter engaged in alleged dilatory conduct in the 1995 Action to stall or delay the collection of Plaintiffs' claim in the 1995 Action.  Plaintiffs have failed to establish that dilatory tactics were employed in the 1995 Action.  Hill A&E answered the Complaint within 45 days of service of the complaint, denying that money was due to Plaintiffs based upon a good faith belief that the Maximum Royalty Payment was not owed.  The parties agreed to a discovery deadline of July 15, 1996, after the Asset Sale. Hill A&E served discovery on Plaintiffs before Plaintiffs served discovery responses on Hill A&E.  Plaintiffs, themselves, requested an enlargement of time to respond to Hill A&E's discovery requests.  Although Hill A&E requested an extension of time of less than 30 days to respond to Plaintiffs' discovery requests, such extension was to expire prior to the Asset

Sale and was requested not to delay responding to these discovery requests before the impending Asset Sale, but because of the voluminous nature of Plaintiffs' discovery requests. Hill A&E answered virtually every interrogatory in June, 1996 and offered to copy and ship numerous documents responsive to Plaintiffs' discovery requests, an offer which Plaintiffs failed to respond to through August, 1996. Plaintiffs and Hill A&E had good faith disputes about the scope of Plaintiffs' discovery requests, which were briefed in a Motion to Compel. Plaintiffs' and Hill A&E's counsel eventually reached a compromise regarding Plaintiffs' discovery requests. Further, Hill A&E responded to Plaintiffs' extensive discovery requests within a reasonable time in view of the broad and objectionable nature of such requests. Finally, Hill A&E did not act wrongfully in allowing a default judgment to enter against it in the 1995 Action. It could not afford substitute counsel to defend the 1995 Action once it ceased operations in May 1996. There was simply no attempt by Hill or Mr. Richter to stall or delay satisfaction of Plaintiffs' claims.

> (c)        Proximate Cause of Loss

32.        Plaintiffs also have not met their burden of proof on the third prong of the instrumentality test that Defendants' alleged control of Hill A&E with respect to the transactions involving Plaintiffs and Defendants' alleged breaches of duty with respect to making payments under the Agreement and under the default judgment proximately caused Plaintiffs' losses. Plaintiffs were not harmed by the Asset Sale, because Hill A&E's assets would not have been available to satisfy Plaintiffs' judgment in the absence of such sale. As found by this Court in Epperson v. Entertainment Express, Inc., 338 F. Supp. 2d 328, 342-43 (D. Conn. 2004), aff'd 159 Fed. Appx. 249 (2d Cir. 2005), cert. denied, 126 S. Ct. 2296

(2006), Hill A&E's assets were subject to valid liens that exceeded the value of Hill A&E's assets. This finding is binding on Plaintiffs under the doctrine of collateral estoppel. See Petrella v. Siegel, 843 F.2d 87, 90 (2d Cir 1988).

33.    Plaintiffs were not harmed by the granting of liens in Hill A&E's assets to Mr. Richter because Mr. Richter never foreclosed on his security interest or obtained title to any of Hill A&E's assets.

34.    Plaintiffs were not harmed by the granting of a security interest to Hill in Hill A&E's assets, because even in the absence of the granting of such security interest, such assets would not have been available to pay Plaintiffs' debt of $174,750 or even Plaintiffs' Default Judgment of $422,466. Defendant Hill A&E had liabilities at least in excess of $13.2 million on April 30, 1996, including a judgment lien of approximately $110,000. Hill A&E had assets valued at $2.3 million on that date. Hill A&E's debt to Hill was nearly $12.2 million. Hill A&E's debt, other than its debt to Hill and Mr. Richter, was approximately $3,173,000. Under no circumstances would there have been sufficient assets to pay Plaintiffs' unsecured claims.

35.    Plaintiffs also have not established that Defendants' alleged conduct with respect to the 1995 Action proximately caused Plaintiffs' harms. The filing of an answer disputing liability and the alleged failure to rapidly respond to Plaintiffs' discovery requests and any alleged litigation delays did not cause a depletion in the assets available to satisfy Plaintiffs' judgment. These assets were not available to Plaintiffs at the time that they filed their lawsuit in October 1995, because, as stated above, they were subject to valid liens that exceeded their value. Compare Litchfield Asset Mgmt., 70 Conn. App. at 155. Further, any

161

alleged delays in responding to Plaintiffs' March 1996 discovery did not harm Plaintiffs,
because such discovery requests did not seek information that Plaintiffs could have used to
secure funds to pay their judgment, including information about the Asset Sale.  In fact, once
Plaintiffs received the discovery responses, it waited two months to file an application for a
prejudgment remedy. Accordingly, any delay in the resolution of the 1995 Action did not
proximately cause Plaintiffs' injury of not being able to collect its debt and the Default
Judgment.

