# **EXHIBIT A**

DEFENDANT'S
EXHIBIT
_48_
ALL-STATE LEGAL

## CUSTOM SOFTWARE DEVELOPMENT AGREEMENT

between

## PERFORMING ARTS TECHNOLOGY, INC. and ARTSOFT, INC.

This is a **Custom Software Development Agreement** between
ARTSOFT, INC., a Connecticut corporation with its principal
address 37 Soundview Road, Guilford, Connecticut 06437 (called
"ArtSoft") and PERFORMING ARTS TECHNOLOGY, INC., a California
corporation, with its principal address at 2125 fourth Street,
Berkeley, California 94710 (called "PAT").

## RECITALS OF FACT:

A.   ArtSoft is, among other things, in the business of
developing and marketing computer software products to the per-
forming arts industry.

B.   PAT is, among other things, in the business of devel-
oping and marketing computer software products to the performing
arts industry.  In addition PAT provides custom software develop-
ment and consulting services utilizing its skills and knowledge
of the data processing requirements of performing arts groups.

C.   ArtSoft wishes to engage the services of PAT for two
projects.  The first project is to port certain of ArtSoft's
existing computer programs designed for use in the Wang and PC
operating environments to run on a DEC Micro-VAX.  The second
project is to design and develop a new generation of software to
replace or supplement some of ArtSoft's Existing Software.

D.   If the porting, design, and development projects are
completed to the satisfaction of both parties, ArtSoft will hire
Dirk Epperson from PAT as ArtSoft's Vice President of Develop-
ment.  In addition, if this transaction proceeds as anticipated,
ArtSoft may acquire an option to purchase all of PAT's issued and
outstanding capital stock under the terms of this Agreement.

## THE PARTIES AGREE AS FOLLOWS:

## 1.0 DEFINITIONS.

1.1   "Program" means the computer software that will be
ported, designed, or developed by PAT for ArtSoft under this
Agreement and any Technical Addenda to it.

1.2   "Ported Program" means the computer software that will
be ported by PAT for ArtSoft as described in Paragraph 2.0.

1.3   "New Program" means the computer software that will be
designed and developed by PAT for ArtSoft as described in Para-
graph 3.0.

for DEIS

1.4 "Technical Addendum" or "Technical Addenda" means any addendum or addenda to this Agreement providing the technical specifications, project timetable, and other information required to define a specific Program porting or development project under this Agreement. A skeleton outline for a Technical Addendum is attached as Exhibit A.

1.5 "Source Code" means the form in which a Program is developed and from which the Program's internal logic and structure may be easily deduced by a trained human being. The Source Code can be used to generate the Program's Object Code.

1.6 "Object Code" means the form of a Program that results from the translation or processing of the Source Code by a computer into machine language or other machine executable code. An Object Code copy of the Program is appropriate for execution in the computer and operating system environment specified in the Technical Addenda. However, it is difficult for a human being to understand the program's internal logic and structure from the Object Code form of the Program.

1.7 "Documentation" means any material other than internal comments contained in the Source Code of the Program such as manuals or other explanatory material intended to assist in the use of the Program.

1.8 "Existing Software" means ArtSoft's existing Wang and PC network based reserved ticketing software⹁as more fully defined in the attached Exhibit B.   *and other software*   ᴸᶠ̲ ArtSᵢ 𝒟ᵢ PAT

1.9 "Confidential Information" means the source code of the Existing Software, Source Code, Program design specifications in any Technical Addenda, the novel processes or algorithms contained in the Existing Software, and any additional information specifically defined as Confidential Information in a Technical Addendum.

1.10 "Technical Contact Persons" means the individual employee designated by each party to represent it in the day to day contacts between the parties regarding work done under this Agreement.

## 2.0 ANTICIPATED SCOPE OF CONVERSION SERVICES, DEVELOPMENT OF THE TECHNICAL ADDENDUM, AND TRAINING.

2.1 ArtSoft and PAT have had extensive discussions about porting certain of ArtSoft's Existing Software to operate in the DEC Micro-VAX environment. The computer programs to be ported are listed in Exhibit B.

2.2 The objective of the parties is to quickly transfer ArtSoft's Existing Software to the Micro-VAX environment while

retaining as much of the function, look, and feel of the Wang and PC network implementations of the Existing Software as is reasonably possible given the time pressure to complete the project quickly.

2.3  Before PAT starts actual work on the conversion project under this Agreement ArtSoft and PAT will develop a Technical Addendum containing the formal written set of porting specifications for the project. The Technical Addendum will contain the following elements:

2.3.1  A detailed description of the hardware and operating system environment that the Ported Programs will be designed to run in.

2.3.2  A detailed description of any compilers or development tools to be used in the porting project, and a detailed description of any required interactions with other software, data bases, or other similar data structures that the Program will be required to operate under or communicate with.

2.3.3  A detailed description of the information or data ArtSoft wants entered into the Program and the information, data, or results ArtSoft wants the Program to achieve or produce.

2.3.4  Any Program design considerations that ArtSoft feels are significant in the porting of the Program to the new environment.

2.3.5  A detailed estimated time table for the porting project. This time table will provide for ongoing review of the project by ArtSoft's staff at all critical points during the porting process.

2.3.6  The acceptance testing procedures to be employed by ArtSoft once the Ported Programs are delivered for testing by PAT.

2.3.7  The names, mailing addresses, and telephone numbers of the designated Technical Contact Persons who will be responsible for supervising the porting of the Program for each company.