     (2).   <u>Identity Rule</u>

36.   In order to pierce the corporate veil under the identity rule, Plaintiffs must
prove that there was "such a unity of interest and ownership that the independence of the
corporations had in effect ceased or had never begun, [thus] an adherence to the fiction of
separate identity would serve only to defeat justice and equity by permitting the economic
entity to escape liability arising out of an operation conducted by one corporation for the
benefit of the whole enterprise."  <u>Tomasso</u>, 187 Conn. at 554.

37.   The identity rule is primarily applied to prevent injustice in situations "where
two corporate entities are, in reality, controlled as one enterprise because of the existence
of common owners, officers, directors or shareholders and because of the lack of
observance of corporate formalities between the two entities."  <u>Id.</u> at 560.  However, even
overlapping boards of directors, 100% stock ownership and complete commonality of
officers are not sufficient to establish an alter ego relationship, particularly where corporate
formalities have been observed.  <u>Hersey v. Lonrho</u>, 73 Conn. App. 78, 88 (2002); Blumberg,
<u>supra</u>, at §6.02.  Accordingly, to pierce the corporate veil under the identity rule, plaintiffs

must establish: (i) that Hill A&E, Hill and Mr. Richter were one "economic entity" and (ii) that Hill A&E conducted the operation for the benefit of the whole enterprise. Tomasso, 187 Conn. at 560 n.11.  Plaintiff can prove neither of these.

38.    Plaintiffs have not established that there was one "economic entity" among Hill A&E, Hill and Mr. Richter.  See Tomasso, 187 Conn. at 560 n.11 (proof of one "economic entity" necessary for liability under the "identity rule").  Hill A&E was founded by Mr. Schwartz and not Hill or Mr. Richter and was operated by Mr. Schwartz.  Where a company had previously been independent, is subsequently acquired by the alter ego defendant and the operations of the company continue to be conducted by the former owners, the company will be considered to have a separate existence, and courts are generally reluctant to pierce the corporate veil.  Blumberg, supra, at §19.16.

39.    Hill A&E elected officers on a regular basis, employed up to 58 employees, filed its own tax returns annually, maintained its own bank accounts separate from Hill's bank accounts, maintained its own office space separate in Connecticut from Hill's office space in New Jersey, had its own assets, prepared its own budgets, cash forecasts and financial statements, passed corporate resolutions authorizing Mr. Schwartz to enter into contracts and write checks and authorizing others to make withdrawals from banks, maintained a minute book, adopted bylaws, kept and maintained stock certificates, passed a resolution authorizing Hill A&E to borrow $1.1 million from Mr. Richter, filed UCC-1 Financing Statements with the relevant Secretary of State's offices each time Hill A&E provided a security interest to either Mr. Richter or Hill and passed resolutions with respect to the Asset Sale. Further, Hill A&E had a line of business, the development of ticketing

software for the sports and entertainment industry, which was completely distinct from Hill's business, which was providing construction consulting services. Additionally, Hill A&E generated funds from its own work, undertook its obligations to Plaintiffs separately, and it, rather than Hill or Mr. Richter, benefited from the transaction with PAT. Moreover, neither Hill nor Mr. Richter used Hill A&E's funds to pay for their personal expenses and there was no commingling of assets among Hill, Hill A&E and Mr. Richter. Also, Mr. Richter, Hill and Hill A&E were not held out to the public as one entity. Accordingly, Plaintiffs cannot prove that a unity of interest and ownership existed between Mr. Richter, Hill and Hill A&E such that Hill A&E ceased to exist or had never begun or that adherence to the notion of a separate identity would only serve to defeat justice and equity. See SFA Folio Collections, Inc. v. Bannon, 217 Conn. 220, 233-34 (1991) (upholding trial court's refusal to pierce corporate veil where corporate assets were not intermingled, formalities of separate corporate procedure were not ignored, corporation was not inadequately financed and where corporations were not held out to the public as one entity, even where corporations had some common officers and directors, sold similar merchandise, and shared financial and market information); KLM Industries, Inc., 75 Conn. App. at 35 (reversing judgment of trial court, which pierced corporate veil, where informal discussions regarding company activities were held and where the company maintained a separate checking account, filed and maintained corporate tax returns and filed biannual reports); Pfeifer v. Legault & Son Construction, No. CV. 054002595, 2006 Conn. Super. LEXIS 3197, at *7-8 (Conn. Super. Oct. 26, 2006) (denying Plaintiff's motion for prejudgment remedy on the grounds that the plaintiff had not established probable cause that the corporate veil of the contractor should