2.4  Changes may be made to the porting specifications at any time by means of a written amendment to those specifications signed by both parties. Changes may result in delays in the project time table and increased costs. Any such changes must be noted in the amendment together with any agreed technical changes.

2.5  The first week of PAT's porting activity will be performed at ArtSoft's offices in Guilford, Connecticut. The balance of the work will be done at PAT's offices in Berkeley, California. The parties presently anticipate that the porting of ArtSoft's Existing Programs will be completed by PAT within a

period of two to four months. Because the porting specifications are not complete the anticipated time for completion is only an estimate, and shall not be construed as a guarantee by PAT.

2.6   In addition to the porting, PAT will train ArtSoft's personnel regarding the use and operation of the DEC Micro-VAX II, and will assist ArtSoft with the installation of the Boston Ballet system.

## 3.0   NEW PROGRAM DESIGN AND DEVELOPMENT OF THE TECHNICAL ADDENDUM.

3.1   ArtSoft and PAT have had preliminary discussions about developing a new generation of software to supplement or replace ArtSoft's Existing Software and the anticipated Ported Programs. PAT and ArtSoft will work together to design and develop this new and advanced version of ArtSoft's Existing Software under the general direction and control of ArtSoft.

3.2   Since the detailed development specifications for the New Program have not been developed at the time of signing this Agreement, the parties will begin work on specifying a Technical Addendum for that project as soon as the porting project is finished and the Ported Program has been installed at the Boston Ballet. The Technical Addendum covering the New Program will contain the following elements:

3.2.1   A detailed description of the hardware and operating system environment that the New Program will be designed to run in.

3.2.2   A detailed description of any compilers or development tools to be used in the development project, and a detailed description of any required interactions with other software, data bases, or other similar data structures that the Program will be required to operate under or communicate with.

3.2.3   A detailed description of the information or data ArtSoft wants entered into the Program and the information, data, or results ArtSoft wants the Program to achieve or produce.

3.2.4   Any Program design considerations that ArtSoft feels are significant in the design of the New Program.

3.2.5   Any user interfaces that need to be provided for the interaction of end users with the Programs.

3.2.6   A detailed timetable for the development of the New Programs. This time table will provide for ongoing review of the project by ArtSoft's staff at all critical points during the development process.

3.2.7   The names, mailing addresses, and telephone numbers of the designated Technical Contact Persons who will be responsible for supervising the development of the Program for each company.

3.2.8   The acceptance testing procedures to be followed by ArtSoft and the support which PAT will provide to ArtSoft's testing efforts.

3.2.9   Any post delivery assistance with acceptance testing or customer installations that PAT will be providing to ArtSoft.

3.3   Once the Technical Addendum is completed and the specifications are accepted and paid for by ArtSoft, the specifications shall belong to ArtSoft as provided for in Paragraph 8.0.

3.4   Changes may be made to a Technical Addendum at any time by means of a written amendment signed by both parties. Changes will not be made on the basis of oral requests or instructions until an amendment has been signed. Changes may result in delays in the project time table and increased costs. Any such changes must be noted in the amendment together with any agreed technical changes.

3.5   At this time it is anticipated that the New Program will be developed and submitted for testing within a period of twelve months following the acceptance of the Technical Addendum by the parties. Since there are no specifications for the New Programs at the time of signing this Agreement, the anticipated time for completion of twelve months is only an estimate, and shall not be construed as a guarantee by PAT.

## 4.0   PORTING AND DEVELOPMENT OF THE PROGRAMS

4.1   PAT shall port and develop the Programs in accordance with the detailed requirements of the Technical Addenda.

4.2   All communication between PAT and ArtSoft regarding the porting or development of the Programs will take place between the designated Technical Contact Persons. These two Contact Persons or alternates designated in writing shall be responsible for controlling each stage of the development of the Programs. In addition they will be expected to keep in weekly contact with each other regarding the status of the project.

4.3   If either party feels it is desirable to modify a Technical Addendum, they may initiate the process through the other party's Technical contact person, but any final amendments must be signed by an officer of each company, or their designee, before they become effective.

SW-DEV.PAT (07/29/88)                                          Page 5

$\mathcal{J}$ DELFS.

4.4  The parties agree that the services of Dirk A. Epperson are essential to the satisfactory performance by PAT of the scope of work called for in this Agreement.

## 5.0  ARTSOFT TO PROVIDE HARDWARE AND OPERATING SYSTEM.

Except for the first week of the porting project, all software development work will be performed by PAT at its Berkeley, California offices.  PAT has certain of the components of the computer operating environment needed to perform the services under this Agreement.  ArtSoft will provide PAT with any additional equipment, software, or other materials that may be necessary to develop or port the Programs as specified in any Technical Addendum.  ArtSoft will provide these materials to PAT for as long as PAT has any Program development or maintenance obligations under this Agreement and will provide all required maintenance to keep the operating environment in first class condition while it is on loan to PAT or being used on ArtSoft projects.  The equipment, software, and maintenance will be provided without charge to PAT.  When the operating environment is no longer required, PAT will return all of the components belonging to ArtSoft freight collect upon request.

## 6.0  FORM OF PROGRAM AND DOCUMENTATION TO BE DELIVERED.

6.1  PAT will deliver the Programs to ArtSoft in the form of a machine readable copy of the Source Code and a machine readable copy of Object Code recorded in the formats and on the media specified in each Technical Addendum.

6.2  PAT will develop the Documentation for the Programs specified in the Technical Addendum and deliver it in the format specified.