be pierced when shareholders and the company maintained separate checking accounts, the company filed its own tax returns, the plaintiff wrote the majority of the checks to the company, although two were written out to the principal personally, the truck used in the business was owned by the company, and the building permit taken out for the improvements to the plaintiff's home was in the name of the company); Lake v. Bayer, No. X1O UWY CV055001416S, 2006 Conn. Super. LEXIS 2291, at * 9 -11 (Conn. Super. July 26, 2006) (refusing to pierce a corporate veil of affiliate under unity of interests theory to find sister affiliate and parent liable for injury to plaintiff as a result of drug, despite allegations that sister affiliate marketed same drug in same market as company did, sister affiliate conducted clinical trials for drug and the individual who had responsibility for collecting information about adverse incidents regarding drug worked for sister affiliate, in the absence of evidence that affiliate and company did not observe corporate formalities or that sister affiliate and parent exercised pervasive control over affiliate); Pompilli v. Pro-Line Paintings, No. CV044001774, 2005 Conn. Super. LEXIS 1390, at *12 (Conn. Super. May 13, 2006) (striking alter ego claim because complaint alleged only one instance of commingling of funds between the company and the individual and did not allege requisite control).

40.    Additionally, Hill A&E provided MIS services to Hill, billed for such services and was paid for such services. See Blumberg, supra, at §19.04 (provision by company of highly specialized computer services to alleged alter ego "is significant because it throws light on the independent viability of the subsidiary as a separate corporation").

41.    Furthermore, Plaintiffs cannot establish that Hill A&E's officers and directors were not functioning as officers and directors on the basis of any claimed lack of shareholders' or board of directors' meetings. Although there may be no minutes of shareholders' and directors' meetings, such meetings were not necessary because Mr. Richter was the sole director from 1990 through the present and the sole shareholder from 1992 to the present. Thus, under Delaware law, action could be taken by written consent. Under these circumstances, there is absolutely no evidence that Hill A&E did not follow corporate formalities. See Commercial Escrow Co. v. Rockport Rebel, Inc., 778 S.W. 2d 532, 540 (Tex. Ct. App. 1989), writ denied (finding that corporate formalities would be found to have been followed when there were no board of director's meetings, because there was only one board member).

42.    This case is dissimilar to cases where Connecticut courts have pierced the corporate veil under the identity rule. Compare Zaist, 154 Conn. at 576-77 (piercing corporate veil where several corporations under control of individual defendant all shared same office, few formal corporate actions occurred and where corporation with which plaintiff contracted had no sufficient funds of its own and acquired no funds from its own work, undertook no obligation of its own to the plaintiff, and gained nothing from the part it played in the transaction at issue); Litchfield Asset Mgmt., 70 Conn. App. at 157-58 (in piercing corporate veil, court considered defendant's complete control over the management of the assets of the companies as if they were her own, including the use of company funds to pay for personal gifts and expenses and make casual loans to family members; the operation of the companies with no input from other members; the use of the

166

same checking and credit card accounts for the companies and personal purposes; the

lack of regular disbursements to members; the lack of corporate meetings; and the

operation of the companies from her own home); Davenport, 53 Conn. App. at 301-302

(piercing corporate veil where individual defendant maintained no business office, observed

few formalities, failed to completely document various transactions, used entities freely to

make "officer's loans" and pay various debts, and paid himself a large salary after the claim

arose); Toshiba, 53 Conn. App. 484 (piercing corporate veil where corporation did not

maintain separate office and had no employees, equipment or property other than an

automobile for individual defendant's use, and where individual defendant used the

corporation's funds to pay his personal income taxes and permitted his son to write checks

on the corporation's account).

43.    Additionally, Mr. Schwartz rather than Mr. Richter was at all times in charge of

the daily operations of Hill A&E.  Mr. Schwartz negotiated the Agreement on behalf of Hill

A&E.  Mr. Schwartz had the authority to sign contracts on behalf of Hill A&E and was the

only person to sign customer contracts.  Mr. Gloss also had check signing authority.  Mr.