## 7.0  DELIVERY AND ACCEPTANCE

7.1  The final delivery of a Program will occur on or about the date specified in the project time table in the Technical Addendum and any amendments to it.  There shall be no late delivery penalties, but the parties agree to use their best efforts to complete the project by the due date.

7.2  ArtSoft shall have up to thirty (30) days following the date PAT delivers the final version of a Program to install it and put it into a testable condition.  ArtSoft shall then have thirty (30) days following the installation of a Program to examine and test it to ArtSoft's satisfaction following the acceptance testing criteria set forth in the Technical Addendum.  PAT shall assist ArtSoft with installation and any tests if requested by ArtSoft.  If ArtSoft feels that thirty days following installation is not adequate for acceptance testing of a given product, a longer time may be incorporated into the testing provisions of the Technical Addendum.

7.3   Should ArtSoft determine in its reasonable discretion that the Program is unsatisfactory because it does not appear to meet the specifications stated in the Technical Addendum, ArtSoft shall give PAT prompt written notice of the nature of the claimed nonconformities.   Any such notice must be sufficiently detailed to allow PAT to recreate and confirm any nonconformity.   If PAT is unable to recreate a nonconformity it will so notify ArtSoft in writing.  If PAT is able to recreate a nonconformity, it will use its best efforts to correct it within a reasonable time. Once the reported nonconformities have been corrected, PAT will provide ArtSoft with a corrected copy of the Program and ArtSoft shall have an additional thirty (30) days to re-test the revised version.

7.4   If ArtSoft does not give PAT notice of nonconformities in the Programs or a revision of the Programs within thirty (30) days after delivery and installation, ArtSoft shall be deemed to have accepted them upon the expiration of the thirty (30) day testing period.

## 8.0   OWNERSHIP OF THE PROGRAM AND COPYRIGHT.

8.1   All right, title and interest in and to the Existing Software, and all portions thereof, are and shall remain with ArtSoft.  It is understood and agreed that all intellectual property rights are and shall remain in ArtSoft including, without limitation, all applicable rights to: (1) copyrights, including all rights incident to copyright ownership, such as all rights of publication, registration and rights to create derivative works; (2) patents; (3) trademarks; and (4) trade secrets (including all know-how, ideas, logic, formulas and confidential information embodied in or reflected in the Existing Software).  All right, title and interest in and to any modifications, changes, enhancements, conversions, improvements, additions, and upgrades to the Existing Software and any copies made of the Existing Software shall be and remain with ArtSoft, whether developed by ArtSoft or PAT.

8.2   Except as provided for in Subparagraph 8.4, all right, title and interest in and to the New Program, and all portions thereof, shall be owned exclusively by ArtSoft, including all applicable rights to: (1) copyrights, including all rights incident to copyright ownership, such as all rights of publication, registration and rights to create derivative work; (2) patents; (3) trademarks; and (4) trade secrets (including all know-how, ideas, logic, formulas and confidential information embodied in or reflected in the New Program).  It is understood and agreed that title to, or ownership in, the New Program shall not vest in, or be held by PAT notwithstanding its participation in the software development effort.

8.3   Except as provided for in Subparagraph 8.4, PAT acknowledges and agrees that the design and development of the New Program and all deliverables generated or developed under this Agreement shall be considered works made for hire within the

SW-DEV.PAT (07/29/88)                                          Page 7

meaning of the Copyright Act (17 U.S.C. Section 101 et seq.), and further that the development of the New Program is for the sole and exclusive benefit of ArtSoft. To the extent that the New Program is, by operation of law or otherwise, not deemed to be works made for hire, or to the extent PAT may, under applicable law, otherwise be entitled to claim any ownership interest in the New Program or any deliverables generated or developed under this Agreement, PAT hereby transfers, grants, conveys, assigns, and relinquishes exclusively to ArtSoft and without the necessity of any further consideration, all of PAT's rights, title, and inter-est in and to the New Program or any of such deliverables includ-ing all applicable rights to patents, copyrights, trade secrets, and trademarks for the longest period accorded to such interests under applicable law. PAT shall perform any acts that may be deemed necessary or desirable by ArtSoft to perfect or to evi-dence more fully ArtSoft's right and claim to exclusive ownership of all such intellectual property rights, which acts shall include but not be limited to the making of further written assignments in a form determined by ArtSoft.

8.4 None of the above assignments or agreements include the contents of compilers, software development tools, run time libraries, algorithms, computer code, or any other similar mate-rial developed by PAT prior to this Agreement, licensed from third parties, or in the public domain. To the extent third party materials may be used, PAT will inform ArtSoft and assist ArtSoft in obtaining any necessary licenses to use those materi-als. To the extent that PAT's existing technology may be employed in the Programs, PAT grants ArtSoft a perpetual fully paid license to use, duplicate, and sublicense PAT's materials to third parties as part of the Programs.

8.5 ArtSoft and PAT acknowledge and agree that the Existing Software is and shall be considered unpublished works subject to protection under the federal copyright laws. PAT shall not per-mit its employees, officers or agents to remove any proprietary or other legal or restrictive notice contained on or included in the Existing Software. It is understood that any such copyright notice or other legend is not intended to indicate that there has been any unrestricted distribution or any relinquishment of trade secret protection.

**9.0  PAT OWNERSHIP CONDITIONS AND STOCK OPTION.**

9.1 PAT will obtain an agreement from PAT's shareholders to refrain from selling or offering their shares in PAT, or selling the assets that make up PAT's "reserved seating" business or "Patron System" to any third party, during the term of this Agreement. These stock agreements shall not apply to transfers between the present shareholders. If the stock or assets of PAT are sold in violation of these agreements, ArtSoft shall have the right to immediately terminate the Agreement without penalty or

further obligation other than to pay for work already done by PAT. Such termination shall be ArtSoft's sole and exclusive remedy in the event of any breach of these stock holder agreements.