Schwartz hired and fired employees; selected employee benefits, drafted budgets and cash

flow documents, and was in charge of advertising; negotiating customer and supplier

contracts, leases, settlement of claims and dealing directly with counsel representing Hill

A&E.  Mr. Schwartz represented the public face of the company by giving speeches and

attending trade shows. See Jacobs Vehicle Systems, 424 F. Supp. at 393 (finding no alter

ego liability under either the indemnity or instrumentality theory when president of subsidiary

managed day-to-day operations of subsidiary despite substantial involvement by parent with operations of subsidiary.)

44.    Although Mr. Schwartz conferred with Mr. Richter about Hill A&E, Mr. Richter's actions with respect to Hill A&E are "no more than a reflection of the reality that all corporations act through individuals" and fall far short of the pervasive control necessary to negate the separate existence of Hill A&E.  KLM Industries, Inc., 75 Conn. App. at 35.  See also Carbonella, 2003 Conn. Super. LEXIS 1539, at *8-10 (refusing to pierce corporate veil where individual defendant was president and only stockholder of closely held corporation, made all of the decisions, was the only person authorized to sign checks, occupied an apartment leased to the corporation, loaned large sums of money to the corporation, and paid personal bills from the corporation account as repayment for those loans); Jacobs Vehicle Systems, 424 F. Supp at 393 (finding no alter ego liability under either the identity or instrumentality theories, even though president of subsidiary reported on a monthly basis to executive of parent company, parent company participated in developing subsidiary's annual plans and goals and relationship of subsidiary to parent gave subsidiary access to research and development funding); In re Acushnet River & New Bedford Harbor, 675 F. Supp. 22, 33 (D. Mass. 1987) (finding that quarterly and annual reports to parent do not represent an untoward intrusion by the owner into the corporate enterprise; shareholder has a right to remain informed).

45.    Similarly, although Mr. Schwartz sought approval for major decisions,  and Mr. Richter was involved in the decision to sell the vast majority of Hill A&E's assets to Entertainment Express and to grant liens in Hill A&E's assets to Hill and to himself, it is well

established that the participation of a parent corporation or shareholder in substantial

financial dealings of another corporation involving large investments, acquisitions and the

disposition of major assets does not make the parent corporation or shareholder the alter

ego of the subsidiary. Akzona, Inc. v. E.I. DuPont de Nemours & Co., 607 F. Supp. 227, 238

(Del. 1984).  See also, Fletcher v. Atex, Inc. , 68 F.3d 1451, 1459 (2d. Cir. 1995) (fact that

parent's approval was required for real estate lease, major capital expenditures,

negotiations for a sale of a minority stock ownership and the fact that parent played a role in

the ultimate sale of the assets of the subsidiary "does not raise an issue of material fact

about whether the two corporations constituted 'a single economic entity'"); Japan

Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc., 456 F. Supp. 831, 838, 841, 846 (D. Del.

1978) (the approval of budgets and large expenditures, particularly if the parent is loaning

the subsidiary funds, the guaranty of the subsidiary's debts, the payment of many of the

subsidiary's bills, which are then debited to the subsidiary's account, and the maintenance

of insurance for the subsidiary do not compel a finding that a subsidiary is an instrumentality

of a parent, when the subsidiary is an operating company with extensive obligations and

rights of its own, deals with routine matters independently, has independent sources of

substantial assets and revenue, employs its own personnel, maintains its own bank

accounts, prepares its own financial statements, and has its own auditors). "Where a parent

corporation is a large creditor of its subsidiary, the fact the former takes an active part in the

management of the latter in order to protect its debt does not make it liable for the debts of

the subsidiary." Id. at 846.  See also Sobol Family Partnership, 2006 Conn. Super LEXIS

2395, at *61 (writing that "[a] loan, in itself, is not evidence of a violation of the indemnity [rule] and may indeed be evidence of the contrary").

46.    Although Hill's vendors also supplied services to Hill A&E, and Hill's lawyers provided services to Hill A&E, administrative services provided by one corporation to another are of "minor importance" and will not result in the imposing of liability on the entity supplying such services because such services are supplied for administrative convenience and managerial efficiency. Blumberg, supra, at §20.06.