9.2  PAT will obtain, within fifteen (15) days of signing this Agreement, an option granting to ArtSoft the right to purchase all of the issued and outstanding capital stock of PAT or all of its assets related to its reserved seating business and Patron System software from PAT's stockholders. The option will become exercisable only if ArtSoft pays PAT the maximum percentage fee described in Subparagraph 10.4. In the case of an asset purchase, ArtSoft will assume all of PAT's then outstanding support obligations to PAT's existing customers provided that Dirk A. Epperson is employed by ArtSoft at the time the purchase takes place. The option exercise price shall be One Thousand Dollars ($1,000) for all the stock or assets. The option will be effective for three (3) years from the date ArtSoft begins making percentage payments under Subparagraph 10.4 or for ninety (90) days after the option becomes exercisable following payment of the maximum fee which ever is longer. However, in no case will the option last longer than three years and three months. PAT shall be free to sell or divest itself of any products or assets not related to the reserved seating business and PAT's Patron System at any time prior to ArtSoft's exercise of the option provided for in this Subparagraph.

## 10.0  COMPENSATION FOR DEVELOPMENT.

10.1  For performance of the services relating to the porting of ArtSoft's Existing Software described in Paragraph 2.0, including the training and installation, ArtSoft will pay PAT the standard monthly fee of Seven Thousand Dollars ($7,000). This fee will be based on a minimum time commitment of one hundred sixty (160) man-hours hours per month. If PAT devotes less than one hundred sixty man-hours to the porting project in any month, ArtSoft's payment will be reduced by Forty-three Dollars Seventy-five cents ($43.75) per hour for each hour less than one hundred sixty. Any excess over one hundred sixty hours per month may be carried forward and billed in subsequent months. However, no more than one hundred sixty man-hours of work or Seven Thousand Dollars in standard monthly fees shall be due from the parties in any one month unless an increase is agreed to in writing. Provided however, in no event shall PAT perform more than 176 man hours of work in any one month without a written amendment to this Agreement providing for such increase in manpower. In addition to the standard monthly fees, ArtSoft will reimburse PAT for reasonable and necessary out-of-pocket expenses for travel, lodging and communications incurred by PAT for this project. PAT shall submit a monthly statement to ArtSoft containing a description of the services performed, the actual number of man hours worked including any extra hours being carried forward, and PAT's reimbursable expenses.

10.2  For performance of the services related to the design, specification, and development of the New Program described in Paragraph 3.0, ArtSoft will pay PAT the standard monthly fee of Five Thousand Dollars ($5,000).  This fee will be based on a minimum time commitment of one hundred sixty (160) man-hours per month.  If PAT devotes less than one hundred sixty man-hours to the development project in any month, ArtSoft's payment will be reduced by Thirty-one Dollars Twenty-five Cents ($31.25) per hour for each hour less than one hundred sixty.  Any excess over one hundred sixty hours per month may be carried forward and billed in subsequent months. However, no more than one hundred sixty man-hours of work or Five Thousand Dollars in standard monthly fees shall be due from the parties in any one month unless an increase is agreed to in writing. Provided however, in no event shall PAT perform more than 176 man hours of work in any one month without a written amendment to this Agreement providing for such increase in manpower.  In addition to the standard monthly fees, ArtSoft will reimburse PAT for reasonable and necessary out-of-pocket expenses for travel, lodging and communications incurred by PAT for this project. PAT shall submit a monthly statement to ArtSoft containing a description of the services performed, the actual number of man hours worked including any extra hours being carried forward, and PAT's reimbursable expenses.

10.3  Subject to the successful completion of the Program porting project described in Paragraph 2.0, it is the intent of the parties to immediately proceed with the development of the New Program.  The parties anticipate that the porting will continue for a minimum period of two months at a standard price of Seven Thousand Dollars ($7,000) per month, and that New Program development will take no less than seven months (with ten months more likely) at a standard price of Five Thousand Dollars ($5,000) per month.  Consistent with the parties' expectation of the time and effort involved, and subject to the satisfactory performance by PAT, the minimum compensation to the paid PAT for both the porting and the New Program development, collectively, shall be in the aggregate sum equal to not less than Fifty Thousand Dollars ($50,000).

10.4  In addition to the standard monthly fees described in Subparagraphs 10.1 and 10.2, ArtSoft will pay PAT an additional fee for its services based on a percentage of ArtSoft's revenue from marketing the New Program in the event the software development project is a success, and ArtSoft commences the marketing of the New Program described in Paragraph 3.0.  ArtSoft will pay PAT a fee equal to ten percent (10%) of each customer's gross payment for use of the New Program (for any product line and excluding the cost of any hardware).  In addition, ArtSoft will pay PAT a fee equal to ten percent (10%) of the gross payment that was made by any customer for the use of the Ported Programs on a Micro-VAX when they are upgraded to the New Program at no cost.  ArtSoft will continue to pay these percentage fees to PAT for a period of three (3) years from the date of its first commercial delivery of the New Program subject to a total maximum percentage payment of

Two Hundred Fifty Thousand Dollars ($250,000) (hereinafter the "Maximum Fee"). If at the end of the three (3) year period, the total of the above-described percentage fees paid to PAT is less the Maximum Fee, ArtSoft shall have the right, if it so chooses, to pay PAT the difference between the amount of the fees paid PAT and the Maximum Fee so that the stock option described in Subparagraph 9.2 will be triggered. ArtSoft may pay the full balance of the Maximum Fee and accelerate the option at any time with the advanced written consent of PAT's stockholders.