47.    Further, in order for the "identity rule" to apply, Plaintiffs are required to prove that Hill A&E conducted its operations for the benefit of the "whole enterprise", which in this case would be for the benefit of Hill A&E, Hill and Mr. Richter. Tomasso, 187 Conn. at 561 n.11.  The operations of Hill A&E were not conducted for the benefit of Hill and Mr. Richter. Hill was in an entirely different business from Hill A&E.  Neither Hill nor Mr. Richter benefited from the Hill A&E operations; rather, they lost funds as a result of such operations.

48.    Neither Mr. Richter nor Hill reaped a benefit from Plaintiffs' labor. The benefit of Plaintiffs' work went to Hill A&E and not to Hill or Mr. Richter. Plaintiffs were compensated for the development of the New Program both before the 1989 Amendment when they were paid $7,000 per month for developing the New Program, and after April 1989, when Epperson was paid a salary for this work. Further, much of the New Program was developed by Hill A&E over a six-year period from April 1989 to May 1996 and not by PAT, as PAT's obligations to develop the New Program terminated when the Amendment was executed in June, 1989, and at that time, the development of the New Program was in its infancy. Hill A&E substantially altered and updated the New Program before it was sold to

Entertainment Express, and Entertainment Express altered it to run on the Internet.

Compare Zaist, 154 Conn. at 507-578 (where plaintiffs had furnished labor, materials and

equipment for shopping centers that benefited defendant stockholder of corporation and

corporations controlled by defendant had same office, there was no formal corporate action

by directors and stockholders of corporations controlled by defendant, corporate party with

whom plaintiffs contracted had inadequate funds, acquired no funds for work that it did on its

own initiative, and did not itself benefit from transactions with plaintiffs, corporate veil would

be pierced and court would disregard corporate entity under the instrumentality theory).

    (3).   Waiver and Estoppel

    49.   Under Connecticut law, a waiver is an intentional relinquishment of a known

right.  Brauer v. Freccia, 159 Conn. 289, 295 (1970).

    50.   Estoppel arises where a party does or says something calculated or intended

to induce another party to believe certain facts exist and to act on that belief; and the other

party must change its position in reliance on those facts to his detriment.  Connecticut Nat'l

Bank v. Voog, 233 Conn. 352, 366 (1995).

    51.   Plaintiffs have waived their veil piercing claims against Hill and Mr. Richter

and are estopped from asserting such claims because they were fully aware that

Connecticut ArtSoft (later Hill A&E) was a corporation separate and apart from Hill.  In the

context of a veil piercing claim, if a party knows of the relationship between the corporation

and its shareholders and chooses to freely and voluntarily deal with them in their respective

capacities, the party is estopped to claim that the shareholder is the alter ego of the

corporation.  Paine v. Carter, 469 S.W. 2d 822, 827 (Tex. Ct. App. 1971).

52.    In the Agreement, Plaintiffs' expressly waived their rights to pursue a veil piercing action against either Hill or Mr. Richter.  Paragraph 25.5 of the Agreement stated "The contract relationship created hereby is between specific entities and does not include corporate parents, subsidiaries or affiliates."  (emphasis added).

Plaintiffs are also estopped from relying on a claim of undercapitalization as the basis of their veil piercing claims, because of their failure to protect their financial interests.  Plaintiffs do not recall seeing or requesting any financial information about Hill A&E.  Although Plaintiffs understood the concept of obtaining security for an agreement, Mr. Epperson and PAT's counsel expressly decided not to request any security for Hill A&E's obligations under its contract with PAT from either Hill or Mr. Richter.  Additionally, Plaintiffs did not obtain any guarantees from Mr. Richter or Hill.  Under these circumstances, Plaintiffs have waived and/or are estopped from asserting their veil piercing claims against Hill and Mr. Richter.  Paine, 469 S.W. 2d at 827; Bostwick-Braun Co. v. Szews, 645 F. Supp. 221, 227 (W.D. Wis. 1986) (the right to assert undercapitalization as a basis to pierce the corporate veil is considered to have been waived, or, alternatively a creditor is estopped from asserting this claim when the creditor did not attempt to ascertain the capital structure of a corporation and continued to do business with that corporation); Consumer's Co-op v. Olsen, 419 N.W. 2d 211, 222 (Wis. 1988) (where no personal guarantee was requested initially or as a condition of continued receipt of credit, creditor waived right to claim inadequacy of capitalization as a basis to pierce the corporate veil and was estopped from seeking to hold shareholder liable for corporation's debt); White v. Winchester Land Dev. Corp., 584 S.W.2d 56, 63 (Ky. Ct. App. 1979) (bank cannot be heard to complain that corporation was undercapitalized because bank had knowledge of the financial