10.5   In addition to all other sums to be paid to PAT under this Agreement, ArtSoft will pay PAT commissions at the rate of five percent (5%) on the gross selling price of a customer contract for the sale of any Program sold through PAT's efforts with a customer. A sale will be deemed made through PAT's efforts if PAT made the initial contact with the customer and assisted ArtSoft in securing the sale. Commissions will be deemed earned upon payment by the customer of the final invoice and will be payable by ArtSoft within thirty (30) days.

10.6   PAT will invoice ArtSoft for all service and cost based payments at the beginning of each month. These invoices are due and payable thirty (30) days after they are received by ArtSoft.

10.7   ArtSoft will account for and pay all percentage payments due under this Agreement within thirty (30) days after the end of each calendar quarter. An accounting will be due each quarter following the start of commercial distribution of the New Program whether or not any percentage payment is due for three (3) years or until the Maximum fee has been paid which ever occurs first.

10.8   In the event ArtSoft payments should become past due, PAT may, without declaring a default, charge ArtSoft a late payment charge on the past due amount equal to one and one-half percent (1 1/2%) of such amount per month or the highest amount permitted by law whichever is less. PAT's exercise of this right shall in no way alter its right to subsequently declare a default.

## 11.0   NO PROGRAM MAINTENANCE

No Program maintenance will be provided under this Agreement. A separate maintenance agreement may be entered in to if desired.

## 12.0   WARRANTY AND DISCLAIMER OF LIABILITY.

ArtSoft is a technically competent merchant that deals in computer software and can evaluate the Programs and Documentation provided under this Agreement. ArtSoft will be provided with a copy of the Programs and any Documentation for evaluation and testing. PAT will help ArtSoft develop a test plan, and ArtSoft may subject the Program to any additional testing ArtSoft feels

is appropriate.  ArtSoft shall determine when and if the Programs are adequate for ArtSoft' needs.

12.1  PAT warrants the Documentation and the magnetic medium on which the Programs are recorded against defects in material or workmanship appearing within ninety (90) days after their acceptance by ArtSoft.  Such defects must be communicated to PAT in writing within a reasonable time.  Within a reasonable time after such notification, PAT will either repair or replace the defective Documentation or medium without charge to ArtSoft as the sole and exclusive remedy.

12.2  PAT warrants that the Programs delivered by PAT will perform in accordance with the specifications set forth in the Technical Addenda.  If a nonconformity appears within one hundred eighty (180) days of ArtSoft's acceptance of the Program and ArtSoft communicates this fact to PAT in writing within a reasonable time PAT will use its best efforts to correct the nonconforming Program within a reasonable time without charge to ArtSoft as the sole and exclusive remedy.

12.3  The media and Documentation warranty does not cover any material which has been subjected to damage or abuse by Art-Soft.  PAT does not warrant the performance of any hardware or the performance of any software except the Programs developed or ported by PAT under this Agreement.  Without limiting the generality of the foregoing, PAT is not responsible for problems or nonconformities caused by changes in the operating characteristics of computer hardware or computer operating systems which are made after the delivery of the Programs nor for problems in the interaction of the Programs with software that was not provided by PAT unless that interaction is required by the Technical Addendum.

12.4  The warranties set forth above are exclusive and are in lieu of all other warranties, whether, oral or written, express or implied.  **NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY.**

12.5  **NEITHER PARTY SHALL IN ANY CASE BE LIABLE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT OR OTHER SIMILAR DAMAGES ARISING FROM BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, OR ANY OTHER LEGAL THEORY.**

12.6  This warranty allocates risks of product nonconformity or failure between PAT and ArtSoft as authorized by the Uniform Commercial Code and other applicable law.  PAT's pricing reflects this allocation of risk and the limitations of liability contained in this Agreement.

13.0    WARRANTY OF TITLE AND INDEMNIFICATION.

13.1  PAT warrants the Programs and any Documentation to be developed and delivered to ArtSoft under this Agreement will not infringe any United States patent, copyright, or trade secret

SW-DEV.PAT (07/29/88)                                          Page 12

of another.

13.2    PAT shall indemnify, defend and hold ArtSoft harmless against and in respect of any claims based on the alleged infringement of any United States patent, United States copyright, or trade secrets protected under the laws of one of the United States or the District of Columbia belonging to any third party.  This indemnity does not cover any trademark infringements.

13.3    PAT shall have no liability under this indemnity to the extent that any infringement is established to have resulted from the use of ArtSoft's existing Programs, PAT's following ArtSoft's express directions, or the use of the Programs as an integral part of any product not supplied by PAT, nor from any material modification, editing, revision, enhancement, improvement or development of the Programs not actually performed by PAT.  In other words, if the product is incorporated with another program, for example, PAT'S only liability hereunder would be for that portion of the infringement caused by the Program as developed by PAT, but not for any infringement caused by the other code or the combination of code.

13.4    ArtSoft shall promptly notify PAT of the existence of any claim, demand or other matter to which PAT's indemnification obligations may apply, and shall allow PAT to defend the same at its own expense and with counsel of its own selection.  ArtSoft shall at all times also have the right to fully participate in the defense at its own expense.  If the claim is one that cannot by its nature be defended solely by PAT, then ArtSoft shall make available all information and assistance that PAT may reasonably request at ArtSoft's expense.