status of the corporation and could have protected itself); Truckweld Equip. Co. v. Olson, 618 P.2d 1017, 1022 (Wash. Ct. App. 1980) (creditor's failure to obtain shareholder's personal guaranty prior to extending credit or timely file liens when payments became questionable caused its loss, not misconduct or abuse of the corporate form by shareholder, and, therefore, corporate veil would not be pierced); Tomasso, 187 Conn. at 560-61 (internal citations omitted) (a court "cannot rescue a party from its own unfavorable or unwise business dealings because "'[a] hard bargain is not enough to energize the equitable power to disregard the corporate form.'")

16.   **Trial Time.**

The parties anticipate the need for 5-7 trial days.

17.   **Further Proceedings.**

**#17 - STATEMENT REGARDING DEFENDANTS IRVIN RICHTER AND HILL INTERNATIONAL'S REASONS FOR THE NECESSITY OF FURTHER PROCEEDINGS PRIOR TO TRIAL**

Defendants Irvin Richter and Hill International, Inc. (the "Hill Defendants") hereby state that further proceedings are necessary with respect to (i) the Hill Defendants' Motion in Limine dated March 23, 2007 Re: Collateral Estoppel, (ii) the Hill Defendants' Motion to Preclude dated March 23, 2007, and (iii) the Hill Defendants' Motion in Limine dated March 23, 2007 Re: Parol Evidence.

18.   **Election for Trial by Magistrate.**

The parties respectfully decline Trial by Magistrate.

Respectfully submitted,
THE PLAINTIFFS

173

By_____/s/ Robert J. Sullivan, Jr._____
  Robert J. Sullivan, Jr.
  LAW OFFICES OF ROBERT SULLIVAN
  190 Main Street
  Westport, CT 06880
  Tel. No. (203) 227-1404
  Federal Bar Number CT08969

DEFENDANTS IRVIN RICHTER AND HILL
INTERNATIONAL, INC.
By_____/s/ Carolyn W. Kone_____
  Carolyn W. Kone
  Brenner, Saltzman & Wallman, LLP
  271 Whitney Avenue
  P.O. Box 1746
  New Haven, CT 06507-1746
  Tel. No. ( 203)772-2600
  Federal Bar No. CT06207

174

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2007, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Robert J. Sullivan, Jr.

_____
Robert J. Sullivan, Jr.
LAW OFFICES OF ROBERT SULLIVAN
190 Main St.,  Westport, CT 06880
Phone:  203/227-1404
Fax: 203/226-6403
Federal Bar No. CT08969
E-mail: rjslaw@optonline.net; rjslawdl@optonline.net

WALTER C. KING II, CAP, PFS, ASA, CFE
WALTER C. KING ASSOCIATES, P.C.
SYNERGY VALUATIONS, LLC
CURRICULUM VITAE

Mr. King is the president of Walter C. King Associates, P.C.  The firm, founded in 1978, renders tax, accounting, financial planning, and litigation support & forensic accounting to its clients.  He supervises each of these activities and reviews all reports and tax returns of the Firm. Two-thirds of Mr. King=s time is devoted to litigation support & forensic accounting (see Experience and Testimony below).  Mr. King is also a general partner of Synergy Valuations, LLC of New York City which renders valuation and litigation support services to its clients.

| | |
|---|---|
| **Education & Certificate** | Bachelor of Arts - University of Maine |
| | Master of Business Administration - University of New Haven |
| | Certified Public Accountant (CPA) - (Licensed in Connecticut & New York) |
| | Accredited personal Financial Spec. (PFS) |
| | Accredited Senior Appraiser (ASA) |
| | Instructor on various subjects for NYCPA & CSCPA |
| | Uniform Standard of Professional Appraisal Practice-passed examination |
| | Certified Fraud Examiner (CFE) |
| **Memberships** | Institute of Business Appraisers, Inc. |
| | American Society of Appraisers |
| | Past President & Chair-Business Valuation Discipline, Connecticut Chapter |
| | Connecticut Society of CPA=s |
| | American Institute of CPA=s |
| | National Association of Forensic Economics |
| | Association of Certified Fraud Examiners |