## 14.0  TERM AND TERMINATION.

14.1    This Agreement shall be retroactively effective from July, 11 1988 until completion of the software development work and the expiration of the option term unless terminated by one of the parties as provided below.    *and continue thereafter in full force and effect

14.2    Either party may terminate this Agreement without penalty on five (5) days written notice to the other if the parties are unable to agree on a necessary Technical Addendum within thirty (30) days of starting negotiations on the specifications for the Addendum.

14.3    Either party shall have the right to terminate this Agreement if the other party defaults in any of its obligations under this Agreement and fails to correct the default within thirty (30) days after receiving written notice of such default. In such a case, the notice of termination may be given with the notice of default and will become effective on the expiration of the cure period.

14.4   The parties agree that if Dirk A. Epperson leaves the employ of PAT at any time before the completion of the New Program or shall no longer be an officer of PAT, or a shareholder of PAT, then upon the happening of any such events, ArtSoft shall have the right to terminate this Agreement for convenience without penalty.

14.5  If this Agreement is terminated at any time before the completion of the development of the New Program, ArtSoft shall retain all of its rights in the Technical Addenda and Programs under this Agreement provided it has paid all sums due to PAT up to the date of termination. In addition, ArtSoft shall be relieved of its obligation to pay the percentage payments and shall forfeit its option to buy PAT's stock or assets.   If ArtSoft fails to pay all the compensation required by Paragraph 10.0, except for the percentage payments, ArtSoft shall forfeit its rights in PAT's work products that would otherwise belong to ArtSoft.

14.6  If this Agreement is terminated at any time after the completion of the development of the New Program based on an uncured default by PAT, ArtSoft shall retain all of its rights under this Agreement, including its option rights, by agreeing to make all required percentage payments as provided for in the Agreement at the time the termination becomes effective.  If this Agreement is terminated at any time after the completion of the development of the New Program based on an uncured default of ArtSoft, ArtSoft shall retain all of its rights under this Agreement, except its option rights, by agreeing to make all required percentage payments as provided for in the Agreement at the time the termination becomes effective.  If ArtSoft fails to make the required percentage payments after a termination described in this Subparagraph 14.6, ArtSoft shall no longer have the right to use or market any New Program containing any PAT work product.

14.7 Neither party to this Agreement shall be liable by reason of termination of this Agreement to the other for compensation, reimbursement or damages on account of any loss of prospective profits on anticipated sales or on account of expenditures, investments, leases or other commitments relating to the business or goodwill of either party, notwithstanding any law to the contrary. No termination of this Agreement shall release ArtSoft from its liability to pay PAT any fees which accrued prior to such termination.

14.8  It is expressly understood and agreed that all rights and remedies to which either party hereto is or may be entitled in law or in equity are preserved subject to the limitations of liability and remedies contained in this Agreement.  No such rights are waived by Subparagraphs 14.5 and 14.6.

15.0 DISAGREEMENTS AND ARBITRATION.

15.1  If any disagreements arise under this Agreement that are not settled promptly in the ordinary course of business, the

senior management of the parties shall meet promptly  to  attempt to resolve the problems on an informal basis.

15.2   If  the senior management is not able to resolve such problems within a reasonable time,  the  disagreements  shall  be settled in the following ways.

15.2.1.  If the parties are able to agree on an informal arbitration process within fifteen (15) days of  reaching  an impasse, that informal process shall be used.

15.2.2   If  the  parties  are not able to agree on an informal arbitration process within fifteen  days the  following procedures will be used.

(a)  If the only problem relates to unpaid fees or costs the party owed the money may bring a simple suit in court for outstanding moneys due under this Agreement.

(b)  Except for the right to bring a suit for moneys due, and the right of any party to apply to a court of competent jurisdiction for a Temporary Restraining Order, a Preliminary Injunction or other equitable relief to preserve the status quo or prevent irreparable harm pending the selection and confirmation of a panel of arbitrators, any dispute between ArtSoft and PAT under this Agreement involving its interpretation or the obligations of a party thereto, shall be determined by binding arbitration under the administration of and in accordance with the commercial arbitration rules of the American Arbitration Association (AAA), in Boston, Massachusetts.

(c)  Arbitration shall be conducted by one (1) attorney arbitrator by mutual agreement, or by three (3) arbitrators if the parties are unable to agree on a single arbitrator within thirty (30) days of first demand for the arbitration.  In the case of a three arbitrator panel, the chairman shall be an attorney at law and the other two shall have a background or training in law, computer science, or the computer industry.  If three arbitrators are necessary, a panel shall be requested from the AAA, and each party shall appoint one (1) arbitrator from the panel within thirty-five (35) days after the first demand for arbitration, and the third arbitrator shall be appointed by the first two and may be chosen from any source deemed appropriate by the first two arbitrators.  If either party fails to appoint its arbitrator or if a third arbitrator is not chosen by agreement within forty-five (45) days after the first demand for arbitration, either party may request the AAA to appoint the remaining arbitrators.

(d)  The arbitrators shall have the authority to permit discovery, to the extent deemed appropriate by the arbitrators, upon request of a party. The arbitrators shall have no power or authority to add to or detract from the agreements of the parties.  The cost of the arbitration shall be borne equally pending the arbitrator's award.  The arbitrators shall have the

authority to grant any temporary, preliminary or permanent injunctive or other equitable relief in a form substantially similar to that which would otherwise be granted by a court. The arbitrators shall have no authority to award punitive or consequential damages. The resulting arbitration award may be enforced by all lawful remedies, including without limitation, injunctive or other equitable relief in any court of competent jurisdiction.