**Experience:**

His experience has covered a variety of subjects, including business valuations (over 1,000 valuations), fairness opinions, fair & reasonable compensation, intangible asset valuation (incl. SFAS 141 compliance), financial damages, acquisition planning and consulting, forensic accounting and investigation of white collar frauds, pre-IPO transactions, lost business opportunities, ESOP structuring & reporting, divorce planning & consulting, stock/warrant option valuation, dissident shareholder matters, contract damages, solvency, and loss income analysis related to injury & wrongful employee termination.  Prior to starting the King firm, Mr. King was Chief Financial Officer of a significant publicly held company as well as being responsible for human resources.   Prior to that he was a management consultant with PricewaterhouseCoopers.

**Testimony:**

176

Mr. King has testified as an expert in numerous cases including family, civil and bankruptcy courts.  Mr. King has testified in cases involving business valuation, damages determination, minority shareholder actions, white collar fraud, marital dissolution, shareholder oppression, executive compensation, wrongful employee terminations, stock option valuations and intangible asset appraisals.  He has also served as a court appointed receiver

Telephone: (203) 227-1414; (212)-399-0717; Fax: 203-227-4472

Address:        991 Post Road East, Westport, CT 06880 and

                      331 West 57th Street, New York, NY 100019

E-mail: wck@sbcglobal.net   / Website: 222.wckcpa.com (click on litigation support)

## STEVE N. ECONOMOU

**Two Penn Center Plaza, Suite 1520**
**Philadelphia, PA 19102-1728**
**Telephone: 215-557-2219**
**Facsimile: 215-972-2388**
**Email: seconomou@curtisfinancial.com**

**OVERVIEW:**

Mr. Economou has 20 years of diverse corporate finance experience, including mergers and acquisitions, private equity, management buyouts, and financial opinions including fairness and valuation opinions. Mr. Economou has completed hundreds of transactions and advisory assignments. He has also advised numerous public companies and portfolio companies of private equity firms. Mr. Economou's primary focus is providing financial advisory services to technology oriented; mid and small cap public; and mid-market private companies. He has spoken frequently to various groups on such topics as capital markets, mergers and acquisitions, valuations of technology companies, and industry consolidation

**PROFESSIONAL EXPERIENCE:**

### *Curtis Financial Group, LLC, March 2003 to Present*

Managing Director

Curtis Financial Group LLC is a middle-market investment banking firm founded in 1994. Curtis is affiliated with Parente Randolph, LLC which is the leading independent accounting and consulting firm in Pennsylvania, and one of the top 30 in the U.S. Transaction advisory services provided by Curtis include representing owners of middle market companies in selling and divesting companies, mergers and acquisitions and raising capital. Corporate finance advisory services provided by Curtis include fairness and other independent opinions for fiduciaries and boards, strategic alternatives analyses, corporate valuations and valuations of intangible assets.

### FLEETBOSTON FINANCIAL, MARCH 2001 TO DECEMBER 2002

Managing Director, Mergers and Acquisitions Group

FleetBoston was a $200 billion asset global financial institution and the largest bank holding company in New England until Bank of America acquired it. Fleet M&A Advisors provided merger and acquisition and corporate finance advisory services to customers of the bank throughout the country.

*Howard, Lawson & Co, 1985 - 2001*

Managing Director and Principal

Howard, Lawson & Co. was a regional investment-banking boutique specializing in corporate finance advisory services and valuations for middle market companies. Mr. Economou began his career in the venture capital group of Howard, Lawson & Co. where he led direct investments in emerging growth technology companies and management buyouts. He was also a principal in the merchant banking affiliate of Howard, Lawson & Co.

**EDUCATION:**

University of Cincinnati - MBA degree with a concentration in Finance, December 1982
University of Pittsburgh - BA degree in Economics., April 1981

## LICENSES:

NASD Licenses - Series 7 and 63

**PROFESSIONAL AFFILIATIONS:**

- Greater Philadelphia Venture Group
- Association for Corporate Growth, Philadelphia Chapter
- Investment Committee of Ben Franklin Technology Partners of Southeastern Pennsylvania

## PRIOR EXPERIENCE AS AN EXPERT WITNESS:

The United States Bankruptcy Court for the Eastern District of Pennsylvania in re: The Official Committee of Unsecured Creditors of Xyan.com, Inc. vs. Banta Corporation as the expert for the Official Committee of Unsecured Creditors.