## 16.0 PROTECTION OF CONFIDENTIAL INFORMATION.

16.1 PAT agrees to develop and use Confidential Information under controlled conditions, and not to allow any one to have access to Confidential Information who does not have a need to use it. PAT agrees to require each person having access to Confidential Information to sign a nondisclosure agreement. PAT will continue to keep Confidential Information in confidence for five (5) years from the date PAT receives it from ArtSoft or delivers it to ArtSoft for acceptance testing which ever is later. PAT agrees not to disclose any part of the Programs to third parties, including contractors or consultants, without the express written consent of ArtSoft. PAT agrees to refrain from and take reasonable precautions to prevent others from duplicating the Programs except as contemplated by this Agreement or other agreements between the parties.

16.2 PAT'S obligation, under this Agreement, to retain Confidential Information in confidence shall be satisfied if PAT protects the information using the same standard of care and procedures that it uses to protect its own confidential information. PAT shall have no liability for any breach of confidentiality that is due to causes beyond PAT'S reasonable control.

16.3 Confidential Information does not include information that: (1) is publicly known through no fault of PAT, (2) information that is lawfully received by PAT from a third party not bound in a confidential relationship with ArtSoft, (3) information disclosed by ArtSoft to a third party without obligation of confidentiality, or (4) information developed by PAT at its own expense or under contract with third parties.

16.4 PAT agrees to notify ArtSoft promptly in the event of any breach of its security under conditions in which it would appear that Confidential Information was prejudiced or exposed to loss. PAT shall, upon request from ArtSoft, take reasonable steps to recover any compromised Confidential Information.

## 17.0 EMPLOYMENT OF DIRK EPPERSON AND OFFERS OF EMPLOYMENT.

17.1 Following completion of the New Program, and upon ArtSoft's readiness to commence marketing of the New Program, ArtSoft agrees to offer employment to Dirk A. Epperson as its vice president of development, a senior executive officer, with responsibilities primarily in continuing software development and support efforts. Mr. Epperson will have the right to perform

SW-DEV.PAT (07/29/88)                                        Page 16

his work for ArtSoft from PAT's existing office in Berkeley, California or from a mutually acceptable location in the San Francisco bay area and will be provided with a suitable office and all necessary furniture and equipment by ArtSoft. The terms, conditions, compensation, and benefits of employment will be comparable to those offered to Messrs. Laurence F. Schwartz and Robert McClintock. It is understood that included among the eligible employee benefits would be any employee incentive compensation program of ArtSoft in effect at such time, including any stock option based incentive compensation program. It is understood, however, that stock options would be granted to ArtSoft employees under any such incentive program only in the event of a public offering of ArtSoft's stock. It is further understood that any stock options that may be granted to Dirk A. Epperson would be separate and distinct from those stock options to be granted as a consequence of, and in accordance with, the Stock Purchase Agreement between ArtSoft and Hill International, Inc.

17.2   Each party will give the other party thirty (30) days advance written notice of its intentions before initiating any discussions with an employee of the other about the employee leaving his or her employment and going to work for the other company. If a party is approached by an employee of the other company about the possibility of employment, the party being approached will immediately notify the other in writing and suspend any discussions for thirty (30) days. On receiving any such notice, a party may consent to the other party starting employment discussions before the end of the thirty days. Provided that the parties comply with the notice and time requirements of this Paragraph, they are free to hire each other's employees.

## 18.0 NONCOMPETITION.

18.1   PAT will refrain from developing or marketing a computer based reserved seat ticketing system in the United States or Canada, including its existing Patron System software, during the term of this Agreement. However, PAT is not restricted from supporting or enhancing its existing products for its existing customers.

18.2   ArtSoft will refrain from developing or marketing a computer based system for use by museums in the United States or Canada during the term of this Agreement.

18.3   Neither party shall approach or attempt to sell its products to entities who have an established customer relationship with the other party during the term of this Agreement without the advanced written consent of the other.

18.4   The noncompetition provisions of this Agreement shall continue in effect for one year following the expiration or any termination of this Agreement for any reason.

SW-DEV.PAT (07/29/88)                                    Page 17

## 19.0  RIGHT TO PUBLICITY.

ArtSoft and PAT, upon the prior written approval of the other party, will have the right to publicize this Agreement, including the issuance of press releases, news articles, and other such publications, subject to the provisions regarding confidentiality and non-disclosure contained in this Agreement.

## 20.0  ADDITIONAL SERVICES.

ArtSoft, at its option, may engage PAT as its sub-consultant to provide programming for data conversion and/or custom programming services related to the Ported Program and New Program.  If ArtSoft refers such business to PAT, PAT will pay ArtSoft fifty percent (50%) of the fees it receives from ArtSoft's customers for such services in excess of a minimum of Five Thousand Dollars ($5,000) per month.

## 21.0  NOTICES.

All notices, demands or consents required or permitted under this Agreement shall be in writing and shall be delivered personally or sent by certified or registered mail to the respective parties at the addresses set forth on the signature page of this Agreement or at such other address as subsequently shall be given by either party to the other in writing and shall be effective on the earlier of receipt or five (5) days after dispatch.

## 22.0  UNFORESEEN EVENTS

Notwithstanding anything else in this Agreement, no default, delay or failure to perform on the part of either party shall be considered a breach of this Agreement if such default, delay or failure to perform is shown to be due entirely to causes beyond reasonable control of the party charged with a default, including, but not limited to, causes such as strikes, lockouts or other labor disputes, riots, civil disturbances, actions or inactions of governmental authorities or suppliers, epidemics, war, embargoes, severe weather, fire, earthquakes, acts of God or the public enemy, nuclear disasters, or default of a common carrier. In the case of any such unforeseen event, the time for performance required by either party under this Agreement shall be extended for any period during which performance is prevented by those events.  However, the other party may terminate this Agreement if such condition continues for a period of ninety (90) days.

## 23.0  SEVERABILITY.

In the event that any one or more of the provisions of this Agreement shall for any reason be held to be unenforceable in any respect under the law of any state or of the United States of America, such unenforceability shall not affect any other provi-

sion, but this Agreement shall then be construed as if such unenforceable provision or provisions had never been contained herein.

**24.0  ENTIRE AGREEMENT.**

This Agreement supersedes all proposals, oral or written, and all negotiations, conversations or discussions between the parties relating to this Agreement.

**25.0  GENERAL CONDITIONS.**

25.1  Time is of the essence in this Agreement.

25.2  The validity and performance of this Agreement shall be governed by New York law.

25.3  This Agreement may be modified only by a writing signed by each party.

25.4  Headings included in this Agreement are for convenience only and are not to be used to interpret the agreement between the parties.

25.5  The contract relationship created hereby is between specific entities, and does not include corporate parents, subsidiaries or affiliates, and all rights hereunder are not assignable nor are the obligations imposed on the parties delegable without the written consent of the other party. Neither party will unreasonably withhold its consent if requested. Any proper assignment shall be binding on any successors or Assigns.

25.6  The failure of either party to enforce at any time any of the provisions hereof shall not be construed to be a waiver of the right of such party thereafter to enforce any such provisions.

25.7  No agency, partnership, joint venture or other joint relationship is created hereby. ArtSoft does not grant to PAT any authority of any kind to bind ArtSoft in and respect whatsoever. PAT does not grant to ArtSoft any authority of any kind to bind PAT in any respect whatsoever.

25.8  In any litigation or arbitration between the parties, the prevailing party shall be entitled to reasonable attorney fees and all costs of proceedings incurred in enforcing this Agreement.

25.9  There shall be no presumption against any party on the ground that such party was responsible for preparing this Agreement or any part of it.

25.10  In no case shall PAT's liability under this Agreement for any breach of warranty exceed the compensation paid by ArtSoft including monthly fees and percentage payments.

25.11   This  Agreement may be executed in two or more coun-
terparts, each of which shall be deemed an original  but  all  of
which together shall constitute one and the same instrument.

EXECUTED BY THE PARTIES AS PROVIDED BELOW:

PERFORMING ARTS TECHNOLOGY, INC.   ARTSOFT, INC.

By _Dil Eppes_____   By _____

Title: _V. PRES._____   Title: _President_____

Date: _8/2/88_____   Date: _8/2/88_____

2125 fourth Street         37 Soundview Road
Berkeley, California  92626   Guilford, Connecticut 06437

EXHIBIT A

Skeleton Outline for a Technical Addendum

1.0  Detailed Program specification developed based on the preliminary specifications.

SUMMARY AND OVERVIEW

a.  Program purpose

b.  Input information and layout

c.  Output information and layout

d.  Detailed internal processing description

e.  Local functions

f.  Special Processing

2.0  Detailed specification of the operating environment for the Program.

SUMMARY AND OVERVIEW

a.  Hardware requirements

b.  Operating system environment

c.  Development systems

d.  Other environmental requirements

3.0  Timetable for the development of the Program.

SUMMARY AND OVERVIEW

a.  Project starting date

b.  Project milestones and target dates with required points for review by ArtSoft

c.  Project completion date

d.  Start of Program acceptance testing

e.  Date for completion of testing

f.  Date for Beta testing

4.  Names, mailing addresses, and telephone numbers of the designated Technical Contact Persons who will be responsible for supervising the development of the Program for each company.

5.  Any agreed modifications to the fees to be paid  to  PAT for their work in developing the Program.

6.  The testing procedures to be  employed by ArtSoft in testing and evaluating  the  Program  together  with  a  detailed description of the data to be entered and the results expected to be achieved together with the support which PAT will  provide  to ArtSoft  testing efforts.  This information must be sufficient to allow a third party to objectively determine whether or  not  the Program  meets the requirements set forth in the Technical Adden- dum and should be accepted or rejected.

7.0  The place of delivery for the final version of the Pro- gram.

8.0  Any  post  delivery  assistance with customer installa- tions that PAT will be providing to ArtSoft.

9.0  Any other matters required to completely  describe  the Program development, testing and installation when this Technical Addendum is attached to the Custom Software Development Agreement between the parties.

Exhibit B
List of ArtSoft's Existing Software and documentation to be ported to the Micro-VAX


Major Software Packages

ArtSoft's Box Office System (includes among other components reserved seating and ticketing software)

ArtSoft's Fund Raising System

ArtSoft's Mailing List System


ArtSoft's SPEED I Utility Software

Btree Enhancements

D.A.T.A. 3500 WP Drivers for the Canon Laser and HP Laser Jet


Documentation

ArtSoft's Box Office System Manual
ArtSoft's Fund Raising System Manual
ArtSoft's Mailing List System Manual
ArtSoft's SPEED I Utilities – Btree Index
ArtSoft's D.A.T.A. 3500 WP Driver Notes

AP 1FJ